**PUBLIC DOCUMENT**

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | |
|---|---|
| NLMK PENNSYLVANIA, LLC, | |
| Plaintiff, | Court No.  21-00507 |
| – against – | |
| UNITED STATES, | |
| Defendant. | |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION PURSUANT TO RULE 56.1 FOR JUDGMENT ON THE AGENCY RECORD**

Sanford Litvack
Andrew L. Poplinger
R. Matthew Burke
**CHAFFETZ LINDSEY LLP**
1700 Broadway, 33rd Floor
New York, NY 10019
Tel. (212) 257-6960
Fax. (212) 257-6950
s.litvack@chaffetzlindsey.com
a.poplinger@chaffetzlindsey.com
r.m.burke@chaffetzlindsey.com

*Counsel for Plaintiff NLMK Pennsylvania, LLC*

## Table of Contents

**Page**

I.    Preliminary Statement.................................................................................................. 1

II.   Rule 56.1 Statement .................................................................................................... 3

  A.   Question Presented for Review.............................................................................. 3

  B.   Administrative Determinations to Be Reviewed ................................................... 3

III.  Background ................................................................................................................. 5

  A.   The Parties ............................................................................................................ 5

  B.   Regulatory Framework ......................................................................................... 6

  C.   NLMK's Need for 250mm-Thick Slab................................................................. 9

IV.   Argument .................................................................................................................. 11

  A.   Applicable Legal Standards ............................................................................... 11

  B.   Commerce's Denials of NLMK's Exclusion Requests for 10-inch Slab
       Run Counter to the Evidence and Should Be Reversed ...................................... 13

       1.   The 2020 Requests .................................................................................... 14

       2.   The First 2021 Requests............................................................................ 27

       3.   The Second 2021 Requests ........................................................................ 31

       4.   The Third 2021 Requests .......................................................................... 34

  C.   Commerce's Unreasoned Denials of NLMK's Requests for 8-inch Slab
       were Arbitrary and Capricious............................................................................ 40

  D.   For all Requests, Commerce Failed to Provide Any Reasoned Explanation
       for Its Conclusions ............................................................................................. 44

  E.   Commerce Has Failed to Certify Complete Administrative Records............................ 45

V.    Conclusion ............................................................................................................... 46

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Broder v. Pfizer, Inc.*,
1972 WL 648 (S.D.N.Y. Nov. 28, 1972) ..............................................................47

*Butte Cnty. v. Hogan*,
613 F.3d 190 (D.C. Cir. 2010) ...................................................................23, 44

*Camp v. Pitts*,
411 U.S. 138 (1973)......................................................................................12

*City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*,
923 F.2d 188 (D.C. Cir. 1991) .......................................................................19

*Env't Def. Fund v. Env't Prot. Agency*,
922 F.3d 446 (D.C. Cir. 2019) .......................................................................26

*Former Emps. of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Lab.*,
814 F. Supp. 1111 (Ct. Int'l Trade 1993) ........................................................14

*Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.*,
865 F.3d 630 (D.C. Cir. 2017)........................................................................18

*Guertin v. U.S.*,
743 F.3d 382 (2d Cir. 2014)......................................................................13, 19

*Home Box Off., Inc. v. F.C.C.*,
567 F.2d 9 (D.C. Cir. 1977)...........................................................................12

*Huff v. Vilsack*,
195 F. Supp. 3d 343 (D.D.C. 2016) ................................................................13

*Invenergy Renewables LLC v. United States*,
476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) ...................................................45

*JSW Steel (USA) Inc. v. United States*,
466 F. Supp. 3d 1320 (Ct. Int'l Trade 2020) ........................................... *passim*

*Judulang v. Holder*,
565 U.S. 42 (2011)........................................................................................11

*Linyi Chengen Imp. & Exp. Co. v. United States*,
391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) ...................................................22

*United States v. Maverick Mktg., LLC*,
   322 F. Supp. 3d 1373 (Ct. Int'l Trade 2018) ...................................................45, 46

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983)..............................................................................12, 13, 20, 44

*N. Am. Interpipe, Inc. v. United States*,
   2021 WL 2106427 (Ct. Int'l Trade May 25, 2021) ............................................12

*Nucor Fastener Div. v. United States*,
   35 C.I.T. 1074 (2011) .......................................................................................38

*Policy & Research LLC v. United States Dep't of Health and Human Servs.*,
   313 F. Supp. 3d 62 (D.D.C. 2018) ..............................................................20, 29

*Robert Bosch, LLC v. Iancu*,
   778 F. App' x 871 (Fed. Cir. 2019). ...................................................................39

*In re Sang Su Lee*,
   277 F.3d 1338 (Fed. Cir. 2002)...................................................................12, 44

*Sierra Club v. EPA*,
   346 F.3d 955 (9th Cir. 2003) ...........................................................................13

*U.S. Steel Corp. v. United States*,
   578 F. Supp. 418 (Ct. Int'l Trade 1983) ..........................................................46

*United States v. UPS Customhouse Brokerage, Inc.*,
   575 F.3d 1376 (Fed. Cir. 2009).....................................................................20, 29

*In re Vivint, Inc.*,
   14 F.4th 1342 (Fed. Cir. 2021) ........................................................................33

*Water Quality Ins. Syndicate v. United States*,
   225 F. Supp. 3d 41 (D.D.C. 2016) ..............................................................23, 43

*Wisconsin Valley Improvement v. FERC*,
   236 F.3d 738 (D.C. Cir. 2001)..........................................................................33

*Yale Univ. v. U. S. Dep't of Commerce, Domestic & Int'l Bus. Admin., Office of
   Imp. Programs*,
   579 F.2d 626 (C.C.P.A. 1977) .........................................................................45

**Statutes**

5 U.S.C. § 706..............................................................................................3, 11, 13

19 U.S.C. § 1862............................................................................................................6

## Other Authorities

15 C.F.R. pt. 705, supp. 1 ................................................................................................ *passim*

*Adjusting Imports of Steel into the United States*, Pres. Proc. No. 9705, 83 Fed.
   Reg. 11,625 (Mar. 8, 2018) .........................................................................................6

*Adjusting Imports of Steel Into the United States*, Pres. Proc. No. 9777, 83 Fed.
   Reg. 45,025 (Aug. 29, 2018) .......................................................................................6

*Implementation of New Commerce Section 232 Exclusions Portal*, 84 Fed. Reg.
   26,751 (June 10, 2019) ................................................................................................7

*Procedures To Grant Relief From the Quantitative Limitation Applicable to
   Certain Steel Articles for Brazil for Parties With Preexisting Contracts That
   Meet Specified Criteria*, 85 Fed. Reg. 64,377 (Oct. 13, 2020) .................................7

*Section 232 Steel and Aluminum Tariff Exclusions Process*, 85 Fed. Reg. 81,060
   (Dec. 14, 2020) ..............................................................................................7, 34, 39, 41

*Submissions of Exclusion Requests and Objections to Submitted Requests for Steel
   and Aluminum*, 83 Fed. Reg. 46,026 (Sept. 11, 2018) .................................... *passim*

U.S. Dep't of Commerce, Office of Inspector General, *Decisions on Exclusions
   from Section 232 Tariffs Were Not Transparent and Based on Incomplete and
   Inaccurate Information*, Final Report No. OIG-21-020-A (Jan. 25, 2021),
   *available at* https://www.oig.doc.gov/OIGPublications/OIG-21-020-A.pdf ........................42

U.S. Gov't Accountability Office, *Steel and Aluminum Tariffs: Commerce Should
   Improve Its Exclusion Request Process and Economic Impact Reviews*, GAO-
   20-517 (2020) (emphasis added), *available at*
   https://www.gao.gov/assets/gao-20-517.pdf .........................................................42

U.S. Gov't Accountability Office, *Steel and Aluminum Tariffs: Commerce Should
   Commerce Should Update Public Guidance to Reflect Changes in the
   Exclusion Process* (2021), *available a*t https://www.gao.gov/assets/gao-22-
   104564.pdf ..................................................................................................................34

**PUBLIC DOCUMENT**

## I.        Preliminary Statement

This case is, as the Court knows, a continuation of NLMK Pennsylvania LLC's ("NLMK") ongoing effort to obtain exclusions from the Section 232 tariffs for the steel slab it needs to manufacture the coil and other products its customers demand, because that slab is not available from U.S. producers.  This story, and NLMK's efforts, began in April 2018 when, following repeated unsuccessful attempts to procure sufficient amounts of semi-finished steel slab from domestic suppliers, NLMK submitted to the Department of Commerce ("Commerce") 85 requests for exclusions from the Section 232 steel tariffs (the "2018 Requests").  The majority of those requests concerned 250mm-thick slabs (i.e., "10-inch slab"), which NLMK requires to manufacture the large hot-rolled coil needed to fill approximately 94% of its customers' orders.

Although they were unable to provide the 10-inch slab, three of NLMK's competitors— United States Steel Corporation ("USS"), AK Steel Corporation (now Cleveland Cliffs) ("AK" or "Cliffs") and Nucor Corporation ("Nucor") (collectively, "Objectors")—objected to every one of those requests.  They did so through formal objections, as well as a series of now well-documented *ex parte* communications.  Unfortunately, and despite the uncontroverted evidence that Objectors had neither the capability nor the capacity to supply the slab NLMK needed, Commerce yielded to the Objectors and issued boilerplate decisions devoid of any reasoning, denying every one of NLMK's requests.

As a result, NLMK was required to pay nearly $170 million in tariffs from which it should have been exempted.  NLMK therefore challenged Commerce's denials, *NLMK Indiana, LLC et al. v. United States*, Court No. 20-00050, and eventually reached a settlement with the

1

Government to refund a substantial portion (but not all) of the unlawfully imposed tariffs.[1]  But the saga has continued.

Since NLMK has no interest in paying unwarranted tariffs, following the denial of its 2018 Requests, NLMK tried again to purchase the slab it needed from Objectors.  As before, it was unable to do so.  Because it was crucial to have the slab in order to service its customers, NLMK filed new exclusion requests.  Specifically, between 2020 and 2021 NLMK filed 58 requests, but, like a bad remake of *Groundhog Day*, the Objectors asserted the same objections each time, and Commerce, ignoring the record evidence, rejected the requests, each time.

As in 2018, Commerce again failed to give any cogent, reasoned explanation for its denials.  It has not done so because no rational decision maker could conclude, based on the record evidence, that the slab NLMK needs is "produced in the United States in sufficient and reasonably available amount."  It is not.  However, as a result of Commerce's wrongful denials, NLMK has once again been forced to pay the tariffs and file an action, challenging the arbitrary and capricious decisions.

If anything is clear from this pattern over the last four years, it is that the Objectors are committed to making certain that NLMK cannot obtain the slab it needs without paying tariffs, even though they themselves cannot supply the slab.  Their motives, while obvious, are irrelevant because the sad truth is that so far they have effectively realized their goal.  They have succeeded because of Commerce's inexplicable, rote acceptance of the Objectors' unsupported assertions, in total disregard of the record evidence.  Without any articulation of its reasoning or citation of evidence supporting its denials, Commerce has consistently rejected every exclusion request made by NLMK.  It has done so, we submit, without adherence to the mandates of its

---

[1] The settlement contained the usual disclaimer that the parties agreed to settle "{w}ithout admitting liability or otherwise."  *See NLMK Indiana, LLC et al. v. United States,* Court No. 20-00050 (Dkt. # 63) ¶ 5.

own regulation, the Administrative Procedure Act, or basic notions of fair play. As a result, NLMK has been wrongly compelled to pay hundreds of millions of dollars in tariffs to secure the slab it needs to stay in business.

Given the history, and for the reasons set forth herein, the appropriate remedy here is not a remand, but an order setting aside Commerce's unreasoned and unsupportable denials of NLMK requests, and requiring the Government to refund the approximately $255 million in tariffs wrongfully collected from NLMK as a result of the arbitrary and capricious denials of the 2020 and 2021 Requests.

