IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

|  |  |  |
|---|---|---|
| NLMK PENNSYLVANIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Court No. 21-00507 |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

ORDER

On consideration of plaintiff's motion for judgment on the administrative record, defendant's response, and all other pertinent papers, it is hereby

ORDERED that 55 of the challenged determinations—concerning Exclusion Request Nos. 111695, 111697, 111698, 111701, 111709, 111713, 111718, 111725, 111729, 111731, 111734, 111740, 111745, 111748, 111752, 111758, 111762, 111767, 111771, 111773, 111775, 111776, 111779, 111780, 111781, 111782, 194445, 194449, 194452, 194455, 194458, 194460, 194463, 194482, 194511, 194515, 194516, 194518, 194521, 194525, 194529, 194532, 194535, 194536, 194547, 194553, 194560, 194562, 194566, 194571, 194573, 194883, 198055, 198056, and 260914—are sustained.

ORDERED that the three remaining challenged determinations—concerning Exclusion Request Nos. 248733, 248740, and 260912—are remanded to the Department of Commerce for reexamination.

Dated:_____, 2022
        New York, N.Y.                                    _____
                                                                    JUDGE

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

| | | |
|---|---|---|
| NLMK PENNSYLVANIA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Court No. 21-00507 |
| | ) | |
| v. | ) | PUBLIC VERSION |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S CORRECTED RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director

MEEN GEU OH
Senior Trial Counsel
KYLE S. BECKRICH
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 307-0184
Email:  Meen-Geu.Oh@usdoj.gov

September 16, 2022
(corrected September 26, 2022)

*Attorneys for Defendants*

**TABLE OF CONTENTS**

STATEMENT PURSUANT TO USCIT RULE 56.1(c)(1) .......................................................... 1

I.     The Administrative Determinations Under Review ......................................................... 1

II.    Statement Of The Issues .............................................................................................. 2

STATEMENT OF FACTS ............................................................................................................ 2

I.     The Section 232 Steel Investigation ........................................................................... 2

II.    The President's Proclamations And Their Implementation .......................................... 3

III.   Commerce's Administrative Procedures For Requesting Product Exclusions ............. 4

IV.   NLMK's Exclusion Requests, The Domestic Industry's Responses, And Commerce's Denials ......................................................................................................................... 8

SUMMARY OF ARGUMENT ................................................................................................... 11

ARGUMENT ............................................................................................................................... 12

I.     Standard Of Review ................................................................................................... 12

II.    NLMK Has Not Demonstrated That Commerce's Decisions To Deny NLMK's Exclusion Requests Were Arbitrary, Capricious, Or Contrary To Law ...................... 13

        A.    In 2020, Commerce Reasonably Denied 26 Of NLMK's Exclusion Requests For "250 mm" Thick Steel Slab Because NLMK Had Domestic Access To Suitable Substitutes To Create Its Specified, General Application Coil Products ............ 15

        B.    Beginning in 2021, Commerce Reasonably Began Denying NLMK's Other "250 mm" Exclusion Requests On The Ground That The Articles Could Be Timely Produced In The United States By A Domestic Objector In Sufficient Quantity And Quality ................................................................................................................ 23

        C.    Commerce Reasonably Denied NLMK's Two Exclusion Requests For "200 mm" Thick Steel Slab On The Ground That The Articles Could Be Timely Produced In The United States By A Domestic Objector In Sufficient Quantity And Quality ........... 26

        D.    Commerce Reasonably Denied Exclusion Request 260914 For "250 mm" Thick Steel Slab On The Ground That The Article Could Be Timely Produced In The United States By A Domestic Objector In Sufficient Quantity And Quality .............................. 31

        E.    The Court Should Return To Commerce NLMK's Mid To Late 2021 Exclusion Requests Which Were Denied On Ambiguity Grounds .................................. 33

III.   NLMK Has No Basis To Attack Commerce's Referrals To A Subject Matter Expert (SME) For Technical Opinions Or To Claim That The Records Are Incomplete .................................... 36

IV.     NLMK Has No Basis To Ask That The Court Commandeer The Exclusion Request Process, Grant Its Exclusions, And Award It Hundreds Of Millions Of Dollars.........................................40

CONCLUSION......................................................................................................................................41

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                          **Page(s)**

*Alfa Int'l Seafood v. Ross,*
    264 F. Supp. 3d 23 (D.D.C. 2017) ............................................................................ 39

*Allied Tech. Grp., Inc. v. United States,*
    649 F.3d 1320 (Fed. Cir. 2011) ......................................................................... passim

*Ammex, Inc. v. United States,*
    23 CIT 549 (1999) ................................................................................................. 40

*Bar MK Ranches v. Yuetter,*
    994 F.2d 735 (10th Cir. 1993) ............................................................................... 40

*Bowman Transp. Inc. v. Arkansas-Best Freight System,*
    419 U.S. 285 (1974) ............................................................................................... 13

*Canadian Lumber Trade All. v. United States,*
    517 F.3d 1319 (Fed. Cir. 2008) ............................................................................. 12

*CSC Sugar LLC v. United States,*
    461 F. Supp. 3d 1363 (Ct. Int'l Trade 2020) ........................................................ 40

*Ctr. for Auto Safety v. Federal Highway Admin.,*
    956 F.2d 309 (D.C. Cir. 1992) ............................................................................... 39

*Dixon Ticonderoga Co. v. United States,*
    468 F.3d 1353 (Fed. Cir. 2006) ............................................................................. 12

*F.C.C. v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ............................................................................................... 13

*Former Emps. of Alcatel Telecommunications Cable v. Herman,*
    24 CIT 655 (2000) ................................................................................................. 13

*Friends of Richards-Gebaur Airport v. F.A.A.,*
    251 F.3d 1178 (8th Cir. 2001) ............................................................................... 39

*Genuine Parts Co. v. Env't Prot. Agency,*
    890 F.3d 304 (D.C. Cir. 2018) ............................................................................... 30

*Inland Steel Indus., Inc. v. United States,*
    188 F.3d 1349 (Fed. Cir. 1999) ............................................................................. 26

*Jacobi Carbons AB v. United States*,
    422 F. Supp. 3d 1318 (Ct. Int'l Trade 2019) ..................................................... 25, 33

*JSW Steel (USA) Inc. v. United States*,
    466 F. Supp. 3d 1320 (Ct. Int'l Trade 2020) ........................................................... 40

*Lobsters, Inc. v. Evans*,
    346 F. Supp. 2d 340 (D. Mass. 2004) ....................................................................... 39

*Marsh v. Oregon Nat. Res. Council*,
    490 U.S. 360 (1989) ................................................................................................ 38

*McEachern v. Office of Personnel Management*,
    776 F.2d 1539 (Fed. Cir. 1985) ............................................................................... 40

*Monsanto Co. v. Geertson Seed Farms*,
    130 S. Ct. 2743 (2010) ............................................................................................ 41

*Motor Vehicle Mfr.'s Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) .................................................................................................. 41

*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*,
    839 F. Supp. 2d 1117 (D. Or. 2011) ........................................................................ 38

*Olenga v. Gacki*,
    507 F. Supp. 3d 260 (D.D.C. 2020) ........................................................................ 13

*Pension Ben. Guar. Corp. v. LTV Corp.*,
    496 U.S. 633 (1990) ................................................................................................ 39

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) ................................................................................................ 13

*Sierra Club v. Marita*,
    46 F.3d 606 (7th Cir. 1995) ..................................................................................... 39

*Stewart v. Potts*,
    996 F. Supp. 668 (S.D. Tex. 1998) .......................................................................... 38

*Taylor Energy Co. LLC v. United States*,
    2020 WL 6075693 (D.D.C. Oct. 14, 2020) ............................................................. 38

**Statutes**

19 U.S.C. § 1862 ............................................................................................................. 1, 2

28 U.S.C. § 1581 .................................................................................................. 12

28 U.S.C. § 2640 .................................................................................................. 12

**Regulations**

15 C.F.R. Pt. 705 ........................................................................................... passim

**Other Authorities**

*Adjusting Imports of Steel Into the United States*,
   *Proclamation 9705*, 83 Fed. Reg. 11,625 (Mar. 8, 2018) ........................................ 3, 4

*Adjusting Imports of Steel Into the United States*,
   *Proclamation 9740*, 83 Fed. Reg. 20,683 (April 30, 2018) ........................................ 3

*Adjusting Imports of Steel Into the United States*,
   Proclamation 9894, 84 Fed. Reg. 23,987 (May 23, 2019) ........................................ 5

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

———————————————————————————

| | |
|---|---|
| NLMK PENNSYLVANIA, LLC, | ) |
| | ) |
|       Plaintiff, | ) |
| | )   Court No. 21-00507 |
|       v. | ) |
| | ) |
| UNITED STATES, | ) |
| | ) |
|       Defendant. | ) |

———————————————————————————

### DEFENDANT'S CORRECTED RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Pursuant to Rule 56.1 of the Rules of this Court, defendant, the United States, respectfully submits this response to the motion for judgment on the administrative record filed by plaintiff, NLMK Pennsylvania, LLC (NLMK).  NLMK challenges the Department of Commerce's decisions to deny 58 exclusions from import measures imposed on certain steel articles by the President under Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, as amended (Section 232).  The Court should deny NLMK's motion as to 55 of those requests because Commerce's decisions were not arbitrary, capricious, or contrary to law.  For the remaining three, we respectfully request that the Court remand those requests for further examination in light of the issues NLMK has raised in its motion.

### STATEMENT PURSUANT TO USCIT RULE 56.1(c)(1)

I.    The Administrative Determinations Under Review

The administrative determinations under review are Commerce's denials of NLMK's 58 requests to exclude certain imports of semi-finished, commodity-grade steel slab from the Section 232 national security duties on steel articles.

II.    <u>Statement Of The Issues</u>

Whether NLMK has demonstrated that Commerce's decisions denying NLMK's requests to exclude imports of semi-finished, commodity-grade steel slab from the President's national security tariffs were arbitrary, capricious, or contrary to law.

<u>STATEMENT OF FACTS</u>

I.    <u>The Section 232 Steel Investigation</u>

Section 232 authorizes the President to adjust imports of an article and its derivatives if the President concurs with a finding by the Secretary of Commerce (the Secretary) that such imports threaten to impair the national security. *See generally* 19 U.S.C. § 1862.

The Secretary must submit to the President a report on the findings of such investigation, along with "recommendations . . . for {Presidential} action or inaction" based on those findings. 19 U.S.C. § 1862(b)(3)(A).  Upon receiving a report from the Secretary finding that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security," the President is authorized, if the President concurs with the Secretary's findings, to "adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security." 19 U.S.C. § 1862(c)(1)(A).

The Secretary initiated an investigation to determine the effect of imports of steel and aluminum on the national security, which was conducted by the Bureau of Industry and Security (BIS), a Commerce sub-agency.  *See generally* U.S. DEP'T OF COMMERCE, THE EFFECT OF IMPORTS OF STEEL ON THE NATIONAL SECURITY (Jan. 11, 2018).  The Secretary issued a report and recommendation to the President, finding that steel imports are "weakening {the United States'} internal economy" and "threaten to impair the national security as defined in Section 232." *Id*. at 5.  The Secretary found that the availability of steel from a healthy domestic

2

industry is important for national defense and to support critical infrastructure needs, and that the current quantity of imports, due to substantial and sustained global overcapacity, adversely affected the domestic steel industry.  *Id.* at 23-41.

In light of these findings, the Secretary recommended that "the President take immediate action by adjusting the level of imports through quotas or tariffs on steel imported into the United States {so as to} keep the U.S. Steel industry financially viable and able to meet U.S. national security needs."  *Id*. at 58.  The Secretary also recommended a process by which certain products could be excluded from the import measures, after a request from affected United States parties demonstrating a lack of sufficient United States production capacity of comparable products, or based on specific national security considerations.  *Id*. at 61.

II.     The President's Proclamations And Their Implementation

After considering the Secretary's report, the President issued *Proclamation 9705,* in which he concurred with the Secretary's finding that steel articles are being imported in such quantities and under such circumstances as to threaten to impair the national security of the United States, and announced measures on "adjusting imports of steel."  *Adjusting Imports of Steel Into the United States*, *Proclamation 9705*, 83 Fed. Reg. 11,625 (Mar. 8, 2018).  The President established a 25 percent tariff on imports of certain steel articles, effective March 23, 2018, from all countries except Canada and Mexico.  *Id.* Clauses (1)-(2).  The exclusion of Canada and Mexico from the Section 232 remedy expired on June 1, 2018, and, thus, steel from those countries became subject to a 25 percent tariff as of that date.  *Adjusting Imports of Steel Into the United States*, *Proclamation 9740*, 83 Fed. Reg. 20,683 (April 30, 2018).[1]

---

[1] Approximately one year later, the President proclaimed that discussions with Canada and Mexico resulted in satisfactory alternative means to address the threatened impairment of the national security posed by steel imports from those countries and, therefore, again excluded

Simultaneously with imposing the tariffs, the President authorized the Secretary of Commerce to provide relief from the tariffs for products determined not to be produced in the United States in a sufficient and reasonably available amount or of a satisfactory quality or based upon specific national security considerations. *Proclamation 9705*, Cl. (3). The President explained that "relief shall be provided for a steel article only after a request for exclusion is made by a directly affected party located in the United States." *Id.* The President instructed Commerce to issue procedures for the requests for exclusion within 10 days after *Proclamation 9705* was issued. *Id.* Cl. (4).

III.   Commerce's Administrative Procedures For Requesting Product Exclusions

On March 19, 2018, Commerce promulgated an interim final rule, establishing the exclusion process envisioned in *Proclamation 9705*. *Requirements for Submissions Requesting Exclusions From the Remedies Instituted in Presidential Proclamations Adjusting Imports of Steel Into the United States and Adjusting Imports of Aluminum Into the United States; and the Filing of Objections to Submitted Exclusion Requests for Steel and Aluminum*, 83 Fed. Reg. 12,106 (Dep't of Commerce Mar. 19, 2018), codified at 15 C.F.R. Pt. 705, Supp. 1.[2]

Under its regulations, only directly affected individuals or organizations (*e.g.*, construction, manufacturing, or supplying steel product to users) located in the United States may submit an exclusion request. *Id.* § (c)(1). Commerce will approve exclusions on a product basis, and the approvals are generally limited to the individual or organization that submitted the

---

Canada and Mexico from the tariffs imposed in *Proclamation 9705* on a long-term basis. *Adjusting Imports of Steel Into the United States*, *Proclamation 9894*, 84 Fed. Reg. 23,987 (May 23, 2019).

[2] NLMK's exclusion requests were submitted in late-2020 through 2021. *See generally Mot.* At all relevant times, Commerce relied on the version of the regulations in effect at the time those requests were submitted. *E.g.*, AR111734-004 (applying the regulations "in effect at the time ITA made its initial recommendation on this exclusion request.").

request.  *Id.* § (c)(2).

Requestors must complete and submit a fillable form available on Commerce's website, *id*. § (b), as well as specify the business activities in the United States with which they are engaged that qualify the individual or organization to be directly affected and thus eligible to submit a request, *id.* § (c)(5).  "The request should clearly identify, and provide support for, the basis upon which the exclusion is sought."  *Id.*

The fillable form required requestors to supply specific factual information, including: (1) the product type and class for which the exclusion is requested, (2) the 10-digit Harmonized Tariff Schedule Code of the United States (HTSUS) for the single product covered by the request, (3) the quantity of product required (stated in kilograms) under a one-year exclusion, (4) estimates of the number of days required to take delivery of, manufacture, and ship the product covered by the request, (5) a full description of the physical properties and chemical composition of the product the requestor seeks to import, (6) any standards organizations that have set specifications for the product, (7) the application for the product, (8) why similar products manufactured in the United States are not suitable, and (9) domestic product availability information.  *See, e.g.*, AR 111695-005-015.

Commerce reviews each request to determine whether an article described in the request meets one of three criteria: (1) the article is not produced in the United States in a sufficient and reasonably available amount, (2) the article is not produced in the United States in a satisfactory quality, or (3) specific national security considerations.  15 C.F.R. Pt. 705, Supp. 1, § (c)(6).[3]

---

[3] National security considerations are "intended to allow the U.S. Department of Commerce, in consultation with other parts of the U.S. Government as warranted, to make determinations whether a particular exclusion request should be approved based on specific national security considerations," such as where "the steel included in an exclusion request is needed by a U.S. defense contractor for making critical items for use in a military weapons

Not produced in the United States in a sufficient and reasonably available amount "means that the amount of steel that is needed by the end user requesting the exclusion is not available immediately in the United States to meet its specified business activities." *Id.* § (c)(6)(i). "Immediately" "means whether a product is currently being produced or could be produced 'within eight weeks', or if that is not possible, by a date earlier than the time required for the requester to obtain the entire quantity of the product from the requester's foreign supplier." *Id.*

Not produced in the United States in a satisfactory quality "does not mean the steel needs to be identical, but it does need to be equivalent as a substitute product." *Id.* § (c)(6)(ii). "Substitute product" "means that the steel being produced by an objector can meet 'immediately' the quality (e.g., industry specs or internal company quality controls or standards), regulatory, or testing standards, in order for the U.S. produced steel to be used in that business activity in the United States by that end user." *Id.* Commerce provided examples of what would constitute substitute products: "if a U.S. business activity requires that steel plates to be provided must meet certain military testing and military specification standards in order to be used in military combat vehicles," or "if a U.S. business activity requires that steel tubing to be provided must meet certain Food and Drug Administration (FDA) approvals to be used in medical devices," Commerce will take that into account when reviewing a request. *Id.* As another example: where "a food manufacturer … requires tin-plate approval from the U.S. Department of Agriculture (USDA) to make any changes in the tin-plate it uses to make cans for fruit juices{,}

---

platform for the U.S. Department of Defense, and the duty or quantitative limitation will prevent the military weapons platform from being produced, the exclusion will likely be granted." 15 C.F.R. Pt. 705, Supp. 1, § (c)(6)(iii). Commerce may also consider "other impacts to U.S. national security that may result from not approving an exclusion, e.g., the unintended impacts that may occur in other downstream industries using steel, but in such cases the demonstrated concern with U.S. national security would need to be tangible and clearly explained and ultimately determined by the U.S. Government." *Id.*

{a}n objector would not have to make steel for use in making the cans that was identical, but it would have to be a 'substitute product' meaning it could meet the USDA certification standards." *Id.*

Any individual or organization that domestically manufacturers steel articles may file objections to exclusion requests. *Id.* § (d)(1). An objection "should clearly identify, and provide support for, its opposition to the proposed exclusion." *Id.* § (d)(4). The fillable form instructed objectors to: (1) indicate whether the objector currently manufactures the product or is capable of immediately manufacturing the product, (2) explain the time period within which the objector can produce the product, if it does not currently manufacture the product, (3) state whether the objector manufactures, or can immediately manufacture, a substitute product, (4) discuss the suitability of the objector's product compared to that identified in the request, (5) provide a full technical description of the physical properties and chemical composition of the product the objector manufactures relative to specifications cited in the request, (6) state what percentage of the total product tonnage requirement covered by the request that the objector can manufacture on a timely basis, and (7) the number of days required to ship, manufacture, and deliver the product. *See, e.g.*, AR111695-032-039. "The objection process is an important part of ensuring the duties and quantitative limitations are working as intended to achieve the stated purposes of the President's Proclamations and the objectives of implementing these duties and quantitative limitations to protect U.S. national security interests." 15 C.F.R. Pt. 705, Supp. 1 § (f).

Requestors may also submit rebuttals, and objectors may submit surrebuttals. *Id.* § (f)-(g). Because information provided in the submissions is made available to the public, the regulations state that information not subject to public disclosure should not be submitted. *Id.* § (b)(5)(ii). "For persons seeking to submit confidential or proprietary business information

7

(CBI), the 232 submission available to the public must contain a summary of the CBI in sufficient detail to permit a reasonable understanding of the substance of the information." *Id.* § (b)(5)(iii).  Requestors and objectors may also submit CBI directly to Commerce.  *Id.*

"Commerce reviews an exclusion request based on the information included in the exclusion request, any objections to an exclusion request, any rebuttals to the objections made by an individual or organization that submitted the exclusion request, and any surrebuttals." *Id.* § (c)(6)(i).

For exclusion requests that receive no objections, Commerce will post a decision granting the request if it identifies no national security concerns.  *Id.* § (h)(2)(ii).  If Commerce "denies an exclusion request based on a representation made by an objector, which later is determined to be inaccurate (e.g., if the objector was not able to meet the requirement of being able to 'immediately' supply the steel that was included in a denied exclusion request in the quantity needed), the requester may submit a new exclusion request that refers back to the original denied exclusion request and explains that the objector was not able to supply the steel." *Id.* § (c)(6)(i).

Approved exclusions will be effective five business days after publication of Commerce's response granting an exclusion, and, on that date, "the requester will be able to rely upon the approved exclusion request in calculating the duties owed on the product imported in accordance with the terms listed in the approved exclusion request." *Id.* § (h)(2)(iii)(A).  Commerce further directed that "{e}xclusions will generally be approved for one year." *Id.* § (h)(2)(iv).

IV.    NLMK's Exclusion Requests, The Domestic Industry's Responses, And
       Commerce's Denials

Between mid-2020 and late-2021, NLMK applied for 58 exclusions from the President's import measures imposed on certain steel articles under Section 232.  Broadly speaking, NLMK

sought exclusions for semi-finished, commodity grade steel slab so that it could import those products from abroad, specifically from Russia.  Its requests generally expressed a need for steel slab with two specific thicknesses: 200 mm (or approximately 7.87 inches), and 250 mm (or approximately 9.84 inches).  In defining the nature of its business, NLMK stated that as a "slab converter," AR 111695-017, *i.e.*, it takes semi-finished steel slab, reheats the slab in a furnace, flattens the slab into sheet, and then rolls that sheet into coil.  The rolled sheets—which take the shape of large paper towel rolls—are then sold to consumers for use in a wide assortment of generalized downstream commercial applications, "including pipe and tube, heavy equipment, transportation (including automotive), general manufacturing, and independent coil coating operations," *id*. at -012.

Despite the generic nature of its end-product, NLMK insisted that its circumstances presented a special case.  It claimed that its "customers want big, full-size coil" because smaller rolls are purportedly more expensive to store, ship, and use.  *Id*. at -018.  Thus, to ensure that its customers could receive more steel sheet per roll, NLMK claimed that it must start with a certain thickness slab, most commonly 250mm (9.84 inch) thick steel slab, rather than ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮] that the domestic industry had historically made available.  *See id*. at -017-018, -072-075.  NLMK argued that—even if these other domestic slab products are compositionally identical—starting with thinner slab (due to its reduced steel volume) results in less rolled coil.  *See id*.  And although NLMK acknowledged that it could make the same size rolls by starting with longer slab to compensate for the reduced slab thickness, it claimed that its furnaces are limited in size and thus cannot accommodate steel slab more than a certain length, *i.e.*, 356 inches.  AR 111695-023.  At bottom, NLMK insisted that its "customers generally will not buy smaller coils," and it would "lose {} orders" if it made smaller coils from thinner slab.

*Id*. at -018.  It thus claimed that it had "no choice but to import slabs to survive as a business."
*Id*.

Domestic entities objected to NLMK's requests.  In their view, NLMK was seeking an
exclusion for a widely available commodity-grade slab product, but it was doing so by contriving
a request to match an "unrealistic{ally}" specific slab thickness that it knew would be least
available in the domestic market, which they viewed as an effort to "circumvent the Section 232
action."  *Id*. at -042.  They claimed that NLMK had a history (a recent one, in fact) of purchasing
steel slab in variant thicknesses to make its steel coil products regardless of whether those slabs
resulted in slightly different roll sizes, but was now reducing its slab-thickness tolerance "to an
unrealistic 0 millimeters" in a clear "attempt to secure tariff-free slab imports" rather than buy
the slab domestically.  *E.g*., *id*.  In opposing NLMK's requests, domestic entities claimed that
they either made the same thickness product NLMK was looking for (and could ramp up
production to meet NLMK's needs), *e.g*., AR 194445-39-48, -66-69, or that they produced a
slightly thinner slab that NLMK could use to create the exact same coil products in slightly
smaller roll sizes, *e.g*., AR 111695-041-044.

Commerce considered the record and denied each of NLMK's exclusion requests.  We
address these decisions in greater detail below, but the central thrust of 55 out of 58 of these
decisions is that the domestic industry already produced the exact thickness commodity grade
slab NLMK supposedly needed to make its coil, *e.g*., AR 194445-04-05, or that NLMK could
still make the same coil (albeit with a slightly smaller coil size) by using a slightly different
thickness of the same slab that was already available in the domestic market, *e.g*., AR 111695-

10

04-05.[4]  For the remaining three of its 58 decisions, Commerce declined to analyze the requests

on the ground that they were technically deficient and ambiguously defined.  *E.g.*, AR 260912-

03-05.

SUMMARY OF ARGUMENT

The Court should sustain Commerce's decisions to deny 55 of NLMK's 58 exclusion

requests.  As to those requests, Commerce complied with its regulations and its decisions were

reasonable in light of the evidence presented by NLMK and the relevant objectors.  NLMK's

arguments do not demonstrate otherwise.  As to the remaining three decisions, we respectfully

request that the Court remand those requests for further examination.

In large part, NLMK's exclusion requests are based upon a contrived basis for a quality-

based exclusion to the President's Section 232 restriction on steel imports.  It seeks exclusions

for unrealistically specific sizes of garden-variety steel slab products.  According to NLMK, it

has no choice but to use that exact size of slab to create the size product rolls that its customers

want.  NLMK insists that its customers' demands entitle it to a quality-based exclusion under the

governing regulation.  The problem with NLMK's argument is that it has no grounding in the

law.  Commerce denied NLMK's requests explaining that quality-based exclusions must be

based on technical and compositional factors of the requested product, not subjective, non-

technical claims of preference.  There is no dispute that NLMK could make compositionally

identical products using domestic materials.  NLMK disagrees with Commerce's explanations

but provides no valid reason why Commerce's decisions are arbitrary, capricious or contrary to

law.

---

[4] Not produced in the United States in a satisfactory quality "does not mean the steel needs to be identical, but it does need to be equivalent as a substitute product."  15 C.F.R. Pt. 705, Supp. 1 § (c)(6)(ii).

11

As to the remainder of NLMK's exclusion requests, Commerce denied them because it found that the exact products NLMK sought were domestically available in sufficient quantities, or because NLMK failed to adequately define the parameters of its request. As to the former group, the record evidence substantiates Commerce's findings. NLMK simply disagrees with the weight Commerce ascribed to the evidence, which does not formulate a proper ground for its challenge. As to the latter group, consisting of three exclusions requests which Commerce denied as ambiguous and deficient, we respectfully request that the Court remand those decisions for re-examination in light of the issues NLMK has raised in its motion.

<u>ARGUMENT</u>

I.    <u>Standard Of Review</u>

In a civil action brought under 28 U.S.C. § 1581(i), "the Court of International Trade shall review the matter as provided in section 706 of title 5." 28 U.S.C. § 2640(e). "When reviewing a decision of the Court of International Trade in a suit brought pursuant to 28 U.S.C. § 1581(i), {the court} appl{ies} the standard of review set forth by the Administrative Procedure Act, and will 'hold unlawful and set aside {agency} action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1331 (Fed. Cir. 2008) (quoting 5 U.S.C. § 706(2)) (citing *Dixon Ticonderoga Co. v. United States*, 468 F.3d 1353, 1354 (Fed. Cir. 2006)).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfr.'s Ass'n v. State Farm Mut. Auto. Ins*., 463 U.S. 29, 43 (1983). Commerce "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the

facts found and the choice made.'" *Id.* (citations omitted).

"The arbitrary and capricious standard of review is {also} narrower than the substantial evidence standard, and the court will therefore remand {Commerce's} … determination only if it finds that 'the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Former Emps. of Alcatel Telecommunications Cable v. Herman*, 24 CIT 655, 658–59 (2000) (quoting *Motor Vehicle Mfr.'s Ass'n*, 463 U.S. at 43).

While the Court "'{m}ay not supply a reasoned basis for the agency's action that the agency itself has not given,' {it} will, however, 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947), *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 285, 286 (1974)); *see also F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009) (describing the arbitrary and capricious standard of review as "narrow").

II.   NLMK Has Not Demonstrated That Commerce's Decisions To Deny NLMK's Exclusion Requests Were Arbitrary, Capricious, Or Contrary To Law

This case covers 58 exclusion requests.  The decisions themselves can be analyzed in five general categories.[5]  The first category covers 26 exclusion requests that NLMK filed in 2020 for

---

[5] For the most part, we agree with NLMK that the records associated with each request are substantively duplicative.  Mot. at 8.  Accordingly, we (like NLMK) mostly rely on representative decisions (and records) for each category of request, as denoted above by the *e.g.* call signal following a description of each category of requests.  Moreover, for the sake of efficiency, we have relied on the same representative decisions as NLMK where possible to

250 mm thick semi-finished steel slab.  Commerce denied those requests because it found that

suitable substitutes for 250 mm slab (*i.e.*, thinner, compositionally identical slab) were widely

and readily available in the domestic market.  *E.g.*, AR-111695-119.  The second category

covers 26 exclusion requests for the same slab that NLMK filed in early 2021.  Commerce

denied those requests because a domestic objector had started manufacturing and made available

the exact product NLMK was seeking and indicated that it would make those items available to

NLMK in a timely and sufficient manner.  *E.g.*, AR-194445-04-05.  The third category covers

two exclusion requests for 200 mm thick semi-finished steel slab that NLMK also filed in early

2021.  Commerce denied those requests because those exact items were widely and immediately

available in domestic markets in sufficient quantities.  *E.g.*, AR-198055-04-05.  The fourth

category covers a single exclusion request that NLMK filed in late 2021 for 250mm thick semi-

finished steel slab.  Commerce denied the request because a domestic objector made the exact

product NLMK was seeking and indicated it could produce that item to NLMK in a timely and

sufficient manner.  AR-260914-03-05.  And the fifth category covers three exclusion requests

that NLMK filed in mid to late 2021 for 250 mm thick semi-finished steel slab.  Commerce

declined to analyze those requests on the ground that they were technically deficient and

ambiguously defined.  *E.g.*, AR-260912-03-05.  We address each of these groups of decisions in

turn.

    A.    In 2020, Commerce Reasonably Denied 26 Of NLMK's Exclusion Requests For
            "250 mm" Thick Steel Slab Because NLMK Had Domestic Access To Suitable
            Substitutes To Create Its Specified, General Application Coil Products

In 2020, NLMK submitted 26 exclusions requests for 250 mm thick semi-finished steel

---

reduce the number of pages that would be cited within these briefs.  *Id.* at 4-5, n. 2-7 (explaining
which decisions and groups are representative of which).

slab.  In defining its business, NLMK described itself as a "steel converter," and more specifically a maker of general application steel coil.  NLMK-111695-017.  Coil makers like NLMK take steel slab, reheat it in a furnace, flatten it into sheet, and then coil that sheet into rolls.  Those rolls are then sold to customers for downstream use in a wide number of relevant applications.  In NLMK's case, its end-products are for general commercial applications, "including pipe and tube, heavy equipment, transportation (including automotive), general manufacturing, and independent coil coating operations," *id*. at -012.

In making its coil, NLMK insisted that it must start with 250 mm thick steel slab, which it claimed was unavailable domestically.  NLMK provided two reasons why it needed such slab. First, it claimed that its "customers want big, full-size coil" and that starting with thinner slab would result in smaller rolls, which are purportedly more expensive to store, ship, and use.  *Id*. at -017-018.  Second, although it acknowledged that it could make the same size rolls by starting with longer slab to compensate for any reduced thickness, it reported that its furnaces are limited in size and thus cannot accommodate steel slab more than a certain length, *i.e.*, 356 inches.  *Id*. at -023.  Based upon these two premises—the length limitations of its furnaces, and its customers' desire for "big, full-size coil"—NLMK argued that the only way for it produce its ideal roll size was by starting with the thickest relevant slab possible, *i.e.*, 250mm (9.84 inch) thick steel slab rather than [████████████████████████] thick steel slab, which are available domestically.[6]  At bottom, NLMK argued that it was entitled to exclusions because its "customers generally will not buy smaller coils," and it would "lose {} orders" if it could no longer produce the larger sized coil that comes from 250 mm thick slab.  *Id*. at -018.

---

[6] NLMK's argument regarding its need for steel coils achieving a certain pounds per inch of width (PIW) is an iteration of this same argument.  Mot. at 9, 18, and 26.  It is another way of NLMK saying that it wishes to make a particular size roll of coil.

Before expounding on why Commerce denied these requests, we highlight an important fact that is not in dispute.  There is no dispute that domestically available slab is compositionally identical to the slab NLMK wishes to import duty-free.  NLMK seeks exclusions for commodity grade, semi-finished steel slab, which is a garden-variety steel product.  Nor is there any dispute that NLMK could use this domestic slab to make coiled steel sheet that is compositionally identical to what it normally makes and offers for sale to its customers.  The *only* difference is that the slab available domestically is slightly thinner, meaning that the rolls that would be produced from using such slab—when ultimately flattened into sheet and rolled into coil—will contain slightly less steel per roll.  Accordingly, NLMK's argument hinges on its claim that its customers demand "big, full-size coil," *id*. at -018, and that desire—to afford its customers slightly more steel per roll by starting with 250mm slab as opposed to [          ]— should entitle it to steel exclusions.

Commerce denied NLMK's requests in three tranches.  In one tranche, covering 10 requests, Commerce concluded that two domestic objectors, AK Steel and U.S. Steel, offered "suitable substitutes" for NLMK's purposes.  *E.g*., AR-111697-04.  Although acknowledging that neither entity made 250 mm thick steel slabs, Commerce explained that these two entities "meet the quality criterion because they can manufacture an *identical product* matching the chemical, mechanical, and technical specifications provided in the exclusion request{s}."  *Id*. at -04 (emphasis added).  That is, these entities offered compositionally identical products, the only difference being that their slabs are slightly thinner than 250 mm.  *Id*. at -043 (explaining that domestic slab can be used to make coil "with identical mechanical and performance properties").  Commerce further explained that both entities "can manufacture 100 percent of the quantity requested" by NLMK, and that they could do so "immediately" as defined within the governing

regulation.  AR-111697-05.

In the second set, covering one request, Commerce made the same essential finding.  It concluded that NLMK's preference to start with a certain size slab to create larger coil sizes, *i.e.*, more sheet per roll, was not a basis for a "quality" based exclusion.  AR-111734-04.  It explained "that parts made from sheet coil utilize a portion of the coil for each part," meaning the only difference in effect is that the user of a shorter roll might have to "swap out the coils more frequently."  *Id*.  The material at issue is otherwise exactly the same.  And while it might be true that users of shorter rolls might have more "by-cuts and scrap" because the user might have to change-out rolls more frequently, Commerce explained "that these are issues of efficiency and economic factors," which have no bearing on the "technical" usability, *i.e.*, "form, fit, function, and performance" of the end-product, 83 Fed. Reg. at 46,036 (BIS response to Cmt. (f)(5)(iv)).  "Based on" there being no distinction between the products in terms of "technical factors," Commerce explained that NLMK's exclusion request would be denied because domestic objectors offered NLMK "suitable substitutes."  AR-111734-04

In the third set, covering 15 requests,[7] Commerce reached the same finding based on the same underlying rationale.  As to NLMK's purported insistence that it would not use slab that is anything other than exactly 250 mm thick, Commerce found the claim untenable, explaining that it is "technologically impossible to mass produce semi-finished steel slab with a thickness tolerance of less than one millimeter."  AR-111695-119.  It thus declined to discredit domestic objectors' submissions on the ground that they could not exactly match the "250mm thickness specified" in NLMK's requests.  *Id*.  Commerce explained that the "thinner slabs offered" by

---

[7] These 15 requests were the subject of Commerce's request for a voluntary remand. ECF No. 41.

domestic objectors—offered in a wide variety of thicknesses, though none exactly matching 250 mm—"would produce a slightly smaller coil but that smaller coil can be used to produce the same end products as a larger coil." *Id*. NLMK, for its part, had identified only "generic end use products" for its coil, meaning there was no quality-based reason why "slightly smaller" coil rolls could not be used for such applications. *Id*. As to NLMK's statement that its furnaces could only handle slab of a certain length, Commerce explained that domestic objectors used a "continuous casting" process to manufacture slab. *Id*. This allowed them to "supply slab of any length" including a length that matched "NLMK's reheat furnaces," which is 356 inches, thereby ensuring that the slab available would fit NLMK's needs. *Id*.

The central question for these 26 requests turns on whether NLMK can prove that Commerce's decisions—that NLMK could avail itself of suitable substitutes in the form of compositionally identical slab in slightly thinner form—were irrational or contrary to law. Or put another way, the Court must decide whether Commerce reasonably concluded that NLMK could use slightly thinner domestic steel slab (instead of foreign-sourced) to create its general application steel sheet rolls.

Respectfully, the record and the law demonstrate that NLMK has no basis for a quality-based exclusion. As defined by regulation, a "{s}ubstitute product" is deemed suitable where the "steel being produced by an objector can meet 'immediately' the quality (*e.g*., industry specs or internal company quality controls or standards), regulatory, or testing standards, in order for the U.S. produced steel to be used in that business activity in the United States by that end user." 15 C.F.R. pt. 705, supp. 1(c)(6)(ii). The steel does not "need to be identical" so long as it is "equivalent as a substitute product." *Id*. By regulatory letter, the quality criterion focuses on the technical and compositional qualities of the material itself—*e.g*., "industry specs," "internal

company quality controls or standards," and "regulatory, or testing standards"—not on how a company sells or packages items, which are non-quality-based preferences.[8]  As the regulatory history further elucidates, a substitute product's suitability is based upon the "form, fit, function, and performance" of that product, 83 Fed. Reg. at 46,036, which are technical and performance-based factors.  It is thus irrelevant for purposes of this case whether one claims that its customers might prefer slightly more or less of the same material within each roll.  The two relevant products are still the same, just in slightly different sizes.  And that slight difference in size has no effect on the quality of the ultimate end-product.  As Commerce rightly concluded, NLMK's purported "efficiency and economic factors," have no bearing on the "technical" usability of the product for purposes of a "quality"-based exception.  AR-111734-04.  NLMK, for its part, identified only "generic end use products" for its coil, meaning it had not identified any technical need for insisting upon a particular amount of coiled steel within each roll.  AR111695-119.  Commerce therefore had ample basis to conclude that domestically available commodity grade steel slab of slightly thinner thickness was sufficient for NLMK's needs.

NLMK nonetheless attacks Commerce's decisions in two ways.  First, it highlights the fact that Commerce reached these decisions in different tranches and used different verbiage for each set, which it says, "illustrates the flailing nature of Commerce's effort to deny the requests."

---

[8]  Commerce provided examples of what would constitute substitute products within the regulatory language.  For example, "if a U.S. business activity requires that steel plates to be provided must meet certain military testing and military specification standards in order to be used in military combat vehicles," or "if a U.S. business activity requires that steel tubing to be provided must meet certain Food and Drug Administration (FDA) approvals to be used in medical devices," Commerce would take such quality-based needs into account when reviewing a request.  *Id.*  As another example: where "a food manufacturer … requires tin-plate approval from the U.S. Department of Agriculture (USDA) to make any changes in the tin-plate it uses to make cans for fruit juices{,} {a}n objector would not have to make steel for use in making the cans that was identical, but it would have to be a 'substitute product' meaning it could meet the USDA certification standards."  *Id.*

Mot. at 20.  It is unclear why NLMK believes that is a valid basis for an argument.  That Commerce used different language to establish the same overarching point does not prove that the point itself is irrational.  It merely shows that despite what language Commerce used, its decisions were substantially consistent, as demonstrated by the fact that it made the same central point in every one of these decisions.[9]  The bottom line is that the evidence established that the domestic industry made the exact same compositional product NLMK was seeking under its exclusion requests, albeit in a "slightly smaller" but nonetheless usable thickness.  And the fact that NLMK might have to make do with "slightly smaller coil" if it used these items did not change the fact that the "smaller coil can be used to produce the same end products as a larger coil."  AR-111695-119.  Regardless of how NLMK attempts to frame its case, its contention regarding its customers' preferences and its concern about losing orders does not form a basis for a quality-based exclusion.

NLMK's second argument fares no better.  It contends that Commerce overlooked a segment of the regulatory language in subpart (c)(6)(ii), which purportedly requires Commerce to evaluate how the "steel" is "to be used in {the} business activity in the United States by {the} end user."  Mot. at 17 (citing 15 C.F.R. pt. 705, supp. 1(c)(6)(ii)).  NLMK insists that this language requires Commerce to focus on NLMK's "*specific needs* to determine" whether the substitute product it decries as unsuitable actually is suitable for its purposes.  *Id*.; *see also* Mot. at 8 (emphasis in original).  But NLMK omits the leading half of that regulatory provision, which makes clear that Commerce's focus—even when it comes to an end-user's "business activity"—

---

[9] It is also noteworthy that NLMK repeatedly accused Commerce throughout this case of issuing boilerplate recommendations and decisions.  *E.g*., Sec. Am. Compl., ECF No. 49-1 at 3, ¶¶ 8, 25, 64, 65, 79, 88, and 116.  But upon recognizing that Commerce used variant language to reach these same recommendations and conclusions, NLMK now castigates Commerce for using different language to establish the same point.  NLMK cannot have it both ways.

is circumscribed by technical facets of "quality," *i.e.*, "industry specs," "internal company quality controls or standards," and "regulatory, or testing standards." That quality criteria is what drives whether the substitute product can "be used in {the} business activity in the United States by {the} end user," *id.* § (c)(6)(ii), not whether using that substitute product will have some purported abstract monetary effect on a requestor's business as a whole. Here, NLMK had identified only "generic end use products which can be produced" from the same slab whether it is sourced domestically or overseas. AR111695-119. Given those record facts, Commerce's decisions are not arbitrary, capricious, or contrary to law.

A few additional points bear mentioning. In its motion, NLMK provides the photograph below to supposedly demonstrate the difference in roll size that would ensue from using "the thinner slab potentially available from Objectors."



Mot. at 10 (citing AR-111695-018). The photographic representation is both irrelevant and misleading. It is irrelevant because regardless of the size of each roll, the product is still compositionally the same—the only difference is how much of each product is within each roll. *See supra*. It is misleading because the photograph itself makes a false comparison. It compares coil made from 250 mm slab (on the left), and 200 mm slab (on the right), AR 111695-018 (explaining that the visual comparison is between 250 mm slab and 200 mm slab), which is not a size slab that anyone suggested NLMK should use. Objectors represented that they could offer

NLMK [███████████████] thick steel slab, meaning the actual difference between the two comparative rolls is substantially smaller than what NLMK's photograph suggests. The visual difference that NLMK attempts to convey through the photograph is thus irrelevant, misleading, and should be ignored.

NLMK also offers a second set of inapposite photographs in an effort to make its case. These photographs, which are provided below, purportedly show that domestic objectors are unable to make the correct length steel to fit within NLMK's furnaces.




Mot. at 9, 19 (citing AR-11695-018 and -075). The suggestion presented in these photographs is also incorrect. As Commerce explained, domestic objectors use a "continuous casting" process to manufacture slab, which allows them to "supply slab of any length" including a length that matches "NLMK's reheat furnaces." AR-111695-119. There is no dispute that domestic objectors can make whatever length slab NLMK needs. NLMK's only point is that, if it were to use thinner slab, it would have to start with a longer piece of slab to make up for the reduced steel-volume within that slab to make its preferred-size rolls, and its furnaces cannot accommodate lengths of slab that exceed 356 inches. But if Commerce is correct that NLMK's desire to create a particular sized steel roll is not a legal basis for a quality-based exclusion, then NLMK's argument is ultimately irrelevant. The pictorial representation that NLMK attempts to

convey thus has no bearing on this case.

NLMK is attempting to contrive a quality-based exception to the President's Section 232 action based upon "unrealistic{}" claims and arguments. *See* AR-111695-042. Commerce reasonably concluded that NLMK had access to widely available domestic substitutes that it could use to make compositionally identical products in slightly smaller rolls sizes. NLMK has no meaningful basis to argue that Commerce's decision was in error.

        B.      Beginning in 2021, Commerce Reasonably Began Denying NLMK's Other "250 mm" Exclusion Requests On The Ground That The Articles Could Be Timely Produced In The United States By A Domestic Objector In Sufficient Quantity And Quality

The following year, in early 2021, NLMK submitted 26 more exclusions requests for the same 250 mm steel slab product. In doing so, NLMK relied on the same arguments and evidence it presented in its first set of applications.

For these requests, however, Commerce denied them on slightly different grounds. A new domestic objector named Cleveland Cliffs indicated that it had started producing the exact product covered by these exclusion requests. AR 194445-040, -042. Cleveland Cliffs explained that it had sufficient capacity to sell NLMK the slab products it was looking for, and that it was prepared to produce such items and quantities in a timely manner. *Id*. at -039-048. Cleveland Cliffs provided Commerce with business proprietary information in support of the latter assertion. *Id*. at -048. Commerce thereafter credited the evidence to conclude that "Cleveland-Cliffs' offered product matches the specifications of the request," and that it could "produce 100 percent of the requested volume" within NLMK's "import delivery time{line}." *Id*. at -004-005.

NLMK does not dispute that Cleveland Cliffs makes the exact products it sought through these exclusion requests. *See generally* Mot. at 27-30. It merely contests whether Cleveland Cliffs had the capacity to supply NLMK with the amount of slab it was seeking. *Id*. In NLMK's

view, even if Cleveland Cliffs made the relevant products, it "did not generally offer 10-inch slab

for sale and, in any event, lacked the capacity to supply NLMK because of its commitment to

sell the 10-inch slab it produced to" a different steel entity.  Mot. at 30.  NLMK thus argues that

there is insufficient evidence "to demonstrate that {domestic entities} could and would supply a

sufficient amount of 10-inch slab to meet NLMK's requirements."  *Id.* at 28 (citing 15 C.F.R. pt.

705, supp. 1(d)(4); 83 Fed. Reg. at 46,035 (BIS Response to Cmt. (f)(4)(i)).

But NLMK overlooks the fact that agency decision makers are "entitled to rely on"

"certif{ied}" factual statements in determining whether a party will comply with the

Government's requirements.  *See Allied Tech. Grp., Inc. v. United States*, 649 F.3d 1320, 1330

(Fed. Cir. 2011).  Here, there is no dispute that Cleveland Cliffs makes the exact product NLMK

sought.  And when asked by Commerce whether it could meet "the total product tonnage

requirement under the Exclusion Request," Cleveland Cliffs represented that it had "the

capability and capacity to provide the product" sought by NLMK's exclusions requests.

AR194445-045.  It then "certif{ied}" through its General Counsel that its representations were

"accurate and complete" and "that the information herein supplied in response to this

questionnaire is complete and correct to the best of his/her knowledge."  *Id.*; *see also id.* at –068-

069 (offering same certification in surrebuttal).   Commerce was "entitled to rely on such

certification{s}" in making its evidentiary assessments.  *See Allied Tech.*, 649 F.3d at 1330.

NLMK's argument lays bare the true basis for its objection.  NLMK is not arguing that

Commerce's decision was arbitrary and capricious.  It simply disagrees with how Commerce

weighed the evidence.  It feels that Commerce should have credited its claims that Cleveland

Cliffs "has already taken a significant contractual obligation that is almost certain to consume

any available slab" capacity, thereby diminishing its ability to provide the slab it had requested.

AR194445-059; *see* Mot. at 30.  Or it feels that Commerce should have doubted Cleveland

Cliffs' certified statements because, for instance, the products were not listed for sale on

Cleveland Cliffs' website.  *Id*.  But Cleveland Cliffs explained precisely why these objections

lacked merit.  It explained that the lack of publication on its website (or via third party

publications) is more an indication of the market than a sign of what products it actually had

available; "slab sales" in particular were "to a very limited market population."  AR194445-067.

It expounded on this point further when it stated that it was ready to "make{} sales decisions to

maximize Return on Investment" and would readily "adjust product mix accordingly" to make

whatever products NLMK needed available.  *See id*. at -068.  Cleveland Cliffs then certified that

these statements were true and accurate, *id*. at -068-069, and Commerce then credited them as a

basis for its conclusion, *see id*. at -04-05 (explaining each side's position and providing a final

assessment).  NLMK cannot demand that the Court overturn these decisions simply because it

disagrees with the weight Commerce ascribed to the evidence.  *See Jacobi Carbons AB*, 422 F.

Supp. 3d 1318, 1325-26 (Ct. Int'l Trade 2019).  There was no "significant countervailing

evidence that should make the agency doubt" these certified representations.  *See Allied Tech.*

*Grp.*, 649 F.3d at 1331.  NLMK cannot "retry factual issues ... de novo" simply because it is

disappointed by Commerce's decisions.  *See Inland Steel Indus., Inc. v. United States*, 188 F.3d

1349, 1359 (Fed. Cir. 1999).

> C.    Commerce Reasonably Denied NLMK's Two Exclusion Requests For "200 mm"
>        Thick Steel Slab On The Ground That The Articles Could Be Timely Produced In
>        The United States By A Domestic Objector In Sufficient Quantity And Quality

In 2021, NLMK also submitted two exclusion requests for 200,000 tons of 200 mm thick

steel slab.  Mot. at 40.  For these requests, however, NLMK acknowledged that the specified

product—200 mm slab—was available domestically.  AR-198055-008-019.  Nonetheless,

NLMK insisted that it should be entitled to these exclusion requests because these items were purportedly unavailable in sufficient supply. *Id.*

Commerce denied these two requests on the same grounds. First, it noted that domestic objectors produced the exact items in question. AR-198055-004 (referring to items as "functionally identical"). It then found that the products were available in sufficient quantities and could be made available in a timely manner. In particular, Commerce credited the business proprietary data provided by one of the domestic objectors, U.S. Steel Corporation (U.S. Steel), indicating that U.S. Steel could "produce 100 percent of {NLMK's} requested volume" and "deliver the product in a timely manner," which according to NLMK's "import delivery time{lines}" meant within "[          ]" *Id.* at -004-005.

NLMK does not contest Commerce's finding that U.S. Steel does in fact make and sell the exact product it was seeking through these exclusion requests. Mot. at 41 ("there is no question that USS was capable of producing 8-inch slab…."). Rather, it contends that the Court should doubt "whether the product was reasonably available in sufficient amounts" despite what U.S. Steel's proprietary data showed. *Id.* According to NLMK, "plant capacity and utilization data" and certain sales figures show that U.S. Steel could not provide the amount of slab that it had requested, *id.* at 43, and NLMK believes that Commerce should not have trusted U.S. Steel's certified sales data showing that it could "produce 100 percent of {NLMK's} requested volume." AR-198055-004-005.[10]

---

[10]  NLMK does not challenge Commerce's timeliness finding, *i.e.*, that U.S. Steel could deliver "the product in a timely manner." *Compare* Mot. at 40-44 *with* AR-198055-005. Nor could it. The record firmly establishes that U.S. Steel was "capable of delivering slabs to NLMK's Pennsylvania facility in under [          ]" with some deliveries occurring (from time of "approved order") as soon as [          ] AR-198055-082, which is [      ] faster that NLMK's desire for a "[          ]" "import delivery time{line}," *id.* at -005.

Before addressing NLMK's argument, we make an important observation.  NLMK does not rely on any of its own actual data to support any of the claims it makes here today.  That is because it submitted no actual data on the record, essentially only narrative, to support any of the claims it made to Commerce.  AR-198055-008-019 & -055-060.  Instead, NLMK relies upon the only real data available—which is U.S. Steel's data (or rather, a misreading of that data)—to press its case.  Mot. at 40-44 (relying primarily upon certain facts and figures in U.S. Steel's submissions to press its arguments, AR-198055-028-040 & -071-082).

We thus turn to what that data shows.  U.S. Steel's proprietary data reveals that U.S. Steel sold over a [        ] of steel slab to outside entities over the three years preceding NLMK's requests, with about [      ] of those sales going directly to NLMK.  AR-198055-079-080.  That amount is approximately [      ] what NLMK had sought in its exclusion requests.  The data further shows that, in 2019 alone, U.S. Steel sold about [       ] the volume of slab that NLMK was purportedly seeking through its requests, *id*. at -080, meaning there was no plausible reason to doubt that U.S. Steel could meet NLMK's needs if called upon to do so.  And U.S. Steel fulfilled these orders through a number of different production facilities, showing that U.S. Steel had the capability to meet slab orders in a combination of different ways.  *Id*. at -079-080.  Overall, these numbers and facts establish that NLMK has no valid basis to argue that U.S. Steel lacked the plant capacity to fulfill NLMK's purported requests.

Moreover, the record evidence is more convincing than what these bare numbers show.  It reveals that these numbers understate U.S. Steel's actual production capacity.  That is because U.S. Steel's sales data does not include large slab orders that NLMK abruptly canceled via email in 2019 despite U.S. Steel having already put those "material{s} in production."  *Id*. at -081.

Those orders would have been one of U.S. Steel's largest outside sales for the relevant year, but NLMK canceled them simply because NLMK no longer wished to pay the already-negotiated price. *Id*. These cancellations (and the communications underlying them) undermine NLMK's present arguments—regarding U.S. Steel's lack of capacity—in two related ways. First, the communications show U.S. Steel had more than sufficient capacity to fulfill some of NLMK's largest orders, but that (in this case) NLMK opted not to move forward at its own election. In fact, in that encounter, [



] Despite those attempts, NLMK reneged, thereby reducing U.S. Steel's slab sales by about [          ] that year, which is the last year that NLMK made substantial slab purchases from U.S. Steel. Second, these communications show NLMK leveraging its strong buyer's position in an attempt to re-price (or cancel) an already-negotiated deal, *see id*., which would be unheard of in an economic climate short on supply or capacity. The cancellations (and underlying communications) thus support that NLMK's unwillingness to deal with U.S. Steel

does not arise out of U.S. Steel's purported lack of supply or capacity, but out of NLMK's own business decisions.

Ignoring these facts, NLMK attempts to undermine Commerce's finding in two ways. First, it claims that the data reveals that U.S. Steel has historically supplied only part of NLMK's needs, claiming that past practice is indicative of U.S. Steel's current ability. Mot. at 43. But as the above communication demonstrates, that arrangement is by NLMK's choice. The record data establishes that U.S. Steel has sufficient capacity (and a [          ]) to satisfy NLMK's largest orders, *e.g.*, AR-198055-079-080 (selling [                              ] of slab to outside entities per year), but NLMK consistently chooses to source its steel from elsewhere, *e.g.*, *id*. at -078 (sourcing a [                        ]). Second, NLMK contends that in 2020, U.S. Steel idled one of its slab production facilities which had been a consistent supplier for NLMK's orders, thereby reducing U.S. Steel's ability to produce slab for NLMK at prior historic rates. Mot. at 43. But that facility (prior to being idled) [                    ] of all of U.S. Steel's outside slab sales by volume, making it the [                              ].] AR-198055-079-080. U.S. Steel's numbers show that the facility closure has only a fractional effect on U.S. Steel's slab production capabilities. Based upon the numbers, the other facilities combined produced and sold over [          ] of slab in 2019, *id*., which is multiple times over the amount of slab NLMK was seeking in its exclusion requests. Even with the idling of that one U.S. Steel facility, the record proves that U.S. Steel can produce more than enough slab for NLMK's needs. In fact, U.S. Steel's submissions show that its production facilities could produce well in excess of [                    ] of steel per year and that its facilities in 2020 were operating at [                        ], AR-198055-082, meaning U.S. Steel is more than capable of taking on increased slab orders.

NLMK, for its part, provided no data establishing otherwise. Accordingly, NLMK has no grounds to argue that U.S. Steel's idling of one facility should demonstrate that U.S. Steel could no longer produce the full amount of steel it had requested within its exclusion requests.[11]

At bottom, NLMK's argument is misleading. It suggests that Commerce refused to credit its evidence. But NLMK produced no evidence, meaning this is not a case where Commerce "ignore{d} evidence that undercuts its judgment." *Genuine Parts Co. v. Env't Prot. Agency*, 890 F.3d 304, 346 (D.C. Cir. 2018). Rather, Commerce evaluated the *only* relevant data available on the record—which U.S. Steel supplied in opposition to NLMK's request—and that data reasonably supported (if not established) that U.S. Steel could "produce 100 percent of {NLMK's} requested volume." AR-198055-004-005. NLMK attempts to undercut that data, but in light of what that data shows, there is no "significant countervailing evidence that" demonstrates that Commerce should have doubted U.S. Steel's figures. *See Allied Tech. Grp.*, 649 F.3d at 1331. NLMK has no grounds to claim that Commerce's decisions were arbitrary, capricious, or contrary to law.

      D.      **Commerce Reasonably Denied Exclusion Request 260914 For "250 mm" Thick Steel Slab On The Ground That The Article Could Be Timely Produced In The United States By A Domestic Objector In Sufficient Quantity And Quality**

In late 2021, NLMK submitted another exclusion request for 250 mm steel slab. AR 260914-008-019. As before, NLMK insisted that "{t}here is no near equivalent" or "substitute"

---

[11] NLMK is correct that this facility was a regular supplier for NLMK's orders. *See* Mot. at 43. In fact, sales data shows that this facility served [ ███████████████████████ ]. AR-198055-079-080. It should not be surprising then that the facility was idled shortly after NLMK sharply reduced its orders from U.S. Steel after NLMK's aforementioned [ ████████████████████████████ ]. *Compare* AR-198055-081 (showing NLMK threatening order cancellation and attempting to renegotiate an already-negotiated price) *with id.* at -079-080 (showing ████████████████████████ ]).

for the slab it was requesting.  *Id*. at -017.  And although it acknowledged that a domestic entity, Cleveland Cliffs, made the product it sought, it reported (while attaching email correspondence in support) that it had "approached Cleveland Cliff for 250 mm thick slab" and claimed that "Cleveland Cliffs was unable to supply the requested slab."  *Id*. at -016.

Various domestic objectors opposed NLMK's request.  Cleveland Cliffs, as before, claimed it made the exact product NLMK sought.  *Id*. at -072-082.  It further explained that it had sufficient capacity to sell NLMK the slab products it was looking for, and that it was prepared to produce such items and quantities in a timely manner.  *Id*. at -073-077.  Another objector, U.S. Steel, claimed that it could offer a suitable substitute slab, and that it could provide NLMK with sufficient quantities and provide the articles in a timely fashion.  *Id*. at -039-058, 110-124.  Upon reviewing the record evidence, Commerce credited Cleveland Cliffs' submission and representations.  *Id*. at -004.  Commerce explained that Cleveland Cliffs makes the product NLMK had sought through its request and credited Cleveland Cliffs' submission explaining that it could produce those products in sufficient quantities and in a timely manner.  *Id*.  It further acknowledged that NLMK had produced "a portion of emailed sales correspondence," *id*. at -004, claiming that "Cleveland Cliffs was unable to supply the requested slab," *id*. at -016.  But Commerce explained that the correspondence was "incomplete, and did not provide sufficient detail of the product involved that would allow {Commerce} to evaluate the applicability of the evidence to the requested product and the objection by Cleveland Cliffs."  *Id*. at -004.  Commerce thus explained that the email would not be considered in the analysis and concluded that Cleveland Cliffs was capable of providing NLMK with sufficient quantities of the items that NLMK had sought in its exclusion request.  *Id*.  And because that determination was dispositive, it did not reach a conclusion as to the other objectors' submissions.  *Id*.

As before, NLMK does not necessarily dispute that Cleveland Cliffs can make the product it seeks through its exclusion request. *See generally* Mot. at 35-38. It instead continues to challenge Cleveland Cliffs' capacity (or willingness) to supply NLMK with the amount of slab it had sought. *Id*. In support, NLMK leans heavily on its email communication with Cleveland Cliffs—the one Commerce chose not to credit—purportedly showing that Cleveland Cliffs would not offer NLMK 250 mm thick slab, and that the slab it did offer could not be produced in sufficient quantities or delivered in a timely fashion. *Id*. at 35 (citing AR260914-104-109). It claims that the "correspondence was complete," and NLMK contends that the email includes all necessary information including NLMK's offer, Cleveland Cliffs' counteroffer, NLMK's rejection, and a "Technical Protocol" describing the product it sought. Mot. at 36-37.

The correspondence is not complete. The email communication clearly references an "inquiry" from NLMK that "provided all specifications" that serves as the genesis of the communication. *Id*. at -06-08. And NLMK did not include that communication—much less a specification sheet—with the correspondence. *See id*. at -104-109. A specification sheet would be critical in this case. It provides the sort of detailed information one would include in a request for quotes associated with these kinds of potential transactions. As Commerce correctly explained, without knowing whether the specifications in the email match those of the requested product, the communication is "incomplete, and d{oes} not provide sufficient detail of the product involved" to enable Commerce to "evaluate the applicability of the evidence to the requested product and the objection by Cleveland Cliffs," *id*. at -004. The only information the email contains as it relates to the referenced product is the item's total thickness, *id*. at 105, making it impossible for Commerce to determine whether the product specification (compositionally or otherwise) actually matches the product for which NLMK is seeking an

exclusion.  For all intents and purposes, NLMK may have been requesting slab with a different

(or unique) carbon composition, or other requirements that would make the inquiry irrelevant to

its request.  But there is no way of knowing without seeing product specific details, none of

which NLMK submitted to Commerce.  Commerce's observations are thus correct.  The

correspondence is incomplete for precisely the reasons it stated.

At bottom, NLMK simply disagrees with what weight Commerce ascribed to certain

evidence.  But that is not a basis upon which to challenge an agency decision.  *See Jacobi*

*Carbons AB*, 422 F. Supp. 3d at 1325-26.  NLMK has not identified any "significant

countervailing evidence that should" have caused Commerce to doubt Cleveland Cliff's certified

statements.  *See Allied Tech. Grp.*, 649 F.3d at 1331.   NLMK's challenge to Exclusion Request

260914 should be denied.

E.     The Court Should Return To Commerce NLMK's Mid To Late 2021 Exclusion
       Requests Which Were Denied On Ambiguity Grounds

In mid to late 2021, NLMK submitted three other exclusion requests for 250 mm thick

steel slab.  *E.g.*, AR-260912.  With minor differences, it presented many of the same arguments

and evidence that it had provided in support of its prior applications, insisting that it needed 250

mm thick slab to make the larger size steel rolls that its customers wanted.  *Compare*, *e.g.*, AR-

194445-020-024 *with*, *e.g.*, AR-260912-020-023 (demonstrating that submissions are nearly

identical).

Commerce denied these last three exclusion requests.  Specifically, Commerce declined

to analyze NLMK's requests based upon technical deficiencies it had identified while performing

its review.  To explain the basis for Commerce's decisions, some factual background is

warranted.  Within each exclusion request application form, applicants are required to "provide a

full, complete description of the product" for which they are seeking an exclusion.  *E.g.*, AR-

260912-011.  Later in the application, applicants must then identify "the chemical composition of th{at} product."  *Id*. at -012.  These questions help Commerce make an assessment as to whether that product (or a suitable substitute) is domestically available.  NLMK responded to the first question in one of two ways: by explaining that it was seeking an exclusion for slab "{c}ontaining by weight less than .25 percent of carbon," *e.g.*, *id*. at -011, or by stating that the slab should contain ".25 percent or more of carbon," *e.g.*, AR-248-733-011.  Then, for the second question—regarding the compositional qualities of its requested product—NLMK wrote that the slab should contain a minimum percentage carbon content of "0" percent, and a maximum percentage carbon content of "0.24" percent, in the former instance, AR-260912-012, or between .25 percent and .3 percent in the latter instance, AR-248733-012.

Upon reviewing NLMK's applications, Commerce denied these requests because there was "an inconsistency in the carbon chemical composition of the requested product{s}."  *Id*. at -004.  NLMK had listed "two different ranges for the carbon content specifications" for these requested products in response to each of these questions, AR-248733-004, meaning the compositional qualities for the steel slab it was seeking appeared to be "ambiguously defined," AR-260912-004.  Commerce thus concluded that it was "unable to provide a complete analysis" and declined to analyze the requests in light of these identified technical deficiencies.  *Id*.

NLMK challenges these denials on three grounds.  First, it argues that there was no actual difference—and thus, no ambiguity—between its two responses.  It claims that in responding to the first question, it provides "the general product description under the relevant HTSUS subheading covering the slab" NLMK sought.  Mot. at 32.  But then, in responding to the second question, it describes the "specific carbon content specification for" that "particular slab."  *Id*.  NLMK thus contends that there is no "ambiguity" because there is no inconsistency in its

…

responses—it merely specifies the same product in different ways. *Id*.  Second, it contends that

these responses are consistent with many of its prior exclusion requests, and Commerce had no

difficulty assessing those prior requests based upon the record evidence. *Id*. at 33.  Third,

NLMK argues that Commerce violated its own procedures by rejecting NLMK's applications on

these procedural grounds after the rebuttal and surrebuttal process had concluded.  NLMK argues

that Commerce is required to conduct "'HTSUS administrability' at the 'start of the process' and

provide{} 'a rejection notification that includes the specific reasons for a rejection'" prior to

completing the submittal process.  Mot. at 34 (citing 85 Fed. Reg. at 81,062 (BIS response to

Cmt. (a)(2)).  NLMK claims it was prejudiced because Commerce deprived it of the ability to

correct its application at a much earlier date. *Id*.

We believe that Commerce should reexamine these three requests.  We respectfully

request that the Court return these decisions to Commerce for further consideration.

III.    NLMK Has No Basis To Attack Commerce's Referrals To A Subject Matter Expert
        (SME) For Technical Opinions Or To Claim That The Records Are Incomplete

NLMK also attacks the fact that Commerce referred some of its exclusion requests to an

SME for a technical opinion and insists that the record regarding the SME is otherwise

incomplete.  According to NLMK, the record "does not identify the SME or its purported

qualifications, the reasons for its conclusions, what evidence the SME relied on, or how it

weighted the evidence."  Mot. at 46.  NLMK claims that if the case is remanded, Commerce

should be required to supplement the record with "these analyses . . . to allow this Court to

determine and review the actual bases for Commerce's determinations." *Id.*

Before addressing these arguments, we provide some relevant background.  The record

makes clear that Commerce's determination was based "on an evaluation of all relevant

submitted certified documentation, including relevant CBI, and, when appropriate, an evaluation

of facts by an SME." *See, e.g.,* AR 111695-121.  Commerce further specifies that "{a}n SME's evaluation of facts is typically sought when submitted documentation indicates: the objector offers a substitute product, the specifications differ in an objector's offering from the request, a processing method differs between the request and objection, or any other relevant product-specific issues." *Id.*  Specifically, "ITA," Commerce's preliminary reviewing bureau, "takes an SME's evaluation of facts into consideration when making a recommendation," but makes clear that "an SME's evaluation of facts is not the only determining factor and is not necessarily dispositive." *Id.*

As it relates to this case, the SME predominantly opined on whether there was any qualitative difference between NLMK had sought within its exclusion requests and what domestic objectors said they produced.  *See* AR-111695-119; AR-198055-004.  The SME was thus asked to consider whether the quality concerns raised by NLMK—specifically NLMK's objection that the objectors could only provide slabs that produce slightly smaller coils—was a legitimate basis for a technical, quality-based exclusion.  *E.g.*, AR-111695-119.  The SME ultimately disagreed with NLMK's contention that producing slightly smaller coils rendered an objector's substitute product unsuitable from a technical standpoint.  *See, e.g., id.*  Then, based on this factual review and review of the entire record, Commerce denied NLMK's request for a quality-based exclusion.

NLMK challenges this process, insisting that the SME was conclusory in his assessments.  But the reasons and bases for the SME's opinions are clear in the record.  We know precisely why the SME arrived at a particular recommendation—NLMK's desire to make larger sized rolls was not a basis for a quality-based exclusion.  Nor are the factual underpinnings for that recommendation in dispute.  We know, for instance, that domestically available slab is

compositionally identical to the slab NLMK wishes to import tariff-free from foreign sources.
We also know that NLMK could use this domestic slab to make coiled steel sheet that is
compositionally identical to what it normally makes and offers for sale to its customers.  These
are not controversial points.  Accordingly, NLMK's claims that it cannot discern the "reasons for
{the SME's} conclusions, what evidence the SME relied on, or how it weighted the evidence"
are plainly incorrect.  Mot. at 46.

NLMK also demands to know the SME's name and qualifications, claiming that there
can be no effective judicial review without that information.  Mot. at 46.  First, this is not a case
where the *technical* function of NLMK's requested product has any outsized bearing on whether
the exclusions should have been granted.  NLMK made a certain quality-based exclusion claim.
The SME was consulted as a backstop, simply because of how NLMK had presented its request,
insisting that substitute slab was unusable.  And ultimately, Commerce decisionmakers (after
hearing what the SME had to say from a technical standpoint) concluded that NLMK was not
entitled to seek a quality-based exclusion based on its desire to make its preferred size rolls.  The
SME made a technical assessment, but Commerce ultimately rendered the final decision, which
was consistent with what the law prescribes.  Second, to the extent this case does touch upon any
technical analysis, there was nothing improper about Commerce relying on (and crediting) its
SME's expertise.  *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("an agency
must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an
original matter, a court might find contrary views more persuasive.").  "Courts are not to act as a
panel of scientists that instructs {the agency} how to validate its hypotheses . . . chooses among
scientific studies, . . . and orders the agency to explain every possible scientific uncertainty."
*Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1124 (D. Or. 2011)

(internal citation and quotation omitted) (alteration in original).  "{T}he Court's task under the APA is to ensure that the agency's decisions are not arbitrary or capricious; it is not to evaluate their scientific methods."  *Stewart v. Potts*, 996 F. Supp. 668, 678 n.8 (S.D. Tex. 1998).

Nor is Commerce obligated to place the SME's qualifications on the record so that NLMK can review and comment on those qualifications.  *See Taylor Energy Co. LLC v. United States*, No. 20-1086, 2020 WL 6075693, at *6 (D.D.C. Oct. 14, 2020) (rejecting argument that plaintiff should have "a meaningful opportunity to review and comment on all technical reports upon which the {agency} relied in making its {reconsideration} determination" because "neither the APA nor the {agency's} regulations afford such procedure," and "there is no general 'due process' right to present rebuttal evidence or argumentation in agency proceedings.").  Expert *voire dire* standards do not apply in the Court's review of final agency action under APA standards*.  See Sierra Club v. Marita*, 46 F.3d 606, 621-22 (7th Cir. 1995) (rejecting argument that agency relied on "bad science" and that *Daubert* should apply, Court held that "{w}hile such a proposal might assure better documentation of an agency's scientific decisions, we think that forcing an agency to make such a showing as a general rule is intrusive, undeferential, and not required"); *Lobsters, Inc. v. Evans*, 346 F. Supp. 2d 340, 344 (D. Mass. 2004) ("*Daubert* and its progeny interpret the Federal Rules of Evidence, however, and the federal rules of evidence do not apply to NOAA hearings.").  "{C}ourts are not free to impose upon agencies specific procedural requirements that have no basis in the APA."  *Pension Ben. Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990) (citation omitted).

The question before the Court is not (as NLMK seems to suggest) whether the SME is "qualified"; it is whether—based on the record—Commerce "examine{d} the relevant data and articulate{d} a satisfactory explanation for its action including a rational connection between the

facts found and the choice made." *See Motor Vehicle Mfr.'s Ass'n*, 463 U.S. at 43 (citation and internal quotation marks omitted).  And "{s}uch 'relevant data' can include policy considerations as well as agency and outside expertise." *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 60 (D.D.C. 2017) (citing *Ctr. for Auto Safety v. Federal Highway Admin.*, 956 F.2d 309, 316 (D.C. Cir. 1992)); *Friends of Richards-Gebaur Airport v. F.A.A.*, 251 F.3d 1178, 1189 (8th Cir. 2001) ("We conclude that the FAA was entitled to rely on expert consultants, including the opinions of other governmental agencies, especially where the evidence deals with scientific judgments.").  Here, the record establishes that Commerce's decisions on the merits properly analyzed the record, including the assessments of the SME, in reaching its reasoned conclusions.

In sum, NLMK's threadbare claim that the record is incomplete is insufficient to warrant any of the relief it seeks.  There is no evidence to support that assertion.  Indeed, Commerce has made clear that "{o}nly information provided in the submitted documentation will be used in the evaluation of exclusion requests and objections." *See, e.g.,* AR-111695-121.  It further explained that it would not "include any ex-parte communications in its evaluation," *id.*, and that it "did not directly or indirectly consider or rely upon any *ex parte* information provided by any of the parties in its consideration of the submitted Exclusion Request," *id.* at -117.  Accordingly, the SME evaluated only the facts as stated in the certified documentation submitted by NLMK and the objectors.  "Only information provided in the submitted documentation" was evaluated, *id.* at -121, and there is no evidence to support otherwise.  And "where an agency has presented a certified copy of the complete administrative record, '{t}he court assumes the agency properly designated the Administrative Record absent clear evidence to the contrary.'" *Ammex, Inc. v. United States*, 23 CIT 549, 555 (1999) (quoting *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 740 (10th Cir. 1993)).  NLMK has provided no evidence to cause the Court to doubt that conclusion.

*CSC Sugar LLC v. United States*, 461 F. Supp. 3d 1363, 1367 (Ct. Int'l Trade 2020) (requiring "well-nigh irrefragable proof" to overcome the presumption that "government officials are presumed to act in good faith in discharging their duties" (citing *McEachern v. Office of Personnel Management*, 776 F.2d 1539, 1544 (Fed. Cir. 1985)), *aff'd,* 854 F. App'x 375 (Fed. Cir. 2021). Its complaints about the SME and an incomplete record are meritless.

IV.   NLMK Has No Basis To Ask That The Court Commandeer The Exclusion Request
      <u>Process, Grant Its Exclusions, And Award It Hundreds Of Millions Of Dollars</u>

We lastly turn to the issue of relief. The extraordinariness of the relief that NLMK seeks in this case cannot be overstated. Rather than requesting a remand—which is the traditional form of relief in this kind of case, *e.g*, *JSW Steel (USA) Inc. v. United States*, 466 F. Supp. 3d 1320, 1332 (Ct. Int'l Trade 2020)—it asks this Court to set aside Commerce's denials, substitute its decision for that of Commerce, grant its exclusion requests, and award it $255 million. Mot. at 3, 13. It insists the Court must do so because, in its view, that is the only conclusion that can follow from the record evidence and remand would "serve no useful purpose." *Id*. at 13.

Respectfully, this is clear overreach. There is no support whatsoever for the drastic and extraordinary relief NLMK seeks. *Cf. Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2761 (2010) (referring to an injunction as a "drastic" and "extraordinary" remedy). As demonstrated above, the relevant records demonstrate that the exact products for which NLMK sought exclusions were either sold by domestic entities, or that suitable substitutes were widely and readily accessible in sufficient quantities. *Supra* at 13-30. NLMK bases its exclusion requests almost entirely on manufactured grounds for a quality-based exclusion. And in instances where it claims that those items cannot be produced in sufficient quantities, the records contain clear evidence supporting a contrary finding. *Supra* at 22-30. Thus, even assuming NLMK is successful in showing that Commerce could have made a more "rational connection"

between the "facts found" and "choices made," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, the records in this case demonstrate that NLMK's case is nowhere near as clear-cut as NLMK purports.

At bottom, if the Court believes that some of Commerce's decisions in this case were not properly grounded, then the appropriate relief is remand, not a granting of NLMK's exclusion requests.  The record does not support the extraordinary relief that NLMK now seeks in this case, and NLMK has no plausible basis to claim otherwise.

<u>CONCLUSION</u>

For these reasons, we respectfully request that the Court sustain 55 of the challenged determinations.  For the remaining three, we respectfully request that those be returned to Commerce for reexamination in light of the issues NLMK has raised.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Tara K. Hogan
TARA K. HOGAN
Assistant Director

/s/ Meen Geu Oh
MEEN GEU OH
Senior Trial Counsel
KYLE S. BECKRICH
Trial Attorney
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044

Tel.: (202) 307-0184
Email:  Meen-Geu.Oh@usdoj.gov

September 16, 2022                                    *Attorneys for Defendants*
(corrected September 26, 2022)

CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedure 2(B)(2), the undersigned certifies that Defendant's

Corrected Response to Plaintiff's Motion for Judgment on the Administrative Record contains

12,853 words as computed by our word processing system, excluding those portions that do not

count toward the word limitation.  Our filing thus complies with the Court's Chambers

Procedures.