**PUBLIC**

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE CLAIRE R. KELLY, JUDGE

NLMK PENNSYLVANIA, LLC,

               Plaintiff,

   – against –

UNITED STATES,

               Defendant.

Court No.  21-00507

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION PURSUANT TO RULE 56.1 FOR JUDGMENT ON THE AGENCY RECORD

Sanford Litvack
Andrew L. Poplinger
R. Matthew Burke
**CHAFFETZ LINDSEY LLP**
1700 Broadway, 33rd Floor
New York, NY 10019
Tel. (212) 257-6960
Fax. (212) 257-6950
s.litvack@chaffetzlindsey.com
a.poplinger@chaffetzlindsey.com
r.m.burke@chaffetzlindsey.com

*Counsel for Plaintiff NLMK Pennsylvania, LLC*

## <u>**TABLE OF CONTENTS**</u>

**Page**

I.   PRELIMINARY STATEMENT ........................................................................... 1

II.   ARGUMENT ................................................................................................... 3

  A.  Commerce Has Expressly Recognized "Dimensional Specifications" and "End Use Requirements" as Quality Factors .................................................... 3

  B.  Commerce's Mere Reliance on Cliffs's Statements to Deny the 2021 Requests for 10-inch Slab was Arbitrary and Capricious .......................................... 9

  C.  Commerce Conducted No Analysis in Denying NLMK's 8-inch Requests..................... 17

  D.  Commerce was Required to Include in the Record the SME's Supposed Analyses on Which Commerce Purported to Rely ................................................ 20

III.   CONCLUSION.................................................................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ad Hoc Shrimp Trade Enf't Comm. v. United States*,
    578 F. Supp. 3d 1310 (Ct. Int'l Trade 2022) ............................................................4

*Allied Tech. Grp., Inc. v. United States*,
    649 F.3d 1320 (Fed. Cir. 2011)............................................................................4

*Ammex, Inc. v. United States*,
    62 F. Supp. 2d 1148 (Ct. Int'l Trade 1999) ............................................................20

*CS-360, LLC v. U.S. Dep't of Veteran Affs.*,
    846 F. Supp. 2d 171 (D.D.C. 2012)......................................................................18

*Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.*,
    865 F.3d 630 (D.C. Cir. 2017) ..........................................................................9, 15

*Friends of Richards-Gebaur Airport v. F.A.A.*,
    251 F.3d 1178 (8th Cir. 2001) .............................................................................21

*Giorgio Foods, Inc. v. United States*,
    35 C.I.T. 297 (2011) ........................................................................................21

*Glycine & More, Inc. v. United States*,
    880 F.3d 1335 (Fed. Cir. 2018).............................................................................7

*Invenergy Renewables LLC v. United States*,
    476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) ..........................................................20

*JSW Steel (USA) Inc. v. United States*,
    466 F. Supp. 3d 1320 (Ct. Int'l Trade 2020) .....................................................10, 18

*Kwo Lee, Inc. v. United States*,
    24 F. Supp. 3d 1322 (Ct. Int'l Trade 2014) .......................................................9, 18

*Lady Kim T. Inc. v. U.S. Sec'y Agric.*,
    30 C.I.T. 1948 (2006) .......................................................................................4

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983).............................................................................4, 16, 18, 21

*Policy & Research LLC v. United States*,
    313 F. Supp. 3d 62 (D.D.C. 2018) .........................................................................7

*In re Sang Su Lee*,
   277 F.3d 1338 (Fed. Cir. 2002) ..........................................................................21

*SKF USA Inc. v. United States*,
   630 F.3d 1365 (Fed. Cir. 2011) ..........................................................................16

*Stewart v. Buechler*,
   34 F. App'x 152 (5th Cir. 2002) .........................................................................21

*Stewart v. Potts*,
   996 F. Supp. 668 (S.D. Tex. 1998) .....................................................................21

*Taylor Energy Co. LLC v. United States*,
   2020 WL 6075693 (D.D.C. Oct. 14, 2020) .........................................................21

*Tropicana Prod., Inc. v. United States*,
   31 C.I.T. 548 (2007) ...........................................................................................16

*U.S. Steel Corp. v. United States*,
   578 F. Supp. 418 (Ct. Int'l Trade 1983) .............................................................21

## Regulations

15 C.F.R. pt. 705, supp. 1 ........................................................................... *passim*

85 Fed. Reg. 81,060, 81,065 (Dec. 14, 2020) ................................................................13

## Other Authorities

*Quality*, Black's Law Dictionary (11th ed. 2019)..........................................................5

U.S. Dep't of Commerce, Office of Inspector General, *Decisions on Exclusions
   from Section 232 Tariffs Were Not Transparent and Based on Incomplete and
   Inaccurate Information*, Final Report No. OIG-21-020-A, at 3, 5 (Jan. 25,
   2021), *available at* https://www.oig.doc.gov/OIGPublications/OIG-21-020-
   A.pdf ..................................................................................................................16

## I.      PRELIMINARY STATEMENT

The Government's Opposition brief, which seeks to rewrite the bases for Commerce's[1]

denials, makes it crystal clear, as NLMK has urged all along, that on the record before the

agency, no decision-maker could have reasonably concluded that the slabs for which NLMK

requested exclusion, or a substitute product, were "produced in the United States in a sufficient

and reasonably available amount."  15 C.F.R. pt. 705, supp. 1(c)(6)(i)-(ii).  The Government's

effort to create new reasons and new arguments to support the denials is futile: the factual record

will not support it and the APA will not permit it.

The linchpin of the Government's attempt to salvage Commerce's denials of the 2020

Requests is the freshly minted argument that the regulation's "quality" criterion excludes any

consideration of slab size.  So, for example, in the Government's world a 10-inch slab and a 2-

inch slab are substitutes for each other as long as they share the same chemical "compositional

qualities."  That, we submit, is nonsense on its face.

More importantly, the Government's claim is inconsistent with the unambiguous

language of the regulation itself, which requires that the requester (NLMK) be able to use the

alleged "substitute product" for its business activity.  In apparent recognition of this fact, none of

Commerce's decisions ever put forth the unreasonably narrow interpretation of the regulation the

Government now tenders.  To the contrary, Commerce's own exclusion form expressly provides

that "dimensional specifications" are specific grounds for finding that an objector's product fails

the quality criterion and is ***not*** a suitable substitute.  The desperate effort to move the goal posts

---

[1] All capitalized terms not defined herein have the meaning ascribed in Plaintiff's Motion Pursuant to Rule 56.1 for Judgment on the Agency Record, ECF Nos. 76-77 ("Mot." or "Opening Brief").

by conjuring up a reason that Commerce neither could nor did offer confirms that the decisions, as Commerce wrote them, are indefensible.[2]

The 2021 Requests presented a slightly different issue because, by the time those requests were filed, Cliffs (formerly AK) had acquired two facilities from ArcelorMittal that concededly had the capability of producing the 10-inch slab NLMK requires.  When Cliffs stated in its objection that it could produce 10-inch slab, it was merely stating the obvious, given the acquisition.  However, Commerce somehow decided that meant it did not have to do anything further—it could simply accept that naked statement because, the Government argues, it was "certified."  But that was wrong.  The inquiry should not have ended there.  Cliffs's statement said nothing about its capacity to produce enough slab to provide NLMK with the required amount, and NLMK submitted evidence showing that although Cliffs was capable of making 10-inch slab, it did not have the available capacity to supply sufficient amounts of slab to NLMK.  Indeed, Cliffs never claimed that it did.  Tellingly, after NLMK submitted this evidence, Cliffs never even responded to (let alone rebutted) the facts that it (i) could not supply the quantity NLMK required because it had committed its 10-inch capacity to ArcelorMittal, and (ii) had already declined to fill NLMK's order for the 10-inch slab it needed.

Commerce's failure to address this undisputed evidence flies in the face of the APA's requirement that the agency must grapple with contradictory evidence to reach reasoned decisions, not simply ignore evidence from parties it does not favor.  The Government's

---

[2] The Government has followed the same approach with respect to the 8-inch 2021 Requests, attempting to substitute its own reasoning for Commerce's actual decisions.  Thus, the Government offers its own interpretation of USS's capacity and utilization data, despite the fact that Commerce expressly stated that it did not and does not analyze such data.  Since Commerce did not and does not actually analyze any Objector's plant capacity and utilization, it did not and could not know whether USS was able to supply the quantity to NLMK required.  The failure to assess this "important aspect of the problem" is quintessential arbitrary decision-making, and the Government's attempt to save the day by offering the analysis it wishes Commerce had undertaken in the first place cannot stand.

admission that, without any analysis or thought, Commerce simply relied on Cliffs's carefully worded statement that it "could" make 10-inch slab (a fact with which no one quarreled), despite the evidence that it lacked the available capacity to supply NLMK, renders Commerce's denials of the 2021 Requests arbitrary and capricious.

Finally, while Commerce's denials specifically purported to rely on supposed analyses of an SME, the Government for some inexplicable reason wants to keep the SME's analyses from this Court and NLMK.  Thus, the Government claims that the SME's views and opinions were merely a "backstop," which justified excluding the analyses from the certified records.  The truth, however, is that the conclusory statements of the SME's purported conclusions were the only thing Commerce purported to rely upon in reaching its decisions.  That being so, Commerce was required to include in the record the SME's supposed analysis supporting its conclusions. Its failure to do so precludes any meaningful assessment of the propriety of Commerce's decisions, as required by the APA.  That is an additional, independent reason why these decisions cannot stand.

## II.   ARGUMENT

### A.   Commerce Has Expressly Recognized "Dimensional Specifications" and "End Use Requirements" as Quality Factors

NLMK's Opening Brief showed that two dispositive facts required Commerce to grant its 2020 Requests: (1) NLMK requires 10-inch slab to manufacture coil that meets its customers' industry standard PIW requirements; and (2) no Objector could produce that 10-inch slab.

Faced with those undisputed facts, the Government now offers a new basis for Commerce's 2020 denials—an interpretation of the regulation Commerce has never adopted. The crux of the current argument is that Commerce's decisions can be justified because the "quality" criterion in 15 C.F.R. pt. 705, supp. 1(c)(6)(ii) only "focuses on the technical and

compositional qualities of the material itself."  Defendant's Corrected Response to Plaintiff's Motion for Judgment on the Administrative Record, ECF Nos. 82-83 ("Opp." or "Opposition") at 18.  Thus, the Government says, slab thickness is a "non-quality-based preference{}," which is purportedly "irrelevant," because all that matters is that Objectors could produce some "compositionally identical" slab.  *Id*. at 18-19.  The argument is baseless.

First, as a threshold matter, it is well-settled that "an agency's action must be upheld, if at all, on the basis articulated *by the agency itself*."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (emphasis added).  "{The} courts may not accept appellate counsel's *post hoc* rationalizations for agency action," which are "an insufficient basis for the Court to reach a decision on the legality of the {agency action}."  *Lady Kim T. Inc. v. U.S. Sec'y Agric.*, 30 C.I.T. 1948, 1954 (2006); *see Ad Hoc Shrimp Trade Enf't Comm. v. United States*, 578 F. Supp. 3d 1310, 1321 (Ct. Int'l Trade 2022) (Kelly, J.) ("{C}ounsel's *post hoc* rationalization of agency action is insufficient where, as here, {the agency} fails to address how its action complies with applicable regulations.").

In short, even if the Government's interpretation of the regulation were correct (it is not), since it is not an interpretation put forth by Commerce, it cannot be used now to justify Commerce's decisions.

Second and more fundamentally, even if the Government could somehow substitute its own *de novo* argument to compensate for Commerce's lack of reasoning, the Government is incorrect in claiming that the regulation excludes dimensional specifications from the "quality" criterion.  This belated interpretation is not only inconsistent with the plain language of the regulation, but *it contradicts Commerce's own interpretation*.

The starting point is the language of the regulation, which requires that an objector's alleged "substitute product" must meet the requester's "quality (*e.g.*, industry specs or internal company quality controls or standards), regulatory or testing standards."  15 C.F.R. pt. 705, supp. 1(c)(6)(ii).  The Government focuses narrowly on "regulatory or testing standards," and ignores the reference to "industry specs or internal company quality controls or standards."  Opp. at 19-21.  However, these are important factors because, per the regulation, the quality inquiry focuses, sensibly, on whether the requester can actually use a claimed substitute product in its specified "business activity."  That, in turn, is measured by reference to the requester's needs based on industry and internal specifications and standards*. Id.* pt. 705, supp. 1(c)(6)(ii) (requiring that substitute products "meet . . . the quality . . . standards{}, in order for the U.S.-produced steel to be used *in that business activity in the United States by that end user* {i.e., the requester}." (emphasis added)).[3]  Nowhere does the regulation require—or remotely suggest—that the quality inquiry is limited solely to whether domestically available steel is "compositionally identical," without regard to whether the requester can actually use that product for its business activities.  Indeed, that would make no sense, as Commerce itself has recognized.

Thus, in accordance with the plain language of the regulation, Commerce has specifically (and correctly) interpreted the regulation to require that all quality factors be taken into account in its assessment, including dimensional specifications such as slab thickness and end use requirements like coil PIW.  As a result, Commerce's exclusion Rebuttal Form expressly includes *"{d}imensional specifications" and "end use requirements" as quality factors* relevant

---

[3] Defining "quality" in relation to NLMK's business needs accords with the ordinary meaning of the word "quality," i.e., "{t}he particular character or properties of a person, thing, or act, often *essential for a particular result.*" *Quality*, Black's Law Dictionary (11th ed. 2019) (emphasis added).

to assessing the suitability of Objectors' putative substitutes.[4]  This is shown below in the standard Rebuttal Form NLMK submitted in response to the objections, pointing out the two specific areas where it was challenging the Objectors' ability to meet its needs.



Hence, it is clear that Commerce does not interpret the quality criterion as limited to chemical composition alone.  Rather, Commerce recognizes that it is one of several factors, including the requester's "{d}imensional specifications" and "end use requirements." Commerce thus provided, in accordance with the regulation's plain language, that if, as here, the requester could not use an objector's product because its dimensional specifications prevented it from meeting the requester's end use requirements, that product did not satisfy the quality criterion and was not a "substitute product."  The Government cannot rewrite the regulation and

---

[4] *E.g.*, NLMK-111695-077.  NLMK adopts the record citation style used by NLMK in its Opening Brief and the Government in its Opposition.  *See* Mot. at 5 n.7; Opp. at 13 n.5.  Where multiple records contain materially the same information, NLMK cites to the record of the lowest numbered request unless context requires otherwise; accordingly, where all records contain materially the same information, NLMK cites only to the record of Request No. 111695.

ignore Commerce's own interpretation.[5]  Dimensional specifications and end use requirements are and always have been part of the determination of substitutability.

With the Government's *post hoc* interpretation of the regulation debunked, there is simply no basis upon which to sustain Commerce's decisions under the regulation.  *See Policy & Research LLC v. United States*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018) ("Under the most elementary precepts of administrative law, an agency … cannot undertake to act in a manner that is contrary to its own regulations.").  Pursuant to Commerce's directions in the Rebuttal Form, NLMK demonstrated that Objectors' proposed substitute slab did not satisfy the "quality" criterion.  It did not meet NLMK's "dimensional specifications"[6] and therefore could not be used to meet its "end use requirements"—*i.e.*, to produce coil meeting an industry standard 1,000 PIW, as required to fill 94% of its customers' orders.[7]  There is *no* evidence to the contrary.

Faced with that record, the Government desperately tries to downplay NLMK's need for 10-inch slab by labeling it a mere "non-quality based preference."  But that is not what it is or what the record shows.  In fact, quite the opposite is true.  The record establishes that NLMK's customers, in accordance with industry standards, *required* coil meeting certain PIW, which NLMK could *only* produce using 10-inch slab.[8]  This is not, as the Government argues, merely a "prefer{ence} for slightly more or less of the same material within each roll,"[9] but a critical

---

[5] Given the plain language of the regulation, if Commerce had attempted to interpret the regulation to exclude slab dimensions and the requester's end use requirements from the quality criterion, that interpretation would be entitled to no deference because it would contravene the plain and unambiguous meaning of 15 C.F.R. pt. 705, supp. 1(c)(6)(ii). *Glycine & More, Inc. v. United States*, 880 F.3d 1335, 1345 (Fed. Cir. 2018) ("Because the regulation's meaning is clear, no deference {to the agency's interpretation} is warranted.").

[6] NLMK-111695-071, 077, 086.

[7] NLMK-111695-017-18, 074, 081-82.

[8] NLMK-111695-017-18, 074, 081-82.

[9] The Government repeatedly incants the false assertion that AK and USS's slab was only "slightly smaller," repeatedly asserting that U.S. Steel could make [        ] slab. *See* Opp. at 9, 15, 16, 22.  This is patently contrary to the record.  U.S. Steel's [        ] capacity was at its Great Lakes facilities, which it idled in 2019, before NLMK filed the 2020 Requests.  NLMK-198055-030, 079-80.  It remains idle today. *See* Mot. at 15 n.34.  Accordingly, in

internal and industry standard specification NLMK must meet to fill its customers' orders.

When 94% of its customers' orders are for coil that has a nominal weight of 1,000 PIW,[10]

meeting that standard is not a "preference," *but a necessity* if NLMK wishes to stay in business.

This is why NLMK has paid approximately $420 million in tariffs in order to obtain the slab it

needs.  As NLMK told Commerce, if it could obtain this slab in the U.S. and not pay those huge

sums, it would obviously do so.[11]  While Commerce may choose to put on blinders, it is plain

(and has been since 2018) that NLMK needs 10-inch slab, and there simply is no such slab

available for purchase from U.S. producers.  History has made that perfectly clear.

     Nonetheless, since 2018, Commerce has denied every single exclusion request that

NLMK has submitted, including the 2020 Requests at issue here.  It has done so with virtually

identical *boilerplate* decisions from BIS, which provide no analysis but simply state that BIS is

relying upon ITA, "Commerce's preliminary reviewing bureau."  Opp. at 36.  The ITA

recommendations, however, do not even address the fundamental fact that NLMK cannot

actually use Objectors' slab in its business to produce 1,000 PIW coil.  Since the record is clear

that NLMK cannot use Objectors' slab to get that result, whether Objectors' thinner slab are

"compositionally identical" is, in the real world, totally irrelevant.  The dispositive fact is that the

slab could not, in the regulation's parlance, "be used in {NLMK's} business activity in the

United States."  15 C.F.R. pt. 705, supp. 1(c)(6)(ii).  Commerce's failure (indeed refusal) to even

consider that reality is both inexplicable and unjustifiable.

---

its Objection Form USS identified Gary, Granite City, and Braddock, which make [████████████████████████████████] slab, respectively, as the facilities from which it could allegedly source NLMK. NLMK-111695-033, 109.  USS does not currently make, and never offered to source NLMK, [████] slab.

[10] NLMK-111695-017.  The Government knows it is inconsistent with the regulation to exclude an "industry specification" like PIW from the quality criterion, so it unconvincingly seeks in a footnote to summarily dismiss PIW as a "another way of saying that it wishes to make a particular size roll of coil."  Opp. at 15 n.6.

[11] NLMK-111695-020.

Ironically, the Government claims that Commerce's divergent reasoning for denying the 2020 Requests and failing to consider whether NLMK could actually use the Objectors' slab to make the required coil "shows that despite what language Commerce used, its decisions were substantially consistent." Opp. at 20. However, as set forth previously (Mot. at 14-27), the only "consistency" in these decisions is that they all found a way to deny the exclusions while avoiding the fundamental question of how Objectors' thinner slabs were a suitable substitute when they could not be used by NLMK to produce coil with the requisite PIW. Commerce's failure to consider this "important aspect of the problem" and its refusal to "grapple with contradictory evidence" render its decisions arbitrary and capricious. *Fred Meyer Stores, Inc. v. Nat'l Labor Relations Bd.*, 865 F.3d 630, 638 (D.C. Cir. 2017); *see Kwo Lee, Inc. v. United States*, 24 F. Supp. 3d 1322, 1330 (Ct. Int'l Trade 2014) (finding "Customs, by failing to consider important aspects of the problem before it, may have offered an explanation for its decision that runs counter to the evidence").

**B.    Commerce's Mere Reliance on Cliffs's Statements to Deny the 2021 Requests for 10-inch Slab was Arbitrary and Capricious**

With respect to the First and Third 2021 Requests that Cliffs objected to,[12] the Government argues that Commerce "was entitled to rely" on Cliffs's "certified" statement that it was capable of producing 10-inch slab to deny NLMK's requests. However, Cliffs's *capability* to make 10-inch slab is very different from it having the available *capacity* to make the product

---

[12] We address here only Request Nos. 194445, 194449, 194452, 194455, 194458, 194460, 194463, 194482, 194511, 194515, 194516, 194518, 194521, 194525, 194529, 194532, 194535, 194536, 194547, 194553, 194560, 194562, 194566, 194571, 194573, 194883, and 260914. Commerce has requested voluntary remand for Request Nos. 248733, 248740, and 260912, to which Cliffs did not object and for which Commerce arbitrarily denied based on purported ambiguities in the product description. For the reasons stated in NLMK's Opening Brief, it objects to remand as futile because the record does not permit any rational decision to deny these requests.

"reasonably available" to NLMK "in sufficient . . . amount," as the regulation requires.  15

C.F.R. pt. 705 supp. 1(c)(6)(i).  How Commerce could not recognize that is a mystery.

Nevertheless, the Government contends that, given Cliffs's statements, Commerce was

relieved of any obligation to examine the facts or to explain how Cliffs's statement that it

"could" make 10-inch slab satisfied the need to demonstrate that it had the available capacity to

make enough 10-inch slab to supply NLMK with the quantity it needed.  Shockingly, given the

facts presented to it, Commerce never received nor required any evidence whatsoever that Cliffs

had the available capacity to supply NLMK with the quantity of slab needed.  Indeed, the only

factual evidence in the record demonstrated the contrary was true.

With its First and Third 2021 Requests, NLMK submitted, under oath, affirmative,

undisputed evidence that Cliffs did not have available capacity to satisfy NLMK's needs.  *See*

Mot. at 27-30, 34-38.  But, for some reason, Commerce (and now the Government) has chosen to

ignore this evidence.  In essence, according to the Government, if one party in an adjudicatory

proceeding makes "certified" statements, Commerce can blindly accepted the "certification" and

ignore the other side's conflicting certified statements and actual countervailing evidence.  *E.g.*,

Opp. at 24.  That, of course, is not the law.

The APA requires that an agency "address detracting evidence" and refrain from

decisions that "run counter to the evidence."  *See JSW Steel (USA) Inc. v. United States*, 466 F.

Supp. 3d 1320, 1328, 1332 (Ct. Int'l Trade 2020) (Kelly, J.).  But in this case, Commerce, once

again, ignored the "detracting evidence" and reached its conclusions by simply accepting the

carefully worded "certification" from Cliffs and asking nothing further.  That, we submit, is not

rational decision making.  Quite the opposite—it is an abdication of the agency's obligation to

make an honest decision based on a weighing of evidence.  Commerce was not permitted simply to ignore, without explanation, the evidence that detracts from its desired result.[13]

Commerce's approach of accepting Cliffs's carefully worded statement, while ignoring NLMK's evidence, is particularly troubling because the records are so one-sided.  Simply certifying, as Cliffs did, that it "could" produce 10-inch slab (which is true),[14] falls far short of certifying and satisfying its obligation to show, *inter alia*, that it had the available capacity to supply NLMK.  Cliffs did not make that certification for one simple reason—it could not do so.  And that should have told Commerce all it needed to know.

For the First 2021 Requests, Cliffs was careful in its objection only to state that it is "*capable of producing this product*."[15]  It did go on to say that information regarding "production capacity and plant utilization {is} propriety information that will be provided confidentially upon request."[16]  But, Commerce inexplicably never requested that information, and Cliffs, for its part, never did provide any information even purporting to show the available capacity to supply NLMK the quantity needed.[17]  Thus, even in a vacuum, Cliffs's "certified" statement did not present a *prima facie* case that it could make enough 10-inch slab to supply NLMK.

However, given Commerce's record of denying NLMK's every request, NLMK did not let the record remain void of any evidence.  It responded with specific evidence citing two

---

[13] *Allied Tech. Grp., Inc. v. United States,* the only case the Government cites to support the claim that Commerce could rely on a party's certification, does not support it at all.  In that case, the court held that a federal contracting officer was entitled to rely on a certified statement but only "*where there is no significant countervailing evidence reasonably known to the agency evaluators that should create doubt whether the offeror will or can comply with the {representation}.*"  649 F.3d 1320, 1330-31 (Fed. Cir. 2011) (emphasis added).

[14] NLMK-194445-040.

[15] *Id.*

[16] *Id.*

[17] The Government acknowledges that Commerce asked *only* for CBI regarding Cliffs's delivery times but not regarding Cliffs's available capacity (Opp. at 23), confirming that Commerce never considered Cliffs's ability to meet the quantity criterion.

pertinent facts.  First, it provided evidence from a well-regarded and reliable industry source, and Cliffs's own website, showing that Cliffs, like ArcelorMittal before it, did not offer 10-inch slab for sale.[18]  Second, NLMK provided specific evidence from Cliffs's quarterly earnings calls that, as a condition of its purchase of the facilities, Cliffs committed to supply ArcelorMittal with 1.5 million tons of slab per year for the next five years, and therefore could not supply the slab NLMK required.[19]

In response to NLMK's evidence, Cliffs's surrebuttal said absolutely nothing about its commitment to ArcelorMittal, which rendered it unable to supply NLMK.  Instead, it stated only that it "is not responsible for the accuracy of third-party documents"—presumably responding to industry data—and that Cliffs "is actively selling slabs to customers.  Lack of publication on our website is more reflective of the fact that slab sales are to a very limited market population."[20]  What is critical here—and it is puzzling why Commerce would not have noted it—is that Cliffs again did ***not*** say that it had the available capacity to supply NLMK with the product it needed.  In fact, it *did not dispute its commitment to ArcelorMittal* at all.[21]

Ignoring the foregoing, the ITA recommendation to deny the First 2021 Requests parrots Cliffs's statements that "it can manufacture an identical product to the product in the request."[22]  It also accepted Cliffs's *ipse dixit* that the industry data were wrong.  Strangely, it totally ignored the glaring absence of any response by Cliffs to the evidence that it had committed its capacity to

---

[18] NLMK-194445-056, 059.

[19] NLMK-194445-057, 059.

[20] NLMK-194445-067-68.

[21] At best, Cliffs's cryptic reference to selling slab to "a very limited market population" actually confirms that it committed this slab to ArcelorMittal.

[22] NLMK-194445-004.

ArcelorMittal.[23]  Instead, ITA confirmed that it "does not examine the production capacity of a company" in determining whether an object meets the quantity criterion.[24]

NLMK then did what any reasonable party in its position would do.  It sought to obtain the slab from Cliffs.  As predicted, Cliffs was unable to provide any 10-inch slab to NLMK. Commerce's guidance states that if an objector is "unable to produce a requested product as they represented in their objections, the requester may submit a new request with documentation evidencing this refusal."  85 Fed. Reg. 81,060, 81,065 (Dec. 14, 2020) (BIS response to Comment (d)(1)).

Faced with its inability to secure the slab from Cliffs, NLMK followed Commerce's guidance and filed the Third 2021 Requests.  This time NLMK submitted a supplement with its requests *certifying* that it offered to purchase "180,000 tons of 250 mm slab per month" from Cliffs, and that with its offer it "provided {Cliffs} with details of its slab requirements and specifications," which were "detailed in the attached Technical Protocol for Purchased Slab."[25] It then provided a specific account of how Cliffs's response to NLMK's order was "deficient across the board," pointing out that Cliffs offered only between 10,000 and 20,000 tons (about 11% of the monthly quantity sought) of 8- and 9-inch slab (not 10-inch), with an unreasonably long delivery time (12 weeks) that failed to comply with the regulations requirement that an objector's product be available "immediately."[26]

Undaunted, Cliffs objected again, ignoring the whole incident and reiterating its familiar refrain that it was "capable of producing this product {and that} {r}esponses for production

---

[23] *Id.*

[24] NLMK-194445-006.

[25] NLMK-260914-021 (emphasis added).

[26] NLMK-260914-022.

capacity and plant utilization are proprietary information that will be provide confidentially upon request."[27]  Cliffs *did not refute or even attempt to refute NLMK's account of its unsuccessful attempts to procure the 10-inch slab*.  Rather, Cliffs confirmed that it had not attempted to sell 10-inch slab to NLMK "within the last two years," further corroborating NLMK's account of its failed attempts to purchase 10-inch slab from Cliffs.[28]

In rebuttal, NLMK recounted its unsuccessful effort to obtain slab from Cliffs, detailing once again what it specifically requested and the counter-offer to provide slab thinner than 10-inches (which NLMK could not use to produce 1,000 PIW coil), at a fraction of the volume NLMK sought.[29]  To *further* demonstrate that Cliffs was not able to supply NLMK with any 10-inch slab, NLMK attached the parties' sales correspondence, which corroborated NLMK's account.[30]

Notwithstanding the opportunity to rebut NLMK's account or contest the accuracy or completeness of the sales correspondence, *Cliffs again did not dispute NLMK's account of the Parties' dealings*.  In fact, it did not submit a surrebuttal at all.  Thus, NLMK's honest, actual record of its unsuccessful attempt to purchase the slab from Cliffs stands undisputed.

But Commerce, undeterred, summarily dismissed NLMK's sales correspondence as incomplete, and never even addressed NLMK's *certified* account of its unsuccessful efforts to obtain 10-inch slab from Cliffs.  In denying the Third 2021 Requests, Commerce stated only that "Cliffs can manufacture an identical product to the product in the request."[31]

---

[27] NLMK-260914-073.

[28] NLMK-260914-077.

[29] NLMK-260914-100-05.

[30] NLMK-260914-106-09.

[31] NLMK-260914-004.

As explained in NLMK's Opening Brief, the sales correspondence was not "incomplete."[32]  But even if it were, NLMK provided a "certified" and detailed account of the Parties' dealings.  The record thus exposes the irrationality of the Government's defense of Commerce's decisions.  If, as the Government claims, Commerce was entitled to treat Cliffs's "certified" statements as sacrosanct, then the fact that Cliffs was not willing to deny under oath that it had been unable or unwilling to satisfy NLMK's order for 10-inch slab should have compelled a fair minded agency to accept this evidence and grant the exclusions, especially since NLMK "certified" the undisputed account of the parties' dealings.  That, of course, did not happen here.

In sum, this is not, as the Government suggests, a situation in which NLMK simply "disagrees with how Commerce weighed the evidence."  Op. at 24.  This is a situation in which Commerce did not weigh the evidence at all.  Instead of "grappl{ing} with contrary evidence," Commerce *ignored the evidence*, which is impermissible.  *Fred Meyer Stores*, 865 F.3d at 638.

One further note in this regard.  Commerce has, *as a conscious and consistent practice*, refused to consider the most important aspect of any objection—namely, whether the objector has the available capacity to satisfy the quantity criterion.  That, of course, is particularly pertinent in the case of Cliffs.

As previously explained (Mot. at 42 & n.152), Commerce's Inspector General and the Government Accountability Office have both identified Commerce's refusal to require and

---

[32] The Government attempts to defend Commerce's summary rejection of NLMK's sales correspondence by arguing that NLMK's "specifications sheet" was missing from the sales correspondence.  This is nonsense.  As explained in NLMK's Opening Brief, NLMK attached its Technical Protocol for Purchased Slabs to its request; it did not need to re-attach it to the sales correspondence submitted with its rebuttal.[32]  Moreover, NLMK certified in its rebuttal that the sales correspondence concerned "the requested slab" and provided other contextualizing information; there was no possibility for Commerce to be confused as to what product the correspondence concerned.  NLMK-260914-105.  Cliffs certainly never claimed it was confused.

examine objectors' plant capacity and utilization data as a fundamental flaw in Commerce's

process.  In the Inspector General's words, because Commerce simply "rely{ies} on the

objector's assertion that it can manufacture the product covered by the {exclusion request} in a

timely manner," Commerce has denied requests where "it was unclear if the product was

available from domestic U.S. suppliers in an adequate quantity or within the required

timeframe."  U.S. Dep't of Commerce, Office of Inspector General, *Decisions on Exclusions*

*from Section 232 Tariffs Were Not Transparent and Based on Incomplete and Inaccurate*

*Information*, Final Report No. OIG-21-020-A, at 3, 5 (Jan. 25, 2021), *available at*

https://www.oig.doc.gov/OIGPublications/OIG-21-020-A.pdf ("OIG Report").

      Commerce nevertheless buried its head in the sand and continued to ignore this critical

issue, unabashedly admitting that "{w}hen determining if a company meets the quantity criteria

… ITA does not examine the production capacity of a company."[33]  And that is precisely what it

did here, despite NLMK's evidence putting that very much in issue (and indeed proving Cliffs

lacked that capacity) and Cliffs offer to provide capacity information.[34]  The deliberate decision

to ignore this critical issue renders Commerce's resulting decisions denying the 2021 Requests

arbitrary and capricious.  *SKF USA Inc. v. United States*, 630 F.3d 1365, 1374 (Fed. Cir. 2011)

(finding determination arbitrary and capricious because it failed to address contrary factors raised

in the proceedings); *Tropicana Prod., Inc. v. United States*, 31 C.I.T. 548, 565 (2007) ("By

'failing to consider several important aspects of the problem,' the {agency's} determination is

arbitrary and capricious." (quoting *State Farm*. 462 U.S. at 43) (cleaned up)).

---

[33] NLMK-111695-121.

[34] Of course, one could guess that Cliffs made its offer to supply that data knowing of Commerce's policy of refusing to look at such factual information.

### C.    Commerce Conducted No Analysis in Denying NLMK's 8-inch Requests

According to the Government, in determining whether USS could fulfill NLMK's 2021 Request for 8-inch slab "Commerce credited the business proprietary data provided by one of the domestic objectors, {USS} indicating that {USS} could 'produce 100 percent of {NLMK's} requested volume.'"  Opp. at 26.  That is simply not true.  Nothing in the BIS or ITA recommendations indicates any analysis at all of USS's confidential data.

On the contrary, as noted, ITA's recommendations confirm that "{w}hen determining if a company meets the quantity criteria … ITA does not examine the production capacity of a company."[35]  In other words, Commerce has effectively acknowledged that it *never considered the confidential information that the Government now says it did*.  Instead, according to Commerce, it only "examine{d} the response to section 3.a" in the Objection Form.[36]  Section 3.a in the Objection Form asked the objector to report:

> What percentage of the total product tonnage requirement covered under the Exclusion Request that is the subject of this Objection Filing can your organization manufacture at its U.S. plants on a timely basis?[37]

USS responded: "100%"[38]

Here, making no evaluation of the confidential data whatsoever, Commerce copied and pasted USS's Section 3.a response, finding:  "{USS} can produce 100 percent of the requested volume.  As such, U.S. Steel meets the quantity criterion."[39]  But being *able to produce 100% of the amount requested* is very different from being having the capacity to *supply the requester*

---

[35] NLMK-198055-006.

[36] *Id.*

[37] NLMK-198055-025.

[38] *Id.*

[39] NLMK-198055-004.

*with the amount needed*.  Again, this is precisely the problem that the Inspector General and Government Accountability Office have identified—Commerce purports to decide whether objectors can meet the quantity criterion without any consideration as to whether those objectors can, in reality, do so.  *See, e.g.,* OIG Report, *supra,* at 5; *see also* Mot. at 42 & n.152.  The agency's failure to make any meaningful judgment runs afoul of the APA's requirement that an agency consider important aspects of the problem to reach reasoned decisions supported by the evidence.  *State Farm*, 463 U.S. at 43; *see Kwo Lee*, 24 F. Supp. 3d at 1330 ("Customs, by failing to consider important aspects of the problem before it, may have offered an explanation for its decision that runs counter to the evidence").

Since Commerce concededly did not and does not take account of capacity, the Government cannot remedy this failure and resuscitate Commerce's arbitrary and unreasoned decisions by supplying the analysis that it wishes Commerce originally undertook.  *CS-360, LLC v. U.S. Dep't of Veteran Affs.*, 846 F. Supp. 2d 171, 185 (D.D.C. 2012).  Indeed, the fact that the Government is consistently left to conjure after-the-fact reasoning for Commerce's decisions only confirms that Commerce engaged in no reasoning of its own.  Such unreasoned decisions are *perforce* arbitrary and must be set aside.  *JSW Steel (USA) Inc.*, 466 F. Supp. 3d at 1331-32.

In any event, neither the Government's characterization of the record nor its *de novo* analysis of USS's confidential submissions is accurate.  First, the Government is wrong that "NLMK does not rely on any of its own actual data to support any of the claims it makes here today."  Opp. at 27.  As summarized in NLMK's Opening Brief, NLMK submitted specific evidence concerning its dealings with USS over a period of years, showing USS's repeated inability to supply NLMK with sufficient quantities of 8-inch slab.  Mot. at 42-43.  Of course,

Commerce addressed none of this evidence, and the Government ignores it as well, despite the fact that NLMK "certified" its submissions.

Second, the Government's "analysis" does not track the data it purports to rely on. Without highlighting all of the ways the Government distorts and misreads the data, there are at least two fundamental facts the Government's *post hoc* analysis overlooks.  The Government first ignores the fact that USS idled its Great Lakes facility in 2019, and therefore any potential production capacity at that facility was irrelevant in analyzing USS's capacity in 2021.[40]  The Government further ignores that, in 2020, the year preceding NLMK's Requests, USS sold only [        ] tons of slab in total, which was [                                    ].[41] And it sold this [      ] tons to [          ] companies, so even this limited amount of slab was not available to meet NLMK's requirements.[42]  The reason USS has such limited capacity to sell slab is that it operates integrated mills where its uses virtually all of the slab it produces to manufacture its own competing finished products.[43]

Accordingly, even if the Government's *post hoc* analysis of USS's confidential submission were relevant, that analysis is contradicted by the evidence.  But at bottom, that analysis is entirely irrelevant.  What is dispositive is that Commerce conducted no actual analysis

---

[40] NLMK-198055-030.  The Government is entirely incorrect in its suggestion that NLMK improperly cancelled an order, or that the cancellation of a single order resulted in USS's idling its Great Lakes a plant.  That is facially silly. As NLMK demonstrated, it cancelled the order "because the general sales manager responsible for the transaction deliberately misled {NLMK} on freight costs."  NLMK-198055-060.  Moreover, USS never claimed, as the Government now does, that NLMK's cancellation of that single order caused it to idle that plant.  According to USS, it idled the plant because of the COVID-19 pandemic.  NLMK-111695-040.  But, as NLMK demonstrated, USS had actually decided to idle the plant in 2019, before the world knew what COVID-19 was. NLMK-111695-080. Whatever USS's reasons for idling that plant, it had nothing to do with NLMK.

[41] NLMK-198055-080.  It was also [                                                              ], demonstrating that, even assuming *arguendo* USS could make a suitable substitute, it could not provide a sufficient quantity to NLMK.

[42] *Id.*

[43] NLMK-198055-059-60, 073.

of the record evidence concerning USS's inability to satisfy the quantity criterion, and its decisions should therefore be set aside.

### D.     Commerce was Required to Include in the Record the SME's Supposed Analyses on Which Commerce Purported to Rely

Although Commerce attempts to withhold the SME's actual evaluations from the record, the Government does not contest that the administrative record must contain "all materials that might have influenced the agency's decision."  *Invenergy Renewables LLC v. United States*, 476 F. Supp. 3d 1323, 1355 (Ct. Int'l Trade 2020); *see also Ammex, Inc. v. United States*, 62 F. Supp. 2d 1148, 1156 (Ct. Int'l Trade 1999) ("{A} document need not literally pass before the eyes of the final agency decision maker to be considered part of the administrative record.").  Therefore, in an apparent attempt to shield the SME's evaluations from disclosure, the Government tries to minimize the SME's role, arguing that the "SME was consulted as a backstop, simply because of how NLMK had presented it request."  Opp. at 37.

Even a cursory examination of Commerce's decisions puts the lie to the Government's characterization.  For thirty of the requests, Commerce did nothing more than state in conclusory fashion the SME's supposed conclusion, adopting it as its own with no explanation or analysis.[44] For example, in denying Request No. 111697, Commerce's conclusion that Objectors' offered a suitable substitute was based exclusively on its statement that "{t}he SME concluded the AK Steel and U.S. Steel objection offerings are suitable substitutes."[45]

Since Commerce "expressly adopted {*and*} incorporated by reference {the SME's evaluations} in {the} final agency decision," it must place the evaluations themselves into the

---

[44] Request Nos. 111695, 111697, 111698, 111701, 111709, 111713, 111718, 111725, 111729, 111731, 111734, 111740, 111745, 111748, 111752, 111758, 111762, 111767, 111771, 111773, 111775, 111776, 111779, 111780, 111781, 111782, 198055, 198056, 248733, and 248740.

[45] NLMK-111697-004.

record to allow this Court to meaningfully review the actual bases for Commerce's

determinations.  *U.S. Steel Corp. v. United States*, 578 F. Supp. 418, 420 (Ct. Int'l Trade 1983);

*Giorgio Foods, Inc. v. United States*, 35 C.I.T. 297, 303 (2011) (ordering government to

supplement record with internal "reports, memoranda, or communications" and "all final staff

reports" the agency relied on "at least indirectly" in reaching its conclusion).  The Government

cannot now backtrack and attempt to hide the SME analyses by rebranding them a mere

"backstop."  Opp. at 37.[46]

Fundamentally, even if, as the Government claims, the SME (along with ITA) conducted

only a "preliminary review," and the SME's evaluation was "not the only determining factor,"

Commerce undeniably considered it, and it therefore must be included in  the  record.  Moreover,

if, as the Government now claims, Commerce's decisions were based on something other than

the SME's supposed analysis, Commerce never identified or explained these other reason for its

determinations, which is yet another reason its decisions cannot stand.  *See In re Sang Su Lee*,

277 F.3d 1338, 1342 (Fed. Cir. 2002) (an agency must "not only have reached a sound decision,

but have articulated the reasons for that decision"); *State Farm*, 463 U.S. at 43 (an agency "must

examine the relevant data and articulate a satisfactory explanation for its action including a

'rational connection between the facts found and the choice made'").

---

[46] The cases the Government relies on confirm that where, as here, an agency considers a purported technical
evaluation in coming to a decision, such evaluation must be included in the administrative record.  Indeed, *Taylor
Energy Co. LLC v. United States*, in particular, proves the point, because the Court there held that technical reports
on which the agency purported to rely on reaching its conclusions were, in fact, *required* to be included in the
record.  2020 WL 6075693, at *5-6 (D.D.C. Oct. 14, 2020); *see also, e.g., Friends of Richards-Gebaur Airport v.
F.A.A.*, 251 F.3d 1178, 1189 (8th Cir. 2001) ("The FAA was entitled to rely on expert documentation *provided in
the record*{.}" (emphasis added)); *Stewart v. Potts*, 996 F. Supp. 668, 683 (S.D. Tex. 1998) (remanding for further
fact-finding on the result of the agency action; agency action was ultimately sustained because, on remand, agency
commissioned an "extensive supplemental study" that it placed into the record for the court to evaluate, *see Stewart
v. Buechler*, 34 F. App'x 152, at *1-2 (5th Cir. 2002)).

III.     **CONCLUSION**

As NLMK showed in its Opening Brief, history has demonstrated that, despite its repeated efforts, NLMK cannot obtain the slab it requires from U.S. producers.  Nonetheless since the domestic producers have been consistently successful with their objections, they continue to object without any basis, and Commerce continues to sustain their objections, ignoring evidence and offering varying explanations for its actions.

Even after NLMK has unsuccessfully sought to procure this slab from Objectors and laid the evidence before the agency, Commerce, with the maniacal focus of Inspector Javert, seems intent on making certain NLMK pays hundreds of millions of dollars in tariffs from which it should properly be excluded.  Commerce's unreasoned and unsupported denials plainly run afoul of the APA's proscription against arbitrary and capricious agency action.  The Government's *post hoc* attempts to somehow save these decisions are not only unavailing, they actually confirm that Commerce did not discharge its duty of reasoned decision-making.

For all the reasons set forth in NLMK's Opening Brief and above, NLMK respectfully requests the Court grant its Motion Pursuant to Rule 56.1 for Judgment on the Agency Record. ECF Nos. 76-77.

Dated: New York, New York
October 7, 2022

Respectfully submitted:


**CHAFFETZ LINDSEY LLP**


By: */s/ Sanford Litvack*

Sanford Litvack
Andrew L. Poplinger
R. Matthew Burke
1700 Broadway, 33rd Floor
New York, NY 10019
Tel. (212) 257-6960
Fax. (212) 257-6950
s.litvack@chaffetzlindsey.com
a.poplinger@chaffetzlindsey.com
r.m.burke@chaffetzlindsey.com

*Counsel for Plaintiff NLMK*
*Pennsylvania, LLC*

23

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chambers Procedure 2(B)(2), the undersigned certifies that Plaintiff NLMK Pennsylvania, LLC's Reply Memorandum of Law in Further Support of Its Motion Pursuant to Rule 56.1 for Judgment on the Agency Record contains 6,900 words as computed by Chaffetz Lindsey LLP's word processing system, excluding those portions that do not count toward the word limitation and, thus, complies with the Court's Chambers Procedures.

*/s/Sanford Litvack*