II.     **Rule 56.1 Statement**

    A.  **Question Presented for Review**

1. Whether Commerce's decisions denying NLMK's requests for exclusions from the Section 232 tariffs were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act (5 U.S.C. § 706(2)(A)) due to Commerce's failure to:  (i) consider and accept uncontroverted evidence in the record; (ii) adhere to its promulgated rule regarding the applicable procedures and standards to be followed in considering exclusion requests; (iii) articulate any reasoned judgment connecting its conclusions to the evidence in the record; and (iv) reach conclusions based on the evidence rather than the unsupported claims of self-interested objectors?

2. We respectfully submit that the answer is "yes."

    B.  **Administrative Determinations to Be Reviewed**

3. NLMK challenges Commerce's denials of the following 58 requests for exclusions from the Section 232 tariffs:

- Twenty-six requests filed July 15, 2020 for 250mm-thick semi-finished iron and non-alloy steel slab, within HTSUS codes 7207.12.0010, 7207.12.0050, 7207.20.0045, and 7207.20.0025 (the "2020 Requests").[2]

- Twenty-six requests filed between March 19 and 22, 2021 for 250mm-thick semi-finished iron and non-alloy steel slab, within HTSUS codes 7207.12.0010, 7207.12.0050, 7207.20.0045, and 7207.20.0025.[3]

- Two requests filed April 1, 2021 for 200mm-thick semi-finished iron and non-alloy steel slab, within HTSUS code 7207.12.0050 (together with the March 19 and 22, 2021 Requests above, the "First 2021 Requests").[4]

- Two requests filed September 14, 2021 for 250mm-thick semi-finished iron and non-alloy steel slab, within HTSUS codes 7207.20.0045 and 7207.20.0025 (the "Second 2021 Requests").[5]

- Two requests filed November 10, 2021 for 250mm-thick semi-finished iron and non-alloy steel slab, within HTSUS codes 7207.12.0010 and 7207.12.0050 (the "Third 2021 Requests").[6]

---

[2] Exclusion Request Nos. 111695 (Dkts. # 64-1, 70-1), 111697 (Dkts. # 64-2, 70-2), 111698 (Dkts. # 64-3, 70-3), 111701 (Dkts. # 64-4, 70-4), 111709 (Dkts. # 64-5, 70-5), 111713 (Dkt. # 64-6, 70-6), 111718 (Dkts. # 64-7, 70-7), 111725 (Dkts. # 64-8, 70-8), 111729 (Dkts. # 64-9, 70-9), 111731 (Dkts. # 64-10, 70-10), 111734 (Dkts. # 65-1, 71-1), 111740 (Dkts. # 65-2, 71-2), 111745 (Dkts. # 65-3, 71-3), 111748 (Dkts. # 65-4, 71-4), 111752 (Dkts. # 65-5, 71-5), 111758 (Dkts. # 65-6, 71-6), 111762 (Dkts. # 65-7, 71-7), 111767 (Dkts. # 65-8, 71-8), 111771 (Dkts. # 65-9, 71-9), 111773 (Dkt. # 60-3), 111775 (Dkts. # 66-1, 72-1), 111776 (Dkts. # 66-2, 72-2), 111779 (Dkts. # 66-3, 72-3), 111780 (Dkts. # 66-4, 72-4), 111781 (Dkts. # 66-5, 72-5), and 111782 (Dkts. # 66-6, 72-6).

[3] Exclusion Request Nos. 194445 (Dkts. # 66-7, 72-7), 194449 (Dkts. # 66-8, 72-8), 194452 (Dkts. # 66-9, 72-9), 194455 (Dkts. # 66-10, 72-10), 194458 (Dkts. # 67-1, 73-1), 194460 (Dkts. # 67-2, 73-2), 194463 (Dkts. # 67-3, 73-3), 194482 (Dkts. # 67-4, 73-4), 194511 (Dkts. # 67-5, 73-5), 194515 (Dkts. # 67-6, 73-6), 194516 (Dkts. # 67-7, 73-7), 194518 (Dkts. # 67-8, 73-8), 194521 (Dkts. # 67-9, 73-9), 194525 (Dkts. # 67-10, 73-10), 194529 (Dkts. # 68-1, 74-1), 194532 (Dkts. # 68-2, 74-2), 194535 (Dkts. # 68-3, 74-3), 194536 (Dkts. # 68-4, 74-4), 194547 (Dkts. # 68-5, 74-5), 194553 (Dkts. # 68-6, 74-6), 194560 (Dkts. # 68-7, 74-7), 194562 (Dkts. # 68-8, 74-8), 194566 (Dkts. # 68-9, 74-9), 194571 (Dkts. # 68-10, 74-10), 194573 (Dkts. # 69-1, 75-1), and 194883 (Dkts. # 69-2, 75-2).

[4] Exclusion Request Nos. 198055 (Dkts. # 69-3, 75-3) and 198056 (Dkts. # 69-4, 75-4).

[5] Exclusion Request Nos. 248733 (Dkts. # 69-5, 75-5) and 248740 (Dkts. # 69-6, 75-6).

III.    **Background**[7]

A.    **The Parties**

NLMK is a major domestic steel producer operating a mill in Farrell, Pennsylvania.[8]

NLMK is a "slab-converter,"[9] which means that it processes semi-finished steel slab into

finished steel products, including hot-rolled coil, which it, in turn, sells to industrial customers.[10]

In order to manufacture those finished products, NLMK must have a reliable supply of iron and

non-alloy semi-finished steel slab, which it does not itself manufacture and therefore must

acquire elsewhere.[11]

NLMK requires 250mm-thick slab (nominally "10-inch") to fill approximately 94% of it

customer's orders.[12]  NLMK can and does use thinner slab—namely, 200mm-thick slabs

(nominally "8 inch")—to produce the products needed to fill the remaining 6% of its orders.[13]

NLMK must import all the 10-inch slab and a majority of the 8-inch slab, because it cannot

source these slabs from U.S. producers.[14]

Defendant is the United States of America, acting by and through Commerce.

---

[6] Exclusion Request Nos. 260912 (Dkts. # 69-7, 75-7) and 260914 (Dkts. # 69-8, 75-8).

[7] These facts are taken from the administrative records (Dkts. # 64-75).  Citations to the administrative record are formatted NLMK-XXXXXX-XXX.  The administrative records for each group of requests are materially the same unless otherwise noted.  NLMK cites to the records of the following requests as exemplars: (i) Request No. 111695 (Dkts. # 64-1, 70-1) for the 2020 Requests; (ii) Request No. 194445 (Dkts. # 66-7, 72-7) for the First 2021 Requests for 10-inch (Nos. 194445-194883); (iii) Request No. 198055 (Dkts. # 69-3, 75-3) for the First 2021 Requests for 8-inch (Nos. 198055 & 198056); (iv) Request No. 248733 (Dkts. # 69-5, 75-5) for the Second 2021 Requests (No. 248733 & 248740); and (v) Request No. 260912 (Dkts. # 69-7, 75-7) for the Third 2021 Requests (Nos. 260912 & 260914).  Where multiple records contain materially the same information, NLMK cites to the record of the lowest numbered request unless context requires otherwise; accordingly, where all records contain materially the same information, NLMK cites only to the record of Request No. 111695.

[8] NLMK-111695-017, 097.

[9] NLMK-111695-017.

[10] NLMK-111695-012, 017.

[11] NLMK-111695-017-018, 020-21.

[12] NLMK-111695-017.

[13] NLMK-111695-017, 082.

[14] NLMK-111695-017, 020-21, 082-083; NLMK-198055-060.

## B.     Regulatory Framework

Section 232 of the Trade Expansion Act of 1962 authorizes the President, upon a finding

by the Secretary of Commerce that the importation of certain articles poses a national security

threat, to "determine the nature and duration of the action that . . . must be taken to adjust the

imports of the article and its derivatives so that such imports will not threaten to impair the

national security."  19 U.S.C. § 1862(c)(1)(A)(ii).

Pursuant to Section 232, on March 8, 2018, former-President Trump issued Proclamation

9705, imposing duties on steel imports.  The Proclamation directs Commerce to grant exclusions

from the duties if it determines that any steel product for which an exclusion is requested is not

"produced in the United States in a sufficient and reasonably available amount or of a

satisfactory quality."  *Adjusting Imports of Steel into the United States*, Pres. Proc. No. 9705, 83

Fed. Reg. 11,625, 11,627 (Mar. 8, 2018).  The Proclamation states,

> If the Secretary determines that a particular steel article should be excluded,
> the Secretary shall . . . notify U.S. Customs and Border Protection (CBP) . . .
> concerning such article *so that it **will be** excluded from the duties*{.}

*Adjusting Imports of Steel Into the United States*, Pres. Proc. No. 9777, 83 Fed. Reg. 45,025,

45,028 (Aug. 29, 2018) (emphasis added).

On March 19, 2018, Commerce, through its Bureau of Industry and Security ("BIS"),

issued an interim final rule (codified at 15 C.F.R. pt. 705, supp. 1) setting forth the circumstances

in which Commerce would grant a tariff exclusion to directly affected U.S. businesses.

Following a notice-and-comment period, on September 11, 2018 Commerce supplemented the

rule.  *See Submissions of Exclusion Requests and Objections to Submitted Requests for Steel and

Aluminum*, 83 Fed. Reg. 46,026 (Sept. 11, 2018).  Commerce has subsequently amended the rule

three times: in June 2019, October 2020, and December 2020.  *Implementation of New

Commerce Section 232 Exclusions Portal*, 84 Fed. Reg. 26,751 (June 10, 2019); *Procedures To*

6

*Grant Relief From the Quantitative Limitation Applicable to Certain Steel Articles for Brazil for Parties With Preexisting Contracts That Meet Specified Criteria*, 85 Fed. Reg. 64,377 (Oct. 13, 2020); *Section 232 Steel and Aluminum Tariff Exclusions Process*, 85 Fed. Reg. 81,060 (Dec. 14, 2020).

The rule is intended to "fulfill the Presidential directives . . . to create an exclusion process to ensure users of steel . . . in the United States would continue to have access to steel … that they may need."  83 Fed. Reg. at 46,026.  If Commerce grants an exclusion, "{o}ther agencies of the U.S. Government, such as CBP, ***will** take any additional steps needed* to implement {the exclusion}."  15 C.F.R. pt. 705, supp. 1(h)(3)(ii) (emphasis added).

The rule provides that an exclusion will be granted if "any of the following three criteria" are met: (1) "the article is not produced in the United States in a sufficient and reasonably available amount," (2) "is not produced in the United States in a satisfactory quality," or (3) "for specific national security considerations."  *Id*. pt. 705, supp. 1(c)(6).

Commerce's rule sets forth the procedures for affected parties to request exclusions, and provides that a domestic producer may object to any such request ***if*** that producer can and will "immediately" supply the product to the requester in a reasonably available and sufficient amount and satisfactory quality.  "Immediately" means "that a product (whether it is currently being produced in the United States, or could be produced in the United States) can be delivered by a U.S. producer 'within eight weeks', or, if that is not possible, by a date earlier than the time required for the requester to obtain the entire quantity of the product from the requester's foreign supplier."  *Id.* pt. 705, sup. 1(c)(6)(i).

A product is "not produced in the United States in a sufficient and reasonably available amount" if:

> {T}he amount that is *needed by the end user requesting the exclusion* is not available immediately in the United States to meet *its specified business activities*.

*Id.* (emphasis added).

If the objector cannot provide an identical product, the request must be granted, unless the objector can and will provide a sufficient and reasonable amount of a "substitute product":

> "Substitute product" for purposes of this review criterion means that the steel . . . being produced by an objector can meet "immediately" . . . the quality (e.g., industry specs or internal company quality controls or standards), regulatory, or testing standards, in order for the U.S.-produced steel *to be used in that business activity in the United States by that end user*.

*Id.* pt. 705, supp. 1(c)(6)(ii) (emphasis added). Because the *requestor's specific needs* determine whether the product or a suitable "substitute product" is "reasonably available" from an objector, a putative substitute product must meet the *requestor's requirements* in terms of "form, fit, function, and performance." 83 Fed. Reg. at 46,036 (BIS response to Comment (f)(5)(iv)); *see also* Objection Form[15] (requiring an objector who "does not currently manufacture the identified product" to explain whether it "can make a substitute produce that has similar form, fit, function, and performance").

The rule plainly and sensibly places the burden on an objector to demonstrate that it can produce the product or a suitable "substitute product" within the requisite timeframe. "A credible objection must state that the objector can produce the product being sought." 83 Fed. Reg. at 46,035 (BIS Response to Comment (f)(4)(i)). Moreover:

> The objection should clearly identify, and provide support for, its opposition to the proposed exclusion, with reference to the specific basis identified in, and the support provided for, the submitted exclusion request.

15 C.F.R. pt. 705, supp. 1(d)(4).

---

[15] *E.g.*, NLMK-111695-033.

### C.      NLMK's Need for 250mm-Thick Slab

The records before Commerce with respect to the 2020 and 2021 Requests were largely
identical to each other.  All but two of these 58 requests concern slab with a thickness of 250mm
(nominally, "10-inch"), which NLMK must have to fill the vast bulk of its customers' orders.[16]
NLMK's customers require a specific coil weight, measured in pounds-per-inch-of-width
(PIW),[17] which, due to the length of its reheat furnace, NLMK can satisfy only if it starts the
manufacturing process with slab that is 250mm thick[18] and no longer than 356 inches
(9044mm).[19]  Thus, longer, thinner slab, which might meet the requisite PIW, are simply not
useable by NLMK.



As it explicitly explained to Commerce, the thinner, longer slab does not work because:

> While longer slabs may weigh the same as the slabs we seek <u>longer slabs do
> not fit in our machines and therefore are not a substitute for the 250 mm slabs
> we need.</u>  Unlike mini-mills which cast directly into their finishing mill, we
> do not have the ability to alter coil size in the hot rolling process.  We are
> limited to the coil size that results from the slab dimensions at the beginning
> of the process.[20]

---

[16] NLMK-111695-017.

[17] NLMK-111695-017-18, 074, 081-82.  PIW is a regular and critical unit of measure for coil.

[18] NLMK-111695-018, 074, 081-82.

[19] NLMK-111695-023, 074-75, 082, 085.

[20] NLMK-111695-018 (emphasis in original).

The following photograph makes the point, juxtaposing the coils NLMK's customers order (left) and those produced from the thinner slab potentially available from Objectors (right).[21]



**Exhibit A: Slab Comparison**

As NLMK further advised Commerce:

> The difference in thickness of the slab produces the difference in coil size after the rolling process.  There is less steel in the coil on the right.  The smaller coil limits storage efficiency, increases freight costs, and creates additional processing costs for our customers.  It negatively impacts their productivity and results in yield loss…. {NLMK's} customers generally will not buy smaller coils, because coil weights are critical for their operations.[22]

In short, NLMK bluntly and explicitly informed Commerce:  "we need slabs in the particular size of these exclusion requests—250 mm thick—to meet our customers' orders; if we cannot meet their specifications, we will lose the orders and go out of business."[23]  There is absolutely no evidence in the record to rebut or refute these facts.

As explained in further detail below, the record was clear that, at the time of the 2020 Requests, none of the three Objectors could produce 10-inch slab.[24]  *A fortiori*, they could not

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] NLMK-111695-025, 033, 056,

provide sufficient amounts of 10-inch slab to NLMK.  Following denial of the 2020 Requests,

Cliffs (formerly AK) acquired two plants that were capable of making 10-inch slab.[25]  However,

as explained and documented below, Cliffs was unable to supply 10-inch slab to NLMK due,

among other things, to its other commitments.[26]  The remaining Objectors, Nucor and USS,

continued to be unable to produce any 10-inch slab.[27]  Accordingly, the records were clear that

no Objector was capable or willing to provide NLMK with the 10-inch slab it needed.

## IV.    Argument

### A.    Applicable Legal Standards

The standard for reviewing agency action under the APA is well-known to this Court.

The Court will set aside challenged agency action that is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  While "a court is

not to substitute its judgment for that of the agency" when conducting such a review, "courts

retain a role, and an important one, in ensuring that agencies have engaged in reasoned

decisionmaking."  *Judulang v. Holder*, 565 U.S. 42, 53 (2011).  The Court "must assess . . .

whether the decision was based on a consideration of the relevant factors and whether there has

been a clear error of judgment."  *Id.* (quotations and citations omitted).  "That task involves

examining the reasons for the agency decisions—or, as the case may be, the absence of such

reasons."  *Id.*

Agency action is arbitrary and capricious if:

the agency has relied on factors which Congress has not intended it to
consider, entirely failed to consider an important aspect of the problem,
offered an explanation for its decision that runs counter to the evidence before
the agency, or is so implausible that it could not be ascribed to a difference in

---

[25] NLMK-194445-059.

[26] *Id.*

[27] NLMK-194445-026; NLMK-248733-040.

view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43

(1983).

To permit meaningful judicial review, the agency must "not only have reached a sound

decision, but have articulated the reasons for that decision." *In re Sang Su Lee*, 277 F.3d 1338,

1342 (Fed. Cir. 2002). The agency therefore "must examine the relevant data and articulate a

satisfactory explanation for its action including a 'rational connection between the facts found

and the choice made.'" *Motor Vehicle Mfrs.*, 463 U.S. at 43 (citation omitted). In the Section

232 context, this requires the agency to "explain what information {it} considered, how it was

weighed, {and} why the evidence compelled denial." *JSW Steel (USA) Inc. v. United States*, 466

F. Supp. 3d 1320, 1330 (Ct. Int'l Trade 2020) (Kelly, J.).

Finally, because "judicial review is confined to the existing administrative records," *N.*

*Am. Interpipe, Inc. v. United States*, 2021 WL 2106427, at *9 (Ct. Int'l Trade May 25, 2021), an

incomplete record "frustrate{s} effective judicial review," *Camp v. Pitts*, 411 U.S. 138, 142–43

(1973). Consequently, if an agency "fail{s} to disclose . . . relevant information that has been

presented to it, a reviewing court cannot presume that the agency has acted properly, but must

treat the agency's justifications as a fictional account of the actual decision making process and

must perforce find its actions arbitrary." *Home Box Off., Inc. v. F.C.C.*, 567 F.2d 9, 54–55 (D.C.

Cir. 1977) (citations omitted).

As explained below, Commerce's denials of NLMK's 2020 and 2021 Requests ran afoul

of all these well-established principles.

12

**B.      Commerce's Denials of NLMK's Exclusion Requests for 10-inch Slab Run
Counter to the Evidence and Should Be Reversed**

Commerce's denials of NLMK's 2020 and 2021 Requests concerning 10-inch slab based

on its finding that these slabs were available in "sufficient and reasonably available amount"

from Objectors "run{} counter to the evidence before the agency." *Motor Vehicle Mfrs.*, 463

U.S. at 43.  A review of the respective records and Commerce's unsupported denials, as set forth

below, demonstrates that the only rational, non-arbitrary decisions Commerce could have

reached under the APA and the standards established in its regulation was that the 10-inch slab

NLMK required was *not* reasonably available from Objectors.  Since Commerce arbitrarily ruled

otherwise and denied the requested exclusions, those decisions must be reversed.

While mindful of the fact that the remedy for arbitrary and capricious agency action is

often in the first instance a remand, the APA specifically authorizes the courts in a case such as

this to "compel agency action unlawfully withheld or unreasonably delayed."  5. U.S.C. §

706(1).  Thus, where "the conclusions that must follow from {the record} are clear," remand is

unnecessary and inappropriate because it fails to "serve a useful purpose," *Sierra Club v. EPA*,

346 F.3d 955, 963 (9th Cir. 2003), since "there is only one rational course for the Agency to

follow upon remand."  *Huff v. Vilsack*, 195 F. Supp. 3d 343, 362 (D.D.C. 2016).  In such

circumstances, the court should direct the agency to take the required action without remand for

further consideration.  *See Guertin v. U.S.*, 743 F.3d 382, 388 (2d Cir. 2014) (holding remand

was unnecessary when the agency's conclusion "is unsupported by the relevant facts," and "there

is compelling evidence in the record … that would not change if remanded to the agency.").

In light of the record and history regarding NLMK's requests for exclusions, this is a case

where remand would serve no useful purpose, and the Court should therefore order the agency to

grant the exclusions sought.  Indeed, as the Court will recall, several requests at issue here have

13

already been voluntarily remanded, but, as discussed below, Commerce's decisions on remand are still not supported by the record or sound decision making.  Further remand would be futile because Commerce simply cannot reach rational, non-arbitrary decisions based on the record evidence to deny the 2020 and 2021 Requests.  *Former Emps. of Hawkins Oil & Gas, Inc. v. U.S. Sec'y of Lab.*, 814 F. Supp. 1111, 1115 (Ct. Int'l Trade 1993) (concluding that, after multiple remands, "the record continues to be scant" and therefore "another remand in this case would be futile").

   1. <u>The 2020 Requests</u>

  In July 2020, NLMK submitted 26 requests for various types of iron and non-alloy 10-inch slab (the "2020 Requests").[28]  NLMK demonstrated that since 2018, when Commerce denied its initial Requests, it had been unable to procure the slabs it required from Objectors, who simply lacked the ability to produce 10-inch slab.[29]

  At the time of NLMK's 2020 Requests, ArcelorMittal was the only domestic producer capable of making 10-inch slab.[30]  But ArcelorMittal used all its 10-inch slab for its own finished products, and did not object to NLMK's requests.  In fact, it also filed exclusion requests for 10-inch slabs because it could not produce enough to meet its own requirements, and the slabs were otherwise not available in the U.S.[31]

  Objectors, as in 2018, opposed every one of NLMK's requests.  The records relating to all 26 requests are largely identical, including the contents of the requests, objections, rebuttals,

---

[28] Request Nos. 111695, 111697, 111698, 111701, 111709, 111713, 111718, 111725, 111729, 111731, 111734, 111740, 111745, 111748, 111752, 111758, 111762, 111767, 111771, 111773, 111775, 111776, 111779, 111780, 111781, and 111782.

[29] NLMK-111695-019-20.

[30] NLMK-111695-013.

[31] *Id.*

and surrebuttals.  Each of the records shows, without contradiction, that none of the Objectors could supply NLMK with any 10-inch slab.

**Nucor**.  Nucor admitted it did not produce any slab, and its objections were therefore entirely irrelevant.[32]

**USS**.  USS did not (and does not) operate any caster capable of making 10-inch slab (250mm).[33]  The thickest slab USS could produce at any relevant time was [███████].[34]

**AK/Cliffs.**  At the time of NLMK's 2020 Requests, AK/Cliffs did not operate a caster that could make 10-inch slab.  The thickest slab it could manufacture was 229mm.[35]

Nevertheless, AK and USS unabashedly argued, without evidence, that its competitor, NLMK could and therefore should simply use thinner slab.[36]  They supplied no evidence to support the claim, and in response, NLMK confirmed that using thinner slab was not an option, for the reasons it had specifically set forth.  NLMK also pointed out the utter lack of merit to the Objectors' argument:

> U.S. Steel fully understands the limits on our reheat furnaces.  The company also knows that for maximum efficiency and coil size, we need to have full hearth coverage.  But it maintains its objections to our requests for exclusions not because of any good faith intent to supply us with slab, but as part of a calculated effort to choke off our access to critical feedstock and push us out of the market.[37]

---

[32] NLMK-111695-004, 119.

[33] NLMK-111695-097.

[34] NLMK-111695-109.  U.S. Steel misleadingly claimed in their surrebuttal that they could produce 9.6 inch or 243mm thick slab.  NLMK-111695-097.  But U.S. Steel's confidential attachment to its surrebuttal makes clear that that production capability was at its [██████████████████].  NLMK-111695-099, 109.

[35] NLMK-111695-029, 075.

[36] NLMK-111695-025, 033, 042-43, 092, 097-98.

[37] NLMK-111695-082.

To emphasize the point and put the lie to its competitor's argument, NLMK offered to host Department officials at its facility to confirm that thinner slabs were not a substitute.[38]

Despite the uncontroverted fact that no Objector either claimed it could produce the 10-inch slab NLMK required or offered evidence rebutting the fact that the thinner slab was not useable by NLMK, and without even responding to NLMK's invitation, on October 24 and November 25, 2020, Commerce denied all of NLMK's 2020 Requests.  It did so in BIS decision memoranda containing the familiar boilerplate it has used since 2018 in denying every one of NLMK's requests.[39]  Specifically, BIS repeated the now-familiar chant "ITA . . . recommends denying" NLMK's request and BIS "accepts ITA's recommended findings."[40]  But ITA's findings, and therefore Commerce's decisions, were arbitrary and capricious.

The record before Commerce with respect to each of the 2020 Requests establishes two dispositive facts:  (1) NLMK required 10-inch slab;[41] and (2) none of the three Objectors was capable of producing any 10-inch slab.[42]  There is not and cannot be any dispute as to these facts.

Interestingly, even though the records for the 2020 Requests are all substantially identical, Commerce was so hard pressed to somehow justify this round of denials that it ultimately produced three different versions of ITA Recommendations.[43]  (Commerce prepared the third version in 2022 for the 15 requests that were voluntarily remanded.[44])  The three ITA recommendations all had one thing in common—they set forth the denials in conclusory terms

---

[38] NLMK-111695-080.

[39] NLMK-111695-001-02.

[40] NLMK-111695-001.

[41] NLMK-111695-017-018, 071, 074, 078, 080-82.

[42] NLMK-111695-025, 033, 056.

[43] Exemplars cited here are Exclusion Request No. 111695 (Dkts. # 64-1, 70-1), 111697 (Dkts. # 64-2, 70-2), 111734 (Dkts. # 65-2, 71-2).

[44] *E.g.*, NLMK-111695.

and they each relied on an unidentified Subject Matter Expert's ("SME") purported finding that Objectors supposedly could produce a "substitute product" for 10-inch slab.[45]  ITA did not provide (and it still has not provided) the SME's purported analysis.  In fact, the administrative records Commerce certified do not include any reports from the unidentified SME.  As a result, NLMK has no idea who the SME is, how they purported to arrive at their conclusions, or whether Commerce is citing the purported findings of the same or different SMEs in each of its recommendations.  Regardless, the record evidence simply cannot support these conclusions.

Since none of the Objectors could produce the 10-inch slab NLMK required, as ITA recognized, the slab was obviously not "reasonably available."  As a result, the Objectors had to show that they could produce a suitable "substitute product," which they could and would provide "immediately" to NLMK in sufficient amounts to meet its needs.

Under its regulation, in assessing whether an objector's product was a suitable, realistic substitute, Commerce was required to consider NLMK's specific requirements.  In other words, Commerce had to consider whether the putative substitute product will "meet its {i.e., NLMK's} specified business activities."  15 C.F.R. pt. 705, supp. 1(c)(6)(i).  While an objector's offering need not "be identical … it does need to be equivalent … in order for the U.S.-produced steel ***to be used in that business activity in the United States by {NLMK}.*** " *Id*. pt. 705, supp. 1(c)(6)(ii) (emphasis added).  The question for the agency, therefore, was whether Objectors' putative substitutes met NLMK's requirements in terms of "form, fit, function and performance." 83 Fed. Reg. at 46,036 (BIS response to Comment (f)(5)(iv)).

Applying that test, the record is crystal clear that these so-called substitutes—longer, thinner slabs—were not substitutes at all.  The record established that shorter, thinner slab would

---

[45] NLMK-111695-119; NLMK-111697-004; NLMK-111734-004.

not yield the requisite PIW and longer, thinner slab would not fit in NLMK's furnace.[46]  In short, a 10-inch thick slab was the only product that could be used for NLMK's "specified business activities," namely the manufacture of large coil.[47]  Yet, none of ITA's trilogy of recommendations even purports to grapple with this dispositive fact.  *Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.*, 865 F.3d 630, 638 (D.C. Cir. 2017) (agency must "reasonably reflect upon the information contained in the record and grapple with contrary evidence").

ITA's failure to address the critical issue is both shocking and disappointing given the amount of evidence in the record on just this point.  NLMK went to great lengths to explain that USS's suggestion that it could make up for the deficiency in the weight of its slab by supplying a longer slab would not work because that slab would be too long to fit in NLMK's reheat furnace, as shown in the following demonstrative.[48]



---

[46] NLMK-111695-017-018, 023, 074-75, 078, 080-82, 84.

[47] NLMK-111695-017-018.

[48] NLMK-111695-084.  This included U.S. Steel's capability at its idled Great Lakes mill, which has been out of commission for over three years now.  *E.g.*, NLMK-260912-048.

PUBLIC DOCUMENT

Likewise, the record was clear that any thinner slab AK (now Cliffs) could provide at the required weight was also too long for NLMK to use to produce coil with the requisite PIW:[49]



With that evidence, which was uncontroverted, a reasonable decision maker could only reach one conclusion under the standards established in the regulation—Objectors' products were not suitable substitutes and the exclusion should have been granted.  Nevertheless, each of the three versions of the ITA recommendations ignored these uncontroverted facts and concluded that Objectors could produce a suitable "substitute product."[50]  Since, Commerce relied exclusively on these recommendations, which were "based on a factual premise that is flatly contradicted by the agency's own record," the denials cannot stand.  *City of Kansas City, Mo. v. Dep't of Hous. & Urban Dev.*, 923 F.2d 188, 194 (D.C. Cir. 1991); *see Guertin*, 743 F.3d at 388 (agency acted arbitrarily and capriciously "{b}y articulating an explanation unsupported by the

---

[49] NLMK-111695-075.

[50] NLMK-111695-119; NLMK-111697-004; NLMK-111734-004.

relevant facts").  A brief recap of the ITA's three recommendations illustrates the flailing nature

of Commerce's effort to deny the requests, despite the record evidence.

**The first ITA recommendation.**  This recommendation, which denied 10 of the

Requests, merely states, "The SME concluded the AK Steel and U.S. Steel objection offerings

are suitable substitutes."  The recommendation does not identify the SME or provide an

explanation as to how the unidentified SME reached this conclusion.[51]  Nor does it even purport

to deal with the evidence regarding the specific reasons Objectors' argument failed.[52]  It is

therefore impossible to understand (and there is no explanation) how the SME or ITA could

reach such a conclusion in the face of the uncontroverted evidence that any slab USS and AK

could produce was too thin *to meet NLMK's requirements*,[53] and therefore did not meet the

regulation's definition of a "substitute product."  15 C.F.R. pt. 705, supp. 1(c)(6)(ii).[54]

Thus, Commerce's denials of Request Nos. 111697, 111698, 111731, 111758, 111767,

111771, 111775, 111776, 111779, and 111780 predicated exclusively on ITA's unsupportable

recommendation were arbitrary and capricious and must be set aside.  *See United States v. UPS*

*Customhouse Brokerage, Inc.*, 575 F.3d 1376, 1383 (Fed. Cir. 2009) ("An agency must follow its

own regulations."); *Policy & Research LLC v. United States Dep't of Health and Human Servs.*,

313 F. Supp. 3d 62, 83 (D.D.C. 2018) ("Under the most elementary precepts of administrative

law, an agency … cannot undertake to act in a manner that is contrary to its own regulations.").

---

[51] NLMK-111697-004.

[52] *Id.*

[53] NLMK-111697-019-020, 073, 076-77, 079, 082-84, 086.

[54] Of course, if the record could actually support a finding that AK and USS produced "substitute products," Commerce would still need to explain why those putative substitutes were reasonably available to NLMK in sufficient quantity.  But nothing in the BIS or ITA decisions addresses this issue at all.  *Motor Vehicle Mfrs.*, 463 U.S. at 43  (agency must "consider important aspects of the problem" and "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" (citation omitted)).

**The second ITA recommendation**.  In its second recommendation, which denied one request,[55] ITA recognized that AK and USS only produced slab thinner than 10-inches, and it acknowledged that "{g}iven the reported constraints of the furnace and other facilities at the requestor's manufacturing site, the slabs from these objectors would produce smaller coils than the requestor states their customers 'generally' want."[56]  But, undaunted, ITA went on to recommend denying the request, stating that "the SME found that parts made from sheet coil utilize a portion of the coil for each part, so the result of a small coil is that the end-user {referring to NLMK's customers} would need to swap out the coils more frequently and it could result in more by-cuts and scrap."[57]

That, of course, is exactly the reason why NLMK's customers would not accept the smaller coils and why AK's and USS's slabs were not a suitable substitute.  As NLMK explained to Commerce, "coil weights are critical for {its customers'} operations," and they will not buy smaller coil because it "limits storage efficiency, increases freight costs, and creates additional processing costs {which} negatively impacts their productivity and results in yield loss."[58]  In other words, NLMK's customers will not buy smaller coil precisely because of the types of inefficiencies ITA recognized (based on the SME's supposed "finding").  Nevertheless, ITA brushed that aside and determined that the fact that NLMK's customers would not accept smaller coils concerned "efficiency and economic factors," which "are outside of ITA's analysis."[59]

While real-world suitability of the product may or may not have been outside the scope of ITA's analysis, those factors are matters which Commerce, whether through ITA or some

---

[55] Exclusion Request No. 111734.

[56] NLMK-111734-004.

[57] NLMK-111734-004.

[58] *E.g.*, NLMK-111734-020.

[59] NLMK-111734-004.

other division, was mandated to consider by its own regulation.  *See* 15 C.F.R. pt. 705,

supp.1(c)(6)(ii); 83 Fed. Reg. at 46,036 (BIS response to Comment (f)(5)(iv)).  The decision

simply to disregard these critical data and change the rules in the middle of the game is neither

permissible nor reasoned decision making.  The only rational decision Commerce could have

reached upon considering these factors was that AK and USS could not produce a substitute

product, and therefore NLMK was entitled to the requested exclusions.

Commerce's denial of Request No. 111734, based exclusively on this ITA

recommendation, was therefore arbitrary and capricious and should be set aside.  *Linyi Chengen*

*Imp. & Exp. Co. v. United States*, 391 F. Supp. 3d 1283, 1294 (Ct. Int'l Trade 2019) (holding a

decision of Commerce was "arbitrary and capricious" where the record evidence did not support

Commerce's conclusion).

**The third ITA recommendation**.  Finally, on May 17, 2022, following the voluntary

remand of 15 of the 2020 Requests, ITA issued a third version of its recommendations.[60]  In this

one, ITA once again recognized that USS and AK could not produce 10-inch slab,[61] but it came

up with new grounds to deny the requests, relying once more on the undisclosed analysis of an

unidentified SME.[62]

In this latest version of its recommendation, ITA states that the SME concluded that

"thinner slabs offered by AK Steel and U.S. Steel would produce a slightly smaller coil but that

coil can be used to produce the same end products as a large coil."[63]  However, under the

regulation, the relevant "end product" was the large coil NLMK produced using the slab, not the

---

[60] Request No. 111695, 111701, 111709, 111713, 111718, 111725, 111729, 111740, 111745, 111748, 111752, 111762, 111773, 111781, and 111782.

[61] NLMK-111695-119.

[62] *Id.*

[63] *Id*.

products NLMK's customers made from that coil.  15 C.F.R. pt. 705, supp. 1(c)(6)(ii).

Moreover, the ITA apparently ignored the evidence that NLMK's customers *would not purchase*

smaller coil, which precludes a finding that the Objectors' thinner slabs were a suitable

substitute.[64]  *See Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 69 (D.D.C.

2016) (finding agency decision arbitrary and capricious where "{t}he decision … ignores critical

context provided in the … record and amounts to cherry-picking of evidence that, when

considered as a whole, raises significant doubt about the ultimately conclusion reached"); *Butte*

*Cnty. v. Hogan*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("{A}n agency's refusal to consider

evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of

§ 706.").

Further, the ITA recommendation states, "the SME determined that it is technologically

impossible to mass produce semi-finished slab with a thickness tolerance of less than one

millimeter," and thus, "ITA does not hold the objectors accountable for matching the 250 mm

thickness specified by NLMK."[65]  But if ITA was not going to hold the Objectors accountable

for meeting precisely 250mm in thickness, as it states, what thickness was it holding the

Objectors accountable to meet?  ITA never says.  Nor does it reveal what an acceptable thickness

tolerance was, or whether USS or AK were able to provide slab within such tolerance.  These are

fatal defects in the ITA's recommendation.

The ITA recommendation also discusses the various thicknesses Objectors allegedly

could make, again without stating the relevance, since none of them made anything close to

250mm-thick slab.  ITA's summary of Objectors' capabilities was, in any event, contradicted by

the record.  ITA incorrectly states, "U.S. Steel claims to manufacture a substitute project with

---

[64] NLMK-111695-119.  For NLMK's contrary evidence, see, e.g., NLMK-111695-018.

[65] NLMK-111695-119.

thicknesses of 202.2, 222.25, 231.84, 243.84 and 304.8 mm."[66]  That is not what the record

evidence shows, and in fact, it is not what USS claimed.  USS's submissions were clear that the

thickest slab it produces is [          ].[67]  USS's confidential submission claimed the ability to

produce [          ]-thick slab at its Ecorse, MI (Great Lakes) facility, but acknowledged that

the plant had been idle since no later than April 2020—several months before NLMK filed its

requests.[68]  Accordingly, even if this thinner slab were relevant to NLMK's requests (it was not),

it could not have been considered "reasonably available."

　　　USS also did not claim that it can produce 304.8mm-thick slab.  Rather, it claimed it

could [          ] to make such slab.[69]  Setting aside that

NLMK does not use and did not request an exclusion for 304.8mm-thick slab (nominally 12-

inch), USS admitted that it would take nearly [          

          ].[70]  Accordingly, even if the

potential to produce this slab were relevant to NLMK's requests (it was not), USS could not

produce and deliver this slab "immediately."  *Id*. pt. 705, supp. 1(c)(6)(i) ("Available

'immediately' means that a product (whether it is currently being produced in the United States,

or could be produced in the United States) can be delivered by a U.S. producer 'within eight

weeks', or, if that is not possible, by a date earlier than the time required for the requester to

obtain the entire quantity of the product from the requester's foreign supplier.").

---

[66] NLMK-111695-119.

[67] NLMK-111695-033 (stating that U.S. Steel "currently manufacture{s} . . . a substitute product" at Gary, Indiana, Granite City, Illinois, and Braddock, Pennsylvania); NLMK-111695-109 (CBI submission indicating that the thickest slab available at Gary, Granite City, or Braddock, was [          ]).

[68] NLMK-111695-040, 043, 080, 099.  U.S. Steel provided no timeline for restarting that plant, as the regulation required before this idle capacity could be considered.  15 C.F.R. pt. 705, supp. 1(d)(4).

[69] NLMK-111695-109.

[70] *Id.*  U.S. Steel indicated no plans to undertake this recommissioning or provide any timeline for doing so, as the regulation requires.  15 C.F.R. pt. 705, supp. 1(d)(4).  It still has not recommissioned the [          ].

In short, the record was clear that the thickest slab any Objector could actually produce at the time of these requests was [████].[71]  USS's own submission acknowledges, as it must, that the slab it could produce "is approximately 17 millimeters thinner than the requested slab."[72] There was and remains no evidence and no reason for Commerce to conclude that 17mm (actually closer to 18mm) was within any standard or acceptable tolerance, and ITA offered none.[73]  (NLMK submitted its commercial specs with the 2021 Requests—prior to these 2022 remand determinations—showing an acceptable tolerance of only 5mm.[74])

ITA also went on in the recommendation to conclude that Objectors could provide a substitute product because they could produce shorter slab that was thinner than 250mm.[75]  That is entirely inapposite.  No one claimed the Objectors could not produce shorter, thinner slab—of course they could.  But the point, which is crystal clear in the record before Commerce, is that shorter thinner slab cannot produce the coil with the requisite PIW that NLMK needed to fill 94% of its customers' orders.[76]  It is hard to understand how Commerce could not or would not grasp this simple, straight-forward, and indisputable fact.

ITA acknowledged that "the thinner slabs" offered by AK and USS would produce smaller coil than NLMK required to meet its customers' orders.[77]  Given that, and having had two years to think about it, ITA recognized it could not simply dismiss this issue as outside its analysis (as it had done in the second version of its recommendations).  So, instead, ITA this time stated:

---

[71] NLMK-111695-080, 084, 097, 109.

[72] NLMK-111695-097.

[73] NLMK-111695-119.

[74] NLMK-248733-029.

[75] NLMK-111695-119.

[76] NLMK-111695-017-18, 074, 080-82.

[77] NLMK-111695-119.

> Regarding NLMK's statement it cannot adjust its furnace to accept thinner, longer slabs, the SME stated that the objectors indicate they are using continuous casting and could therefore supply slab of any length required to fit in NLMK's reheat furnace.  NLMK does not state its end use products require coil of a certain length but rather identifies generic end use products which can be produced from a portion of the coil length.  Accordingly, the products offered by AK Steel and U.S. Steel are suitable substitutes.[78]

ITA's conclusion that Objectors' could "supply slab of any length required to fit in NLMK's reheat furnace" totally misses the point.  Because Objectors could not provide slab that was 250mm-thick, to satisfy NLMK's PIW requirements, Objectors' thinner slab would have to be longer than 356 inches to make up for the lack of weight of the thinner slab.[79]  But, as repeatedly stated, that slab is of no use to NLMK because it is too long for its furnace.[80]  It is a mystery how or why an SME could not or would not comprehend the fact that making thinner slab shorter does not solve the problem—it is the problem.  *See Env't Def. Fund v. Env't Prot. Agency*, 922 F.3d 446, 454 (D.C. Cir. 2019) ("An agency acts arbitrarily and capriciously when it offers inaccurate or unreasoned justifications for a decision.").

Likewise, the statement that "NLMK does not state its end use products require coil of a certain length" is also unsupportable on this record.[81]  The coil is NLMK's end product, and it is hard to imagine how NLMK could have made it any more clear (as the record reflects)—NLMK needs the thicker slab specifically because it must produce bigger (i.e., longer) coil to meet its customers' requirements.[82]  Indeed, NLMK specifically explained, "the length of the coil produced from thinner slab "is radically different."[83]

---

[78] *Id*.

[79] NLMK-111695-017-18, 023, 074-75, 081-82, 084.

[80] *Id*.

[81] NLMK-111695-119.

[82] NLMK-111695-018.

[83] *Id*. (emphasis in original).

In sum, even after remand and two years to refine its analysis, ITA's recommendation cannot support the conclusion that the product NLMK actually required—250mm-thick slab—was "reasonably available" from USS or AK. It plainly was not, and that is the only rational conclusion Commerce could have reached based on the record before it. Thus, Commerce's denial of Request Nos. 111695, 111701, 111709, 111713, 111718, 111725, 111729, 111740, 111745, 111748, 111752, 111762, 111773, 111781, and 111782 based on ITA's inapposite conclusions concerning slab length were arbitrary and capricious.

2.    The First 2021 Requests

After Commerce denied its 2020 Requests, NLMK again attempted to obtain the slab it needed from Objectors, but again came up empty. Accordingly, between March 19 and April 1, 2021, NLMK filed 28 more exclusion requests. Twenty-six of these requests covered 1,000,000 tons of 10-inch slabs.[84]  (Two remaining requests covering 200,000 tons of 8-inch slabs are discussed in Section IV.C, *infra*).[85]

Two Objectors, Nucor and Cliffs (formerly AK), filed objections to the 26 First 2021 Requests covering 10-inch slab.[86]  Nucor again acknowledged that it did not produce any slab.[87] Cliffs had, however, since the time of the 2020 denials, acquired two of ArcelorMittal's U.S. facilities (Indiana Harbor and Burns Harbor) that were capable of producing 10-inch slab.[88]  In a barebones objection, unsupported by any supplement or evidence, Cliffs stated the obvious—it, like ArcelorMittal before it, "*is capable* of producing this product" at the former ArcelorMittal

---

[84] Request Nos. 194445, 194449, 194452, 194455, 194458, 194460, 194463, 194482, 194511, 194515, 194516, 194518, 194521, 194525, 194529, 194532, 194535, 194536, 194547, 194553, 194560, 194562, 194566, 194571, 194573, and 194883.

[85] Request Nos. 198055 and 198056.

[86] NLMK-194445-025-38, 039-48.

[87] NLMK-194445-026.

[88] NLMK-194445-057, 059.

plants.[89]  It provided no evidence that it actually produced or offered any 10-inch slab for sale,

let alone that it had sufficient excess capacity to supply NLMK.  It did, however, state that

"{r}esponses for production capacity and plant utilization are proprietary information that will

be provided confidentially upon request."[90]  However, and inexplicably, Commerce was

apparently uninterested and never even requested this information.  Cliffs, of course, never

produced any such evidence.

On June 26 and July 10, 2021, Commerce denied all 26 Requests covering 10-inch slab,

employing the same old boilerplate language "accept{ing} ITA's recommended findings."[91]

The only basis ITA provided for its recommendation regarding these requests was that

"Cleveland-Cliffs states it can manufacture an identical product to the product in the request,"

and "there is no evidence on the record to support NLMK's assertion that Cleveland-Cliffs is

unwilling to provide the requested slab."[92]  This conclusion both ignores Commerce's regulation

and simply does not follow from the record.

First, the regulation plainly places the *burden on the Objectors*, not NLMK, to

demonstrate that they could and would supply a sufficient amount of 10-inch slab to meet

NLMK's requirements.  15 C.F.R. pt. 705, supp. 1(d)(4); 83 Fed. Reg. at 46,035 (BIS Response

to Comment (f)(4)(i)).  That is, it was up to Cliffs, as the Objector, to show that it had the

capacity to provide NLMK with 10-inch slab in the quantity sought.  Importantly, Cliffs never

even claimed it did.  To the contrary, it was quite careful only to say that it *could* manufacture

10-inch slab at the plants it had recently acquired from ArcelorMittal.[93]  That statement

---

[89] NLMK-194445-040.

[90] *Id*.

[91] NLMK-194445-001.

[92] NLMK-194445-004.

[93] NLMK-194445-040.

obviously did not and does not answer the fundamental question of whether the 10-inch slab was "reasonably available in sufficient quantity" to NLMK.[94]  Cliffs notably never said that it was actually producing 10-inch slab, it never claimed that it even offered any 10-inch slab for sale, and it certainly never provided any evidence that it had sufficient excess capacity to supply NLMK.

Commerce's decision to ignore its regulation and reverse the burden of proof to deny the exclusions was, on its own, reversible error.  *See UPS Customhouse Brokerage, Inc.*, 575 F.3d at 1383 ("An agency must follow its own regulations."); *Policy & Research LLC.*, 313 F. Supp. 3d at 83 ("Under the most elementary precepts of administrative law, an agency has no choice but to provide a reasoned explanation for its actions, and it cannot undertake to act in a manner that is contrary to its own regulations.").

But, there is a more fundamental problem with this decision.  Commerce's conclusion ignores the actual, uncontroverted evidence that Cliffs was not only unwilling, but unable, to provide 10-inch slab to NLMK.  Specifically, in its rebuttal to Cliffs' objection filing, NLMK provided evidence that (i) the Association for Iron & Steel Technology (AIST) database showed that neither the Indiana Harbor nor Burns Harbor plants currently offered 10-inch slab for sale;[95] and (ii) Cliffs's marketing materials indicated that it did not offer slab from either facility.[96] This demonstrated that, like ArcelorMittal before it, Cliffs did not have 10-inch slab available for sale.

NLMK further demonstrated why that was the case with evidence showing that, as part of its purchase of the Indiana Harbor and Burns Harbor plants, Cliffs made a 5-year commitment to

---

[94] NLMK-194445-040; NLMK-194449-040.

[95] NLMK-194445-056, 059.

[96] *Id.*.

supply ArcelorMittal 1.5 million tons of slab per year, meaning it did not have the capacity to supply NLMK.[97]  Thus, ITA's conclusion that "there is no evidence on the record to support *NLMK's assertion* that Cleveland-Cliffs is unwilling to provide the requested slab" was simply wrong.[98]

In its surrebuttal, Cliffs weakly responded only that it "is actively selling slabs to customers.  Lack of publication on our website is more reflective of the fact that slab sales are to a very limited market population."[99]  That was the entirety of its response.  Its reference to a "limited market population" actually confirms Cliffs' commitment to ArcelorMittal, which it did not even bother to otherwise address in its response.[100]  Cliffs provided absolutely no evidence that it could simultaneously satisfy its undisputed multi-year commitment of 1.5 million tons of slab per year to ArcelorMittal and also supply 1,000,000 tons of slab to NLMK.[101]

Accordingly, the uncontroverted evidence showed that Cliffs did not generally offer 10-inch slab for sale and, in any event, lacked the capacity to supply NLMK because of its commitment to sell the 10-inch slab it produced to ArcelorMittal.  In short, the record again permitted only one conclusion—namely that 10-inch slab was not "reasonably available in sufficient quantity" from Cliffs.  Commerce's contrary conclusion, based exclusively on ITA's recommendation, to deny Request Nos. 194445, 194449, 194452, 194455, 194458, 194460, 194463, 194482, 194511, 194515, 194516, 194518, 194521, 194525, 194529, 194532, 194535, 194536, 194547, 194553, 194560, 194562, 194566, 194571, 194573, and 194883 was therefore arbitrary and capricious.

---

[97] NLMK-194445-057, 059.

[98] NLMK-194445-004.

[99] NLMK-194445-067.

[100] NLMK-194445-059, 067.

[101] NLMK-194445-066-69.

3.      The Second 2021 Requests

Following denial of the First 2021 Requests, and mindful of Commerce's claim that there

was allegedly "no evidence on the record… that Cliffs is unwilling to provide the requested

slab,"[102] NLMK attempted to purchase 10-inch slabs from Cliffs.[103]  But, as NLMK predicted,

Cliffs was unable to supply NLMK with any 10-inch slab.[104]

Accordingly, on September 14, 2021, NLMK submitted two additional exclusion

requests for 10-inch slab,[105] citing its unsuccessful efforts to procure the slab from Cliffs.[106]

Specifically, NLMK offered uncontroverted evidence showing that Cliffs' had responded to

NLMK's orders for 10-inch slab by offering only 8- and 9-inch slab, and offering far less than

NLMK requested.[107]

Tellingly, Cliffs did not object to the Second 2021 Request.  Instead, USS and Nucor

did.[108]  Both companies acknowledged that they do not produce the 10-inch slab NLMK

requires,[109] but USS rehashed the old canard, without evidence, that NLMK could use USS's

thinner slabs to meet its customers' requirements.[110]

On December 24, 2021, with absolutely no evidence to support it, Commerce denied

NLMK's Second 2021 Requests.[111]  The BIS memorandum used the same boilerplate language

to claim once again that it was "accept{ing} ITA's recommended findings" on "whether the

---

[102] NLMK-194445-004.

[103] NLMK-248733-021-22.

[104] NLMK-248733-022.

[105] Request Nos. 248733 and 248740.

[106] NLMK-248733-021-22.

[107] NLMK-248733-022.

[108] NLMK-248733-039-58, 059-71.

[109] NLMK-248733-040, 060.

[110] NLMK-248733-040, 047-50, 091-92, 094-97.

[111] NLMK-248733-002.

relevant steel article is produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality."[112]

However, by "just following the form," BIS made a classic mistake—ITA had made no such findings.[113]  Rather, with no Objector capable of producing any 10-inch slab, ITA stated that the mysterious SME had "concluded that the requested product is ambiguously defined," because the carbon content described in box 2.j on NLMK's request form was purportedly inconsistent with the description in box 3.a.[114]

ITA stated:

> The SME determined the requested product has two different ranges for the carbon content specifications that were stated in 2.j and 3.a.  Based on technical factors, the SME concluded the requested product is ambiguously defined.  As such, ITA is unable to provide a complete analysis due to an issue with the request.[115]

Commerce of course did not provide any analysis or report from the SME.  More importantly, it is clear that there was no "ambiguously defined" product.

The ranges for carbon content in boxes 2.j and 3.a were not "different."  Box 2.j provides the general product description under the relevant HTSUS subheading covering the slab NLMK sought to import, namely slab containing "by weight .25 percent or more of carbon."[116]  Box 3.a, on the other hand, described the specific carbon content specification for the particular slab NLMK sought to import, which required a minimum carbon content of 0.25% and a maximum of 0.3%.[117]  The carbon content range between 0.25% and 0.3% (as stated in box 3.a) clearly

---

[112] NLMK-248733-001.

[113] NLMK-248733-004.

[114] *Id*.

[115] *Id*.

[116] NLMK-248733-011.

[117] NLMK-248733-012.

falls within the HTSUS subheading for products with ".25 percent or more of carbon" (as stated in box 2.j).  Thus, these ranges were entirely consistent and do not "ambiguously define" the slabs for which NLMK sought exclusion.

Indeed, NLMK's respective descriptions in boxes 2.j and 3.a were identical to those included in the 2020 and First 2021 Requests for slab falling within the same HTSUS codes.[118] On those prior occasions, Commerce had no problem identifying the slabs covered by those requests, accepting them, and proceeding to purportedly evaluate and deny those requests on the merits (albeit arbitrarily).  Indeed, in its recent redeterminations on remand with respect to certain of the 2020 Requests, Commerce directly addressed the issue again.  And, although it stated the descriptions were purportedly inconsistent, it concluded that that purported "inconsistency" was not material to its determinations, and denied the requests based on a finding (albeit arbitrary) of domestic availability.[119]

Commerce's "depart{ure} from established precedent" that the descriptions were either correct or immaterial "without a reasoned explanation {was} arbitrary and capricious."  *In re Vivint, Inc.*, 14 F.4th 1342, 1352 (Fed. Cir. 2021); *Wisconsin Valley Improvement v. FERC*, 236 F.3d 738, 748 (D.C. Cir. 2001) (agency's "abrupt departure" from the "position it previously held without satisfactorily explaining its reason for doing so" is arbitrary and capricious).

---

[118] *Compare* NLMK-248733-011-12, *with* NLMK-111773-014-15 (Dkt. # 60-3), NLMK-111775-010-11 (Dkts. # 66-1, 72-1), NLMK-111776-010-11(Dkts. # 66-2, 72-2), NLMK-111779-010-11 (Dkts. # 66-3, 72-3), NLMK-111780-010-11 (Dkt. # 66-4, 72-4), NLMK-111781-008-09 (Dkt. # 66-5, 72-5), NLMK-111782-008-09 (Dkts. # 66-2, 72-6), NLMK-194547-011-12 (Dkts. # ), NLMK-194553-011-12 (Dkts. # 68-6, 74-6), NLMK-194560-011-12 (Dkts. # 68-7, 74-7), NLMK-194562-011-12 (Dkts. # 68-8, 74-8), NLMK-194566-011-12 (Dkts. # 68-9, 74-9), NLMK-194571-011-12 (Dkts. # 68-10, 74-10), *and* NLMK-194573-011-12 (Dkts. # 69-1, 75-1).

[119] NLMK-111773-120 ("Regarding carbon concentration, the SME determined that the product is ambiguously defined because of the two different values for the maximum allowed concentrations of carbon.  *Accordingly, ITA does not hold the objectors accountable for matching the carbon specification in the request*." (emphasis added)); NLMK-111781-119 (same); NLMK-111782-119 (same).

Moreover, by rejecting NLMK's requests on this basis after receiving objections, rebuttals, and surrebuttals, Commerce contravened its own established procedures. Under the regulation, Commerce supposedly conducts its "HTSUS administrability review" at the "start of the process" and provides "a rejection notification that includes the specific reasons for a rejection." 85 Fed. Reg. at 81,062 (BIS response to Comment (a)(2)).[120] Had Commerce followed that procedure, NLMK could have quickly corrected the putative error (or, more precisely, pointed out there was none) without the time and expense of responding to objections or bringing this action to challenge Commerce's arbitrary denials based on a purported "ambiguous" product description Commerce had previously accepted on numerous occasions. Commerce's failure to follow its own procedures is an additional, independent reason why its denial of Request Nos. 248733 and 248740 was arbitrary and capricious and must be set aside. *JSW Steel*, 466 F. Supp. 3d at 1331 (concluding Commerce acted unreasonably when it failed to "indicate why an incorrect HTSUS statistical reporting number interferes with its ability to consider the substance of the request or why it d{id} not ask for clarification as to the correct statistical reporting number").

4.    The Third 2021 Requests

Still unable to procure 10-inch slab domestically, on November 10, 2021 NLMK filed its Third 2021 Requests, again seeking exclusions for certain 10-inch slab.[121] NLMK's Third 2021

---

[120] A GAO report summarizing Commerce's findings from its investigation into Commerce's decisions on Section 232 exclusion requests confirmed that when BIS rejects an exclusion request for technical errors with respect to "the amount, descriptions, specifications, strength, and chemical composition of the requested steel," it "does not issue a public decision," but instead "notifies the requester by email of the rejection and the reason" during a "preclearance" phase of its decision process. *See* U.S. Gov't Accountability Office, *Steel and Aluminum Tariffs: Commerce Should Commerce Should Update Public Guidance to Reflect Changes in the Exclusion Process*, GAO-22-104564, at 6 (2021), *available a*t https://www.gao.gov/assets/gao-22-104564.pdf.

[121] Exclusion Request Nos. 260912 and 260914.

Requests consisted of two specific requests (Nos. 260914 and 260912).  Nucor and USS objected to both.[122]  Cliffs objected only to Request No. 260914.[123]

**Request No. 260914**.  Seemingly forgetting that it had turned down NLMK's request to purchase 10-inch slab, Cliffs baldly asserted in its objection that it was "capable of producing" "100%" of the slabs NLMK required, and that it could do so "immediately" within the meaning of the regulation.[124]  Cliffs provided no evidence to support these assertions and Commerce required none.  Indeed, Cliffs even conceded that it had not "attempted to sell" NLMK 10-inch slabs "within the last two years."[125]

In rebuttal, NLMK provided evidence, including sales correspondence, showing that in direct response to NLMK's solicitations for a monthly supply of 180,000 tons of 10-inch slab, Cliffs: (i) could only offer NLMK 8- or 9-inch slab; (ii) could only supply between 10,000 and 20,000 tons of those thinner slabs (a mere 2% of the volume covered by Request No. 260914); and (iii) could not provide this limited volume of thinner slabs "immediately," as it would take at least twelve weeks to source NLMK.[126]  *See* 15 C.F.R. pt. 705, supp. 1(c)(6)(i).  Faced with this record, Cliffs did not even bother to submit a surrebuttal, conceding what the sales correspondence confirmed—it could not supply any 10-inch slab to NLMK.

Commerce nonetheless again denied the request, relying exclusively on ITA's recommendation.[127]  ITA, for its part, somehow concluded that "Cleveland-Cliffs me{t} the

---

[122] NLMK-260912-039-58, 059-071.

[123] NLMK-260914-072-082 (Dkts. # 69-8, 75-8).

[124] NLMK-260914-073, 077.

[125] NLMK-260914-077.

[126] NLMK-260914-104-05, 106-109.

[127] NLMK-260914-001.

quality, quantity, and timeliness criteria."[128]  ITA provided no reasoning whatsoever for this strange conclusion, including why the uncontroverted evidence that Cliffs was unable to meet NLMK's offer to purchase 10-inch slab did not compel granting the request.  Instead, ITA claimed that nothing "in the request {or} rebuttal . . . provide{d} evidence to contradict {Cliffs's} claims."[129]  Recall that all Cliffs ever claimed was that it was "capable of producing" 10-inch slab, not that it could or would supply sufficient amounts to NLMK.[130]  ITA just ignored the uncontroverted evidence that Cliffs had already refused to supply any 10-inch slab to NLMK.

The only purported "explanation" ITA offered for its strange conclusion was that the sales correspondence NLMK submitted was "incomplete" and therefore "was not considered," because it supposedly "did not provide sufficient detail of the product involved that would allow us to evaluate the applicability of the evidence to the requested product and the objection by Cleveland-Cliffs."[131]  This blithe disregard of the specific evidence that Cliffs could not supply 10-inch slab to NLMK is truly bewildering and cannot withstand scrutiny.

First, the sales correspondence was complete.  It included NLMK's offer, Cliffs counteroffer of thinner slab in less quantity, and NLMK's reasons for rejecting that counteroffer.[132]  It conclusively established that Cliffs could not provide NLMK with any of the 10-inch slab covered by the Request, as NLMK succinctly told Cliffs in the following excerpt from the correspondence NLMK submitted.

---

[128] NLMK-260914-004.

[129] *Id.*

[130] NLMK-260914-073.

[131] NLMK-260914-004.

[132] NLMK-260914-106-08.



NLMK also submitted the Technical Protocol for Purchased Slabs it provided to Cliffs with its order, removing any doubt about the product NLMK requested from Cliffs.[133]

Moreover, NLMK provided Commerce with a detailed explanation of precisely why Cliffs' response to NLMK's offer did not meet NLMK's specifications, volume or delivery times.

> First, Cleveland Cliffs did not offer slab meeting our dimensional and other technical specifications. Cleveland Cliffs offered slabs that are 8-inches (203.2 mm) and 9 inches (228.6 mm) thick, not the 250 mm thick slab that we requested and that Cleveland Cliffs previously certified to BIS that it was capable of producing. In its objection to our previous exclusions, Cleveland Cliffs offered slab from its East Chicago {Indiana Harbor} and Burns Harbor facilities, both of which they claimed are capable of producing 250 mm thick slab, but in response to our order, Cleveland Cliffs offered its thinner slab from Dearborn and Middletown, two facilities that all know cannot produce the slab we requested.

> Second, Cleveland Cliffs offered this deficient slab to begin delivery within approximately 10 weeks, longer than the eight weeks and longer than the time it would take us to secure our slab from international producers.[134]

Cliffs did not challenge the foregoing in any way. In fact, as noted, it did not even offer a surrebuttal purporting to refute NLMK's account. In short, the record is clear and undisputed.

---

[133] NLMK-260914-021 ("On July 6, 2021, NLMK contacted Cleveland Cliffs for a quote to supply 180,000 tons of 250 mm thick slab per month, with the first shipment the first week of September. NLMK provided Cleveland Cliffs with details of its slab requirements and specifications, *which are detailed in the attached Technical Protocol for Purchased Slab*." (emphasis added)); NLMK-260914-024-038 (Technical Protocol).

[134] NLMK-260914-104.

ITA had to close its eyes and pretend this never happened in order to reach its conclusion.  And, that is what it did, and BIS decided to go along with the charade.  The decision to deny NLMK's request, despite the uncontroverted evidence that 10-inch slab was not available at all from Cliffs (or any other Objector), was flatly contrary to the evidence and was therefore arbitrary and capricious.  *See Nucor Fastener Div. v. United States*, 35 C.I.T. 1074, 1090 (2011) (agency's treatment of "limited data . . . as the full picture" " 'r{an} counter to {the} evidence'" (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43)).

**Request No. 260912**.  Only Nucor and USS objected to this request, even though, concededly, neither could produce 10-inch slab.[135]  So, faced with a clear record that no Objector could provide 10-inch slab to NLMK, Commerce once again dodged the merits by finding another purported "ambiguity" in NLMK's product description.[136]  This time, ITA claimed, "There is an inconsistency in the carbon chemical composition of the requested product between what is detailed in 2.j and what is detailed in 3.a{.}"[137]  But again there was no "inconsistency" between boxes 2.j and 3.a whatsoever.  Box 2.j stated that the slabs subject to Request No. 260912 fall within the HTSUS subheading covering slabs "containing by weight *less than .25 percent of carbon*."[138]  Box 3.a stated that the range of carbon content for the slab NLMK sought to import was between 0% and 0.24%.[139]  A range of 0% to 0.24% carbon is clearly "less than .25 percent of carbon."  The two are literally the same.

Indeed, as with the Second 2021 Requests, NLMK previously submitted requests falling within the same HTSUS codes with the same exact descriptions for the carbon ranges in boxes

---

[135] NLMK-260912-040, 060.

[136] NLMK-260912-004.

[137] *Id*.

[138] NLMK-260912-011.

[139] NLMK-260912-012.

2.j and 3.a, which Commerce accepted and (arbitrarily) purported to find sufficient domestic availability.[140]  In fact, the carbon content descriptions in boxes 2.j and 3.a for Request No. 260914, which Commerce decided on the same day, were identical.[141]  Yet, Commerce arbitrarily denied Request No. 260914 on the merits, based on its erroneous finding of domestic availability.[142]  In other words, ***on the same day, Commerce found the same descriptions both ambiguous and unambiguous***.  To state the obvious, reaching contrary conclusions on identical facts is not just puzzling and troubling, it is plainly arbitrary.  *Robert Bosch, LLC v. Iancu*, 778 F. App' x 871, 874–75 (Fed. Cir. 2019) (concluding determination of United States Patent and Trademark Office was arbitrary and capricious where it found subject of an application both obvious and nonobvious because "{n}othing could better evidence an arbitrary and capricious decision than the very same panel reaching exactly the opposite conclusion in two proceedings on an identical issue").

Finally, Commerce's denial of the request on this purported technicality again contravened its own procedures, which provided that, if the product description were in fact ambiguous (it was not), Commerce should have immediately rejected the request, and alerted NLMK to the reason and provided the opportunity to correct the description.  *See* 85 Fed. Reg. at 81,062 (BIS response to Comment (a)(2)).  This is yet a further reason why this denial was arbitrary and capricious.  *See JSW Steel*, 466 F. Supp. 3d at 1331.

---

[140] *Compare, e.g.*, NLMK-260912-011-12, *with* NLMK-111695-008-09 (Dkts. # 64-1, 70-1), NLMK-111697-010-11 (Dkts. # 64-2, 70-2), NLMK-194445-011-12 (Dkts. # 66-7, 72-7), *and* NLMK-194449-011-12 (Dkts. # 66-8, 72-8).

[141] NLMK-260914-011-12.

[142] NLMK-260914-001-02, 004.

### C.      Commerce's Unreasoned Denials of NLMK's Requests for 8-inch Slab were Arbitrary and Capricious

NLMK's First 2021 Requests included two requests covering 200,000 tons of 8-inch slab.[143]  Two Objectors, Nucor and USS, objected to these requests.  Nucor followed its usual practice of objecting and admitting it does not produce any slab.[144]  As for USS, the record demonstrated that it had historically failed to supply sufficient quantities of 8-inch slab to NLMK,[145] and had actually idled facilities, effectively eliminating its capacity to supply any 8-inch slab to NLMK.[146]

Nevertheless, Commerce once again denied the requests.  The BIS memoranda predictably claimed it was relying on ITA's recommendations.[147]  But those recommendations were again conclusory and devoid of reasoning or analysis.  They simply stated, "U.S. Steel can produce 100 percent of the requested volume."[148]  That was it.  That was the sum and substance of ITA's recommendation.  There was no indication how it reached this conclusion, nor why a finding that USS *could produce 8-inch slab* supported a finding that *it could produce enough 8-inch slab* to meet its own requirements and also supply NLMK.

In sum, ITA never explained or cited the evidence that purportedly supported the conclusion that USS had enough slab to meet its own needs, and NLMK's requirements (as well as the slab USS committed to others by objecting to scores of exclusion requests for slab).[149]  The truth is that there is no such evidence and the record simply does not support that

---

[143] Exclusion Request Nos. 198055 and 198056.

[144] NLMK-198055-042.

[145] NLMK-198055-056, 059.

[146] NLMK-198055-030.

[147] NLMK-198055-001.

[148] NLMK-198055-004.

[149] *Id*.

conclusion.  Thus, Commerce's denial of NLMK's First 2021 Requests covering 8-inch slab was arbitrary and capricious.

Unlike with 10-inch slab,[150] there is no question that USS was capable of producing 8-inch slab, which meant the critical question was whether the product was reasonably available in sufficient amounts from USS.  15 C.F.R. pt. 705, supp. 1(c)(6)(i).  That obviously requires analysis of whether USS made enough or was capable of making enough 8-inch slab to supply NLMK.  To answer that question a fair minded decision maker would need to know USS's plant capacity and utilization.  For, if USS required all the slab it produced to support its own operations and/or meet commitments to other customers, its product would not, in the regulation's parlance, be "reasonably available" to NLMK in "sufficient . . . amounts."  *Id.*

Commerce expressly recognized the importance of capacity and utilization issues in deciding exclusion requests, including the need to consider "any concerns {requesters} had about an objector overcommitting the steel … manufacturer's current or future capacity."  83 Fed. Reg. at 46,037 (BIS response to Comment (f)(6)(iii)(A)).  Commerce therefore promised that "{t}he Department, including product experts from ITA, will be evaluating these factors as part of the review process when objections are received."  *Id*. (BIS response to Comment (f)(6)(iii)(C)); *see* 85 Fed. Reg. at 81,066 ("Commerce is aware . . . {of} examples" where an objector could not meet the "cumulative impact of {its} objections to exclusions" and "the demand from other customers in the U.S" (BIS response to Comment (d)(2))).

Nonetheless, and despite its recognition of the salience of this information, when faced with the reality of the problem, Commerce confessed that, in practice, it ***"does not examine the***

---

[150] Were it correct (it is not) that Objectors provided a suitable substitute for 10-inch slab, Commerce would likewise have had to assess whether Objectors had the capacity to provide that substitute slab to NLMK, and Commerce's failure to do so renders those decisions arbitrary for the reasons discussed in this Section.

*production capacity"* of any objector.[151]  Prior to the 2021 Requests, both Commerce's Inspector

General and the United States Government Accountability Office (the "GAO") conducted

extensive investigations into the Department's Section 232 exclusion process, and identified

Commerce's failure to consider objectors' plant capacity and utilization as a major flaw in the

process that undermined the reliability of Commerce's determinations to deny exclusion

requests.[152]  Notwithstanding that these watchdogs specifically identified Commerce's failure to

consider this critical data as problematic, Commerce still did not consider it in deciding these

requests.

Despite Commerce's stubborn refusal to look at the pertinent plant capacity and

utilization data, there was evidence, which Commerce ignored, showing that USS lacked the

capacity and the willingness to supply sufficient amounts of 8-inch slab to NLMK.  Specifically,

Commerce ignored the evidence that USS (i) had historically only been able to supply NLMK

with small amounts of 8-inch slab in the three years since Commerce denied NLMK's 2018

---

[151] NLMK-198055-006 (emphasis added); *see also* NLMK-111695-121; NLMK-111697-005; NLMK-111734-0065 NLMK-194445-006; NLMK-248733-006; NLMK-260912-006.

[152] In a damning report, the GAO confirmed that the Department conducted no independent analysis in connection with its denials of exclusion requests and "d{id} not verify the validity" of representations made by objectors.  *See* U.S. Gov't Accountability Office, *Steel and Aluminum Tariffs: Commerce Should Improve Its Exclusion Request Process and Economic Impact Reviews*, GAO-20-517, at 18 (2020) (emphasis added), *available at* https://www.gao.gov/assets/gao-20-517.pdf.  In fact, Department officials admitted, "Commerce does not confirm whether . . . a domestic producer {i.e., an objector} can fulfill the quantity it states it is able to provide."  *Id.*  After a lengthy investigation and audit into the Department's administration of the Section 232 exclusion process, the Inspector General issued a report that similarly found that "ITA recommended denying {requests} due to sufficient U.S. supply even though objectors did not provide information on plant capacity or plant utilization."  U.S. Dep't of Commerce, Office of Inspector General, *Decisions on Exclusions from Section 232 Tariffs Were Not Transparent and Based on Incomplete and Inaccurate Information*, Final Report No. OIG-21-020-A, at 4 (Jan. 25, 2021), *available at* https://www.oig.doc.gov/OIGPublications/OIG-21-020-A.pdf.  In fact, Commerce personnel even confirmed that the ITA "*does not consider plant capacity or percent plant utilization in its analysis, relying instead on the objector's assertion that it can manufacture the product covered by the {exclusion request} in a timely manner.*"  *Id.* at 5 (emphasis added).  Thus, the Inspector General found, "ITA made recommendations using incomplete or contradictory information that resulted in {exclusion request} denials even though it was unclear if the product was available from domestic U.S. suppliers in an adequate quantity or within the required timeframe."  *Id.* at 3.

Requests, which fell far short of the quantity NLMK required;[153] (ii) had sold just [⬛⬛⬛] tons total of slab to anyone in 2020, of which it sold just [⬛⬛⬛] tons to NLMK (a mere [⬛⬛] of the amount requested);[154] (iii) had not offered NLMK any slab during the prior 8-month period;[155] and (iv) had idled its Great Lakes Works plant in late-2019, which had provided [⬛⬛⬛⬛] of the limited slab USS made available in the past, effectively eliminating any potential excess capacity to supply NLMK.[156]

Thus, the record evidence showed that between 2018 and 2021, USS was only able to supply NLMK with [⬛⬛⬛] tons of slab *in total*,[157] with [⬛⬛⬛] tons coming from its Great Lakes facility in Ecorse, Michigan.[158]  USS idled this plant *more than a year before NLMK filed its First 2021 Requests*.[159]  That plant remains idle today.[160]  USS provided no evidence of plans to restart its Great Lakes plant or the timeline for doing so, as the regulation requires before its production capacity at this facility could be considered.  15 C.F.R. pt. 705, supp. 1(d)(4).  In other words, the record demonstrates that USS's capacity to supply NLMK has only *further decreased* over time.  USS had not only historically failed to meet NLMK's requirements for 8-inch slab, supplying a mere [⬛⬛⬛] tons in the preceding year, but it had even less slab capacity at the time of NLMK's requests.  Yet, Commerce never even acknowledged the issue in its denials.

---

[153] NLMK-198055-056, 059.

[154] NLMK-198055-079-80.

[155] NLMK-198055-059.

[156] NLMK-198055-030, 079-80.

[157] *E.g.*, NLMK-198055-079-80; *see also, e.g.*, NLMK-111695-106-07; NLMK-260912-102-03.

[158] *E.g.*, NLMK-198055-079-80; *see also, e.g.*, NLMK-111695-106-07; NLMK-260912-102-03.

[159] NLMK-198055-030; *see* NLMK-111695-099.

[160] NLMK-260912-051.

Simply put, on this record, the only rational conclusion the evidence permits is that this slab was not reasonably available from USS in sufficient quantity, and Commerce's contrary conclusion was arbitrary and capricious. *See Water Quality Ins. Syndicate*, 225 F. Supp. at 69 (finding agency decision arbitrary and capricious where "{t}he decision … ignores critical context provided in the … record and amounts to cherry-picking of evidence that, when considered as a whole, raises significant doubt about the ultimately conclusion reached"); *Butte Cnty.*, 613 F.3d at 194 ("{A}n agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706.").

D.     **For all Requests, Commerce Failed to Provide Any Reasoned Explanation for Its Conclusions**

As we have pointed out, in addition to running counter to the record evidence, Commerce's denials of NLMK's requests are arbitrary and capricious, on their face, because they fail to "present a full and reasoned explanation of its decision." *In re Sang Su Lee*, 277 F.3d at 1344. As the Court is well-aware, to withstand scrutiny under the APA, Commerce was required to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs.*, 463 U.S. at 43. It did not do so. Instead, its decisions rely on "{c}onclusory statements . . . {which} do not fulfill the agency's obligation" of "reasoned decisionmaking." *In re Sang Su Lee*, 277 F.3d at 1344-1345.

BIS relied exclusively on the ITA recommendations.[161] But that is a weak reed because the ITA recommendations themselves are devoid of any analysis or reasoning, generally relying on conclusory statements of the purported findings of an unidentified SME, while providing no

---

[161] NLMK-111695-001, 116.

explanation of how or why the SME reached these conclusions.[162]  In other words, the denials

are essentially a pyramid scheme, in which each layer of decision making purports to rely on the

conclusions of another sub-agency, never revealing who is actually behind the curtain or how

they arrived at their conclusions.  Commerce's failure to disclose how its conclusions flowed

from the record evidence is fatal.  *See JSW Steel*, 466 F. Supp. 3d at 1330 (finding the BIS and

ITA decisions were "devoid of explanation and frustrate{d} judicial review"); *Yale Univ. v. U. S.*

*Dep't of Commerce, Domestic & Int'l Bus. Admin., Office of Imp. Programs*, 579 F.2d 626, 633

(C.C.P.A. 1977) (vacating Commerce's denial of request for exclusion from tariffs because

Commerce "summarily adopted the recommendations" of another agency, which

recommendations provided no reasoning or analysis).[163]

###        E.        Commerce Has Failed to Certify Complete Administrative Records

"When a party challenges an administrative determination, the agency must produce the

complete administrative record."  *JSW Steel*, 466 F. Supp. 3d at 1328.  That record must contain

"those documents directly or indirectly considered by the agency," *id*., which includes "all

materials that might have influenced the agency's decision," *Invenergy Renewables LLC v.*

*United States*, 476 F. Supp. 3d 1323, 1355 (Ct. Int'l Trade 2020).  In this case, as in the past,

there is "clear evidence that the record was not properly designated" because although

Commerce expressly relies on and incorporates by reference the purported analysis of an

unidentified SME, the record contains no reports or other indication of the SME's actual

analyses.  *JSW Steel*, 466 F. Supp. 3d at 1328.

---

[162] NLMK-111695-119.

[163] Decisions of the Court of Customs and Patent Appeals are binding in the Federal Circuit.  *See United States v. Maverick Mktg., LLC*, 322 F. Supp. 3d 1373, 1379, n.13 (Ct. Int'l Trade 2018) (Kelly, J.).

Four sets of denials—the 2020 Requests,[164] the 2020 Remand Results,[165] the First 2021 Request for 8-inch slab,[166] and the Second 2021 Requests[167]—purported to rely on, and incorporate by reference, the analyses of the SME in denying NLMK's requests.  Despite this, the record does not identify the SME or its purported qualifications, the reasons for its conclusions, what evidence the SME relied on, or how it weighed the evidence.  If they exist, and the Court remands these decisions to Commerce (rather than ordering it to grant the requests and refund the tariffs), these analyses must be available to the parties and included in the record to allow this Court to determine and review the actual bases for Commerce's determinations. *U.S. Steel Corp. v. United States*, 578 F. Supp. 418, 420 (Ct. Int'l Trade 1983).

## V.    Conclusion

NLMK's experience in seeking exclusions from the Section 232 tariffs in order secure the slab it needs has been both puzzling and frustrating.  For four years now, NLMK has been attempting to acquire the slab it needs domestically, but it has struck out.  As NLMK told Commerce, if it could have acquired the slab from U.S. producers it would have done so.[168]  "It would shorten the lead time on orders and save on transportation costs," and NLMK "could save the time and expense of filing" repeated exclusion requests, which are consistently denied.[169]  Paying hundreds of millions of dollars in tariffs and suing for refunds is not a sensible or viable business strategy.  It is certainly not NLMK's preferred approach.  Yet, because of the Objectors'

---

[164] NLMK-111697-004.

[165] NLMK-111695-119.

[166] NLMK-198055-004.

[167] NLMK-248733-004.

[168] NLMK-111695-020.

[169] *Id.*

game plan and Commerce's consistent denials, in order to avoid going out of business, NLMK has been forced to engage in precisely that pattern.

Even more fundamentally, Commerce's denials are plainly arbitrary and capricious. It never clearly spells out the reasons for its denials, choosing instead to rely upon broad, conclusory language, usually attributed to the ITA, which in turn has now passed the buck to the undisclosed SME. Who the SME is or what reports, if any, it has rendered is neither disclosed nor described in the decisions or the records before the Court. That is unacceptable. This type of Star Chamber approach not only fails to pass muster under the APA, it runs afoul of fundamental due process. Commerce has, we submit, an obligation to both appear to do justice and to do justice. Here it has done neither.

We have already had one remand (for the 2020 Requests), and neither the evidence nor Commerce's approach has changed. Neither would change on a second remand. Awarding Commerce a third bite at rationalizing its irrational denials is, we submit, unwarranted. There comes a time when, as the late Judge Gurfein put it, it is time to apply the well-known "doctrine of enough is enough." *Broder v. Pfizer, Inc.*, 1972 WL 648, at *8 (S.D.N.Y. Nov. 28, 1972). In this case, that time is now. We therefore respectfully request that the Court grant Plaintiff's Motion and order an immediate refund of the more than $255 million in tariffs NLMK has paid as a result of Commerce's unlawful denial of its 2020 and 2021 Requests.

PUBLIC DOCUMENT

Dated: New York, New York
July 22, 2022

Respectfully submitted:


**CHAFFETZ LINDSEY LLP**


By: */s/Sanford Litvack*

Sanford Litvack
Andrew L. Poplinger
R. Matthew Burke
1700 Broadway, 33rd Floor
New York, NY 10019
Tel. (212) 257-6960
Fax. (212) 257-6950
s.litvack@chaffetzlindsey.com
a.poplinger@chaffetzlindsey.com
r.m.burke@chaffetzlindsey.com

*Counsel for Plaintiff NLMK*
*Pennsylvania, LLC*

48

**PUBLIC DOCUMENT**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chambers Procedure 2(B)(2), the undersigned certifies that Plaintiff NLMK

Pennsylvania, LLC's Memorandum of Law in Support of Its Motion Pursuant to Rule 56.1 for

Judgment on the Agency Record contains 13,615 words as computed by Chaffetz Lindsey LLP's

word processing system, excluding those portions that do not count toward the word limitation

and, thus, complies with the Court's Chambers Procedures.


*/s/Sanford Litvack